1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

COALVIEW CENTRALIA, LLC,
a Delaware limited liability company,

11

Plaintiff,

12

v.

13
14
15

TRANSALTA CENTRALIA MINING LLC,
a Washington limited liability company, and
TRANSALTA CORPORATION, a Canadian
corporation,

16

Defendants.

NO.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND FOR
DAMAGES

JURY DEMAND

17      Plaintiff, Coalview Centralia, LLC ("**Coalview**" or "**Plaintiff**"), through undersigned

18  counsel, hereby sues Defendants, TransAlta Centralia Mining LLC ("**TransAlta**"), and

19  TransAlta Corporation ("**TransAlta Parent**"), and alleges:

20          **INTRODUCTION: NATURE OF THE CASE, PARTIES,**
21              **JURISDICTION, AND VENUE**

22      1.      This is an action arising from TransAlta's breach and anticipatory repudiation of

23  contractual relationships between Coalview and TransAlta.  TransAlta Parent is the guarantor

24  to Coalview of the payment obligations of its controlled subsidiary TransAlta to Coalview.

25  *See*, December 2013 Guarantee Agreement between TransAlta Parent and Coalview.

26

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 1

2.     TransAlta (a) has breached its contract with Coalview by failing to pay for services Coalview rendered pursuant to the parties' agreements, and (b) has anticipatorily breached those contracts by twice stating in writing that it is unilaterally declaring its intent to terminate the parties' agreements.

3.     Through this action, Plaintiff seeks (a) declaratory relief pursuant to 28 U.S.C.A. § 2201, (b) damages for TransAlta's breach of contract and anticipatory repudiation in an amount greater than Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest, costs, and attorneys' fees, and (c) injunctive relief requiring TransAlta to continue to operate under the parties' agreements while the issue of any claimed breach is being adjudicated.

4.     Plaintiff Coalview is a Delaware limited liability company with its principal place of business in Lewis County, Washington.

5.     Defendant TransAlta is a Washington limited liability company, conducting business in Lewis County, Washington.

6.     Defendant TransAlta Parent is a Canadian Corporation, incorporated under Section 185 of the Canada Business Corporation Act.

7.     This action is one in which the United States District Court has original jurisdiction by reason of diversity of citizenship and the requisite amount in controversy, pursuant to 28 U.S.C. §1332(a)(1), in that the suit is between citizens of different states.  The amount in controversy in this case, exclusive of interest and costs, substantially exceeds $75,000.

8.     Alternatively, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) or (a)(3), in that the suit is between citizens of a state and citizens or subjects of a

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

foreign state, or between citizens of different states and in which citizens or subjects of a foreign state are additional parties.[1] The requisite amount in controversy in this case, exclusive of interest and costs, remains in excess of $75,000.

9.      More specifically, TransAlta is a Washington limited liability company ("**LLC**"), which, according to the Washington Office of the Secretary of State Corporations and Charities Division, and upon information and belief, has the following owners/members: Wayne Collins, Tecwa Fuel, Inc., Mickey Dreher, and Bob Nelson.

10.     Upon information and belief, Mickey Dreher and Bob Nelson are citizens of the state of Washington. Upon information and belief, Wayne Collins is a citizen of the state of Washington or a citizen or subject of Australia or Canada.

11.     Tecwa Fuel, Inc. is a citizen of the state of Washington as Washington is its place of incorporation and its principal place of business.

12.     TransAlta Parent is a Canadian Corporation and a citizen of Calgary, its place of incorporation and principal place of business.

13.     Coalview is a Delaware LLC, whose members/owners are comprised of three limited liability companies.

14.     The first limited liability company, Telluride Too LLC, is a Florida LLC, whose sole member/owner is an individual who is a citizen of the state of Florida.

---

[1] While Coalview maintains that this is an action between citizens of different states, to the extent TransAlta Parent is a citizen or subject of a foreign state, it is an additional party. In short, this is a legitimate dispute between diverse citizens, with aliens joined on both sides of the controversy. In other words, there are citizens and aliens on both sides of the case, and the citizens are fully diverse. *See Transure, Inc. v. Marsh and McLennan, Inc.,* 766 F.2d 1297, 1298 (9th Cir. 1985) (in cases where there are citizens and aliens on both sides of a case, jurisdiction exists under § 1332(a)(3) so long as there is complete diversity among the citizen parties and the citizen parties are legitimately involved in the underlying controversy and not present merely to establish federal jurisdiction).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 3

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

15.     The second limited liability company, Coalview Investment Partners Limited Partners 1, LLC, is a Delaware LLC, whose members/owners are an individual and the third limited liability company.  The individual is a citizen or subject of the United Kingdom.  The third limited liability company, Coalview Ltd., LLC, is a Delaware LLC, whose members/owners are eleven (11) individuals who are citizens of the state of Florida, a citizen of the state of California, a citizen of the state of Pennsylvania, a citizen or subject of the country of Switzerland, and a citizen or subject of the country of Jordan.

16.     Neither Coalview nor any of its LLC or individual owners/members are citizens of the state of Washington, where TransAlta is a citizen.

17.     Venue and personal jurisdiction is proper in the Western District of Washington under 28 U.S.C.A. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and Defendants are otherwise subject to personal jurisdiction in this judicial district.

18.     TransAlta Parent is subject to the jurisdiction of this Court pursuant to Article 8.01 of its Guarantee Agreement with Coalview, wherein TransAlta Parent agreed to "submit to the exclusive jurisdiction of the federal and state courts located in the State of Washington" for purposes of the subject matters of this action.  This lawsuit also satisfies the Due Process Clause of the Fourteenth Amendment because the harm alleged relates to TransAlta Parent's contact with Coalview in Washington State, TransAlta Parent purposely availed itself of this forum and voluntarily submitted itself to the jurisdiction of this Court by written agreement, and traditional notions of fair play and substantial justice will not be offended.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 4

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

## GENERAL ALLEGATIONS

**The Centralia Mine and the Business of the Parties**

19.     TransAlta Parent or a related entity purchased the Centralia Mine in May 2000. The Centralia Mine is a sub-bituminous surface coal mine located in Centralia, Washington about six miles northeast of the city of Centralia, in Washington State (the "**Mine**"). https://www.transalta.com/facilities/mines-operation/centralia-mine/ accessed July 24, 2018.

20.     The Mine began commercial operation in 1971. *Id.*

21.     The Mine supplied coal to TransAlta's Centralia Power Plant (owned and/or operated by TransAlta or a related entity) (the "**Power Plant**") until November 2006, when active mining operations at the Mine stopped.  *Id.*

22.     As is common with coal mines that feed power plants, the mine generated waste coal slurry ("**WCS**")[2].

23.     The WCS was stored in three impoundment structures referred to by the parties as 3B, 3C, and 3D (each structure is commonly referred to as a "**Pond**", and ponds 3B, 3C, and 3D may collectively be referred to as the "**Ponds**").  According to reports compiled by Norwest Corporation (now known as Stantec Consulting Services, Inc. ("**Stantec**")) on behalf of TransAlta and provided to Coalview, TransAlta estimated the Ponds contained approximately 18 million of tons of WCS.

24.     TransAlta owns the fee simple estate in the land upon which the Mine, the Power Plant, and the Ponds are located (the "**Land**").  *See*, December 2013 Ground Lease between Coalview and TransAlta (the "**Ground Lease**"), p. 1.

---

[2] Coal slurry is the waste product from the processing of mined coal to produce energy.  Coal slurry consists of a mixture of solids, including fine coal particles, rock, and water.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 5

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

25.     As required and as a condition of its mining permit, TransAlta agreed to reclaim WCS in the Ponds contemporaneously with the operation of the Mine, and further upon closure of the Mine.  Once TransAlta announced the closure of the Mine, it was obligated to develop a broad based reclamation plan for the WCS and the Ponds.  Reclamation entails (a) reducing risk of human injury and loss of lives, and (b) returning the land back to its approximate original contour and conditions that support the approved post-mining land use of forestry and wetlands.

26.     TransAlta's initial plan to reclaim the Ponds was to remove all of the water from the Ponds, to put dirt over the slurry, and to vegetate the top surface.  However, this initial plan proved not to be feasible because there was no way to create a stable basin to plant on.

27.     TransAlta estimated that it would cost greater than $60 million to reclaim the three Ponds in this manner.

28.     It was also TransAlta's belief at the time - and Stantec's - that there was approximately 20% of fine coal in the WCS.

29.     In order to offset the significant cost of the reclamation project, TransAlta developed a plan to dredge the WCS from the Ponds, separate the remaining fine coal from the WCS, transfer the remaining waste slurry to a more suitable storage place, and transfer the refined fine coal retrieved from the WCS to the Power Plant. It was envisioned that the value of the refined fine coal retrieved from the WCS could create an offset of the total reclamation cost.

30.     TransAlta's plan was submitted to and approved by the United States Department of Labor, Mine Safety and Health Administration ("**MSHA**") in September 2013.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 6

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

As approved, the plan was scheduled to take approximately 12 years (through 2025), assuming the slurry amount provided by TransAlta and Stantec, and provided for the "removal and reprocessing of the fine coal slurry refuse previously deposited in the [Ponds] and re-deposition of the reject from the reprocessing operation into Pond 3E or [also known as] the North Hanaford Pit." *See*, TransAlta's Operating Plan Modifications, Fine Coal Recovery Processing Project, TransAlta Centralia Mining LLC, Centralia Mine, p. 10.

31.     In connection with its plan approved by MSHA, TransAlta desired to hire Coalview on an exclusive basis to process the WCS from the Ponds "(a) into Refined Coal for use in the Centralia Power Plant, and (b) to deliver the non [sic]-Coal Slurry to a reclamation pond designated by" TransAlta (the "**Work**").  Ground Lease, p. 1.

32.     The reclamation pond designated by TransAlta to store the Non-Coal Slurry is a large "pit", referred to by the parties as Pond 3E[3].  *Id.*

33.     In order to accomplish the Work, TransAlta knew that Coalview was required "to invest considerable sums [in excess of $31,500,000.00] to build a Processing Plant and dredging operation" in 2014.  *Id.*

34.     Coalview secured part of the funding to build the processing plant and dredging operation necessary to do the Work from the proceeds of $26,500,000.00 in revenue bonds issued by the Washington Economic Development Finance Authority, an independent agency within the executive branch of the Washington State government established by the legislature to act as a financial conduit to businesses through the issuance of revenue bonds (the "**Authority**"), and $5,000,000 of additional capital.

---

[3] Although referred to by the parties as Pond 3E, Pond 3E is not a true impoundment.  Pond 3E is an abandoned mining area consisting of a large pit that could be filled with waste slurry without the need for a dam customarily found in impoundment structures.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

35.     The Authority and Coalview entered a Loan Agreement dated December 1, 2013 whereby the Authority loaned Coalview the $26,500,000.00 from the proceeds of the revenue bonds for its use in connection with building the infrastructure necessary to do the Work (the "**Loan Agreement**"). *See e.g.*, Loan Agreement, p.1 and Article 3.1.

36.     Contemporaneously with signing its Loan Agreement with the Authority, Coalview also executed a number of documents that, among other things, pledged its personal property and its interest in its Ground Lease as a security interest.

**The Parties' Master Services Agreement and Related Contracts**

37.     The parties memorialized their rights and obligations regarding the Work in several agreements.  The pertinent agreements at issue are the Master Services Agreement, the Exclusive Waste Coal Slurry Recovery and Processing Agreement ("**Processing Agreement")**, and the Exclusive Coal Tendering Agreement ("**Tendering Agreement**").  In sum, these agreements provided that TransAlta had 45 days to object to and invoke non-judicial dispute resolution procedures regarding the weighing procedures and calculations that determined the amount of TransAlta's payments to Coalview, and 30 days to object to any payment invoice that Coalview sent to TransAlta, and citing the reasons for such objection with specificity.

38.     TransAlta has not lodged any objections pursuant to the 45 day objection and dispute resolution procedures of the Processing Agreement or the Tendering Agreement, and has similarly failed to lodge any objections to Coalview's invoices within the 30 day deadline within which it contractually agreed to do so.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 8

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

39.     Years after any time to object has passed, TransAlta now belatedly claims that based on a "newly developed" third-party "review" (discussed more fully below), TransAlta was over-invoiced by almost $16,000,000.00 "from December **2014** through March 15, 2018."

40.     Based on this clearly time-barred claim, TransAlta asserts that it "intends to terminate the Master Services Agreement."  *See*, June 25, 2018 Letter from TransAlta to Coalview, attached as Exhibit "A". [4]

41.     TransAlta has no basis to terminate the Master Services Agreement.

### *The Master Services Agreement*

42.     Coalview and TransAlta entered into a Master Services Agreement that was signed by both parties as of December 15, 2013 (the "**MSA**").  Pursuant to the MSA, TransAlta hired Coalview on an exclusive basis to do the Work.

43.     The MSA is intended to "define all requirements of the Parties related to" Coalview's Work.

44.     Pursuant to the MSA, TransAlta knew and acknowledged that Coalview was "going to invest considerable sums to (a) build a Processing Plant and dredging operation, (b) Process [TransAlta's] WCS into Refined Coal for use in the Centralia Power Plant, and (c) deliver the Non-coal Slurry to a reclamation pond [Pond 3E] designated by [TransAlta]". MSA, p.1.

45.     The MSA is to continue "until December 31, 2025".  MSA, Article 2.01.

---

[4] After Coalview responded on July 11, 2018 to TransAlta's June 25, 2018  letter (explaining why TransAlta's claims are improper and too late), TransAlta revised its position in a meaningless way, refusing to retreat from its position to terminate the contract as stated in its initial letter, but now claiming TransAlta "will set off and deduct the full amount of all invoices issued by Coalview until $5,663,682 is repaid and may continue  to exercise its right of setoff until Coalview repays the entire sum of $15,815,591."  Copies of Coalview's July 11, 2018 letter and TransAlta's July 30, 2018 letter are attached as Exhibits B and C, respectively.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 9

Garvey Schubert Barer, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

46.     Pursuant to the MSA, Coalview was to "prepare calculations to support an invoice" to TransAlta "for all WCS dredged or in any way recovered by [Coalview] for Processing" in accord with the formula set forth in the parties' Processing Agreement (the "**Slurry Payment Calculation**").  MSA Article 6.01.  (The Processing Agreement is discussed below).

47.     Pursuant to the MSA, Coalview was "prepare calculations to support an invoice" to TransAlta "for all Refined Coal Tendered to [TransAlta]" in accord with the formula set forth in the parties' Tendering Agreement (the "**Refined Coal Payment Calculation**").  MSA Article 6.02.  (The Tendering Agreement is discussed below).

48.     Once Coalview determined the Slurry Payment Calculation and the Refined Coal Payment Calculation, it was to submit an invoice for those amounts to TransAlta (the "**Period Invoice**").  MSA Article 6.03.  After making any required adjustments, "[t]he Period Invoices will require [TransAlta] to pay [Coalview] the greater of the Slurry Payment Calculation or the Refined Coal Payment Calculation that corresponds to each Ton of Refined Coal Tendered for such Period Invoice."  *Id.*

49.     "[TransAlta] shall pay [Coalview] net thirty (30) days from the date of Contractor's Period Invoice."  MSA, Article 7.03.

50.     The MSA provides a deadline and procedure by which TransAlta must dispute Coalview's invoices:

> **In the event a Party in good faith disputes upon all or part of an invoice** issued under this Agreement, **written notice** of the disputed portion, **with reasons for dispute, must be given to the other Party prior to the due date of the invoice** and the undisputed portion shall be paid by the due date.  If the disputed portion is determined to have been properly due and payable,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 10

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

simple interest on that portion in dispute and which has not been paid shall accrue from the date that portion was due and payable and until that portion is paid. If the disputed portion is paid and is later determined not to have been properly due and payable, simple interest will similarly be refunded from the date payment had been received and until that portion is refunded. Interest shall be calculated at two (2) percentage point over the then current US Prime Rate as listed in the Money Rates section of the Wall Street Journal. **All invoices will be final and not subject to further adjustments or collection unless objection to the accuracy thereof is made prior to the lapse of one (1) year after the date of the invoice**.

MSA, Article 7.04.

51. TransAlta failed to follow, and in fact totally ignored, the bargained for notice and objection provisions of Article 7.04 in connection with Coalview's invoices in its June 25, 2018 letter.

### *The Processing Agreement*

52. Coalview and TransAlta entered an Exclusive Waste Coal Slurry Recovery and Processing Agreement as of December 2013 in connection with the MSA and the performance of its Work (the "**Processing Agreement**").

53. The Processing Agreement again acknowledges the importance of TransAlta's required regular periodic invoice payments to Coalview in order for Coalview to maintain its continued economic viability and to continue in business:

[t]he fees relating to the Processing of WCS and delivering Refined Coal are a critical part of the compensation to [Coalview] for (a) building and operating the Processing Plant, (b) Processing [TransAlta's] WCS, (c) tendering the Refined Coal to [TransAlta] and (d) delivering the Non-coal Slurry to [TransAlta's] Pond 3E[.]

54. In the Processing Agreement TransAlta also acknowledges the importance of contractual clarity regarding its payments to Coalview: "the Parties believe it will be mutually

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES - 11

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939*

beneficial to set the terms and conditions under which the Contractor will be compensated for Processing the WCS into Refined Coal and Non-coal Slurry". Processing Agreement, p. 2.

55.     TransAlta is to pay Coalview a base price of nine dollars ($9.00) for each dry ton of WCS recovered. Article 6.01 of the Processing Agreement states:

> For all WCS dredged or in any way recovered by Contractor [Coalview] for processing pursuant to this Agreement, Owner [TransAlta] shall pay Contractor [Coalview] the WCS base price of nine dollars ($9.00) per "dry" Ton ("WCS Base Price"), as adjusted in accordance with this Article 6.

56.     The Processing Agreement has several provisions regarding the weighing and invoicing of recovered WCS slurry.

57.     The Processing Agreement provides Coalview with wide discretion regarding how the WCS is processed and weighed, and shifts the risk of loss related to the presence of coal, if any, to TransAlta.

58.     In this regard, the Processing Agreement provides that Coalview shall "Process WCS at a volume that it determines to be commercially appropriate over the Term" because Coalview "will be incentivized to remove as much Refined Coal from the WCS as commercially practicable because [Coalview] will receive payments for the Refined Coal pursuant to the Tendering Agreement. Correspondingly, **[Coalview] makes no representation and warranty and shall have no responsibility or liability to [TransAlta] for the failure to remove Refined Coal from the WCS or the failure to meet its projections for removing Refined Coal**." Processing Agreement, Articles 3.02, 3.03 (emphasis added).[5]

---

[5] Indeed, the Processing Agreement also provides that "[TransAlta] shall not object to the amount processed in variance from [Coalview's] estimates . . . ." Processing Agreement, Article 4.04.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 12

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

59.     Also in this regard the Processing Agreement provides that "[Coalview's] weights shall govern for purposes of invoicing and payment." Processing Agreement, Article 5.04.

60.     The Processing Agreement sets forth express terms for the weighing of the WCS and for TransAlta's monitoring of the weighing process:

> Contractor [Coalview] shall cause, at its expense, the WCS to be processed and to be weighed on a continuous basis at, or as close as practically possible to, the point of dredging in accordance with current ASTM Standards, or another mutually agreed upon location or method.

Processing Agreement, Article 5.01.

> The calculation will be made by using data from the mass flow meter and density gauge located on each dredge's discharge pipe and calculated through the PLC of the processing system to determine the dry tons process. The Owner [TransAlta] will be enabled to access and monitor weighing equipment and the weighing process each processing day. Owner [TransAlta] shall have the right to analyze and verify the weighing.

*Id.*, Article 5.02.

61.     "Based on [Coalview's] weights [Coalview] will invoice [TransAlta] on a semi-monthly basis for all WCS Processed by [Coalview]" after any adjustments required by Article 6 of the MSA (*i.e.*, the Slurry Payment Calculation defined above). Processing Agreement, Article 7.01.

62.     The Processing Agreement provides both a deadline by which TransAlta must dispute Coalview's weighing calculations, and a mechanism by which TransAlta must resolve any such disputes:

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES - 13

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

1

2

3

4

5

6

7

8

9

10

> In the event a dispute arises between Owner [TransAlta] and Contractor [Coalview] **within forty-five (45) days of the date of the weighing**, due to a difference between Owner's and Contractor's calculation of the quantity of WCS that was withdrawn from Processing, **either party may retain an independent expert, mutually agreeable to Owner and Contractor, to ascertain the accuracy of Contractor's [Coalview's] density and flow equipment and to recalculate the tonnage of the WCS transported for processing by Contractor** (the "**Referee Determination**").  **The Referee Determination shall govern for the delivery in question.**  In such case, the cost incurred in arriving at the Referee Determination shall be borne by the Party whose calculation of tonnage is furthest from the Referee Determination.  In the event both Parties' tonnages differ from the independent testing laboratory result by the same amount, the Parties' shall share equally the cost of the independent expert.

11

12

Processing Agreement, Article 5.05.

13

14

15

63.     TransAlta has not lodged any complaint and has not invoked the bargained for notice of objection and dispute resolution provisions of Article 5.05 in connection with Coalview's weighing of WCS.

16

### *The Tendering Agreement*

17

18

19

64.     Coalview and TransAlta entered an Exclusive Coal Tendering Agreement as of December 2013 in connection with the MSA and the performance of Coalview's Work (the "**Tendering Agreement**").

20

21

22

23

24

65.     Like in the MSA, the Ground Lease and the Processing Agreement, in the Tendering Agreement TransAlta acknowledges Coalview's investment of considerable sums in order for Coalview to build and acquire the infrastructure to do the Work, that the Tendering Agreement is a material inducement for Coalview to obtain the loan from the Authority and to

25

26

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES - 14

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

build the Processing Plant, and that the fees Coalview is to receive pursuant to the Tendering Agreement are "critical" to Coalview.  Tendering Agreement, p. 1.

66.     TransAlta agreed to pay Coalview $42.00 per ton of any coal received, regardless of quantity, subject to certain adjustments.  Tendering Agreement, Article 8.01.

67.     "Based on [Coalview's] weights, [Coalview] will invoice [TransAlta] on a semi-monthly basis for all Refined Coal Tendered . . . ."  Tendering Agreement, Article 9.01.

68.     The Tendering Agreement has several provisions pertaining to the weighing and invoicing of any recovered coal delivered to TransAlta's Power Plant.

69.     As with the Processing Agreement, the Tendering Agreement provides Coalview with wide discretion regarding how the WCS is processed and weighed, and shifts the risk of loss, relating to the quantity of coal, if any, to TransAlta.

70.     In this regard, the Tendering Agreement provides that Coalview shall provide TransAlta with monthly estimates of "the amount of Refined Coal  . . . it expects to result from Processing" for the next four quarters and TransAlta agreed that if Coalview "is unable to Tender Refined Coal in amounts equal to the estimated Quantity, **it will have no liability** to [TransAlta] in the absence of bad faith."  Tendering Agreement, Article 3.03 (emphasis added).

71.     The Tendering Agreement sets forth express terms for the weighing of the recovered coal and for TransAlta's monitoring of the weighing process, and provides TransAlta access to the weighing, the equipment, and the right to analyze and verify the weighing and further provides that Coalview's analysis shall control for purposes of invoicing and payment:

> Contractor [Coalview] shall provide certified commercial scales at its Processing Plant to determine Refined Coal weights.  Such scales shall be calibrated and tested approximately every six (6) months in accordance with the guidelines outlined in the National

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 15

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

> Institute of Standards and Technology Handbook #44. ...the Owner [TransAlta] will be enabled to access and monitor the weighing equipment and process each Processing Day that Contractor [Coalview] is processing the WCS. Owner [TransAlta] shall have the right to analyze and verify the weighing. Contractor [Coalview] shall cause within eight (8) hours after the end of the Processing Day, the previous Processing Day's Refined Coal Tonnage to be provided to Owner [TransAlta] by a mutually agreed upon method of electronic communication. Subject to Section 5.02 below, **Contractor's [Coalview's] analysis shall govern for purposes of confirmation compliance, including for purposes of invoicing and payment**. All Refined Coal will be weighed at the delivery point by Contractor [Coalview] or its agent or affiliate in accordance with current ASTM Standards.

Tendering Agreement, Article 5.01.

72.     Like the analogous provision in the Processing Agreement, the Tendering Agreement provides both a deadline by which TransAlta must dispute Coalview's weighing calculations, and a mechanism by which TransAlta must resolve any such disputes:

> In the event a dispute arises between Owner [TransAlta] and Contractor [Coalview] **within forty-five (45) days of the date of the weighing** due to a difference between Owner's [TransAlta's] and Contractor's [Coalview's] calculation of tonnage, **either Party may retain any independent expert, mutually agreeable to Owner [TransAlta] and Contractor [Coalview], to ascertain the accuracy of Contractor's scale and to recalculate the tonnage of refined coal tendered to the delivery point by Contractor [Coalview] ("Referee Determination"). <u>The Referee Determination shall govern for the delivery period in question</u>**. In such case, the cause of the analysis made by such independent expert will be borne by the Party whose analysis is furthest from the Referee Determination. In the event both Parties' calculation of the tonnage differs from the independent expert's result by the same amount, the Parties shall share equally the cost of the independent expert.

Tendering Agreement, Article 5.02 (emphasis added).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES - 16

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

73.     The Tendering Agreement further provides that Coalview's "analysis [of the Refined Coal] shall govern for purposes of compliance, including for purposes of conformance, invoicing and payment," Tendering Agreement, Article 6.01, and provides the same dispute notice and resolution mechanism for any complaint about Coalview's analysis as is applied to a dispute regarding weighing.  *Id.*, Article 6.03.

74.     TransAlta has not lodged any complaint and has not invoked the bargained for notice of objection and dispute resolution provisions of Articles 5.02 and 6.03 of the Tendering Agreement.

**TransAlta's Improper Notice of Breach and Wrongful Repudiation and Claimed Termination of the Parties' Agreements**

75.     As discussed above, TransAlta had 45 days within which to object to weighing procedures under the Tendering Agreement and Processing Agreement.  TransAlta has not made any such objection.

76.     The MSA required TransAlta to pay Coalview no later than "net thirty (30) days from the date of" Coalview's Period Invoice.   MSA, Article 7.03.

77.     In the event TransAlta seeks in good faith to dispute an invoice, it "must" provide "**written notice** of the disputed portion, **with reasons** . . . **prior to the due date** of the invoice". MSA, Article 7.04.

78.     TransAlta has not provided any such notice under Article 7.04 of the MSA.

79.     The provisions of Article 7.04 of the MSA provide strong and bargained for economic protection to Coalview so that it may proceed with its Work on the project with economic certainty, free of doubt about TransAlta's payment obligations, and without fear that

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 17

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

TransAlta can remain silent and raise a dispute over the amounts due to Coalview months, if not years, later.

80.     But that is just what TransAlta is wrongfully attempting to do now.

81.     TransAlta's June 25, 2018 Letter to Coalview (a) improperly raises belated "objections" to Coalview's invoices dated as long ago as December **2014** (and to all invoices from that date forward through March 15, 2018), (b) claims that it overpaid Coalview by almost sixteen million dollars ($16,000,000.00), (c) states that it will not pay Coalview any further monies for any work Coalview has done[6], (d) asserts a "right of setoff as provided in Section 7.03 of the Master Agreement", and (e) claims that it is terminating the MSA thirty (30) days from its June 25, 2018 letter because of "Coalview's inaccurate invoices."  Ex. A.

82.     TransAlta's complaints come far too late and TransAlta's letter is itself a breach and an anticipatory repudiation of the parties' agreements.

83.     First, to preserve its right to contest an invoice, TransAlta *is required* to provide written notice to Coalview *prior* to the due date of that invoice, or "no later than" 30 days from when such invoice is issued.  MSA, Articles 7.03, 7.04.

84.     Accordingly, TransAlta has no ability to seek to object to Coalview's invoices dated "from December 2014 through March 15, 2018" as it claims to do in its June 25, 2018 Letter.[7]

---

[6] Since May 3, 2018, Coalview has invoiced TransAlta as follows: (a) Invoice "Revision" 2018-06-001 for $311,661.85; (b) Invoice Revision 2018-06-003for $124,256.03; and (c) Invoice 2018-07-001 for $402,688.19 (collectively, the "**Outstanding Invoices**"). TransAlta has not paid any of the Outstanding Invoices.

[7] Alternatively, and in all events, the MSA contains a one year deadline within which TransAlta must "object to the accuracy" of any invoice.  Failure to do so renders "[a]ll invoices . . . final and not subject to further adjustments or correction".  MSA Article 7.04.  Thus, in all events, TransAlta has no ability to object to Coalview's invoices dated prior to June 25, 2017 and all such invoices are "final and not subject to further adjustments or correction."

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

85. Additionally, the MSA requires that if objection to an invoice is timely made, TransAlta must provide its "reasons for the dispute." MSA, Article 7.04. TransAlta's letter itself provides no reasons for the dispute other than relying "on a review performed for TransAlta by Stantec Consulting Services, Inc." June 25, 2018 Letter, p. 1. Ex. A.

86. Even if TransAlta's objection were timely - which it is not - the Stantec "review" provides no basis for TransAlta's positions in its June 25, 2018 Letter or for invoking any provision of the parties' agreements.

87. The conclusion posited in Stantec's "review" is that "Based on the dry tons of FRC solids invoices, both the Stantec and TransAlta models show that dredging of Pond 3C should be complete." June 2018 Stantec Review, p. 5, Ex. A.[8]

88. As Coalview informed TransAlta in response to its June 25, 2018 Letter:

> Here, TransAlta did not timely raise any issues to the weighing and calculation of the quantity of WCS that was withdrawn for processing, and did not timely provide notice under the Master Services Agreement of a dispute relating to an invoice issued by Coalview. Accordingly, TransAlta's alleged dispute with respect to any past invoice is time-bared.
>
> Furthermore, **the [Stantec] survey of remaining slurry has no bearing on pay quantities pursuant to all of the project agreements. Indeed, pursuant to Article 5 of the Processing Agreement, weighing of the material is the only thing that controls payment of the invoices, not the remaining quantity of the slurry**.

Coalview's July 11, 2018 Letter to TransAlta, attached as Exhibit "B" (emphasis added).

---

[8] The Stantec Review was enclosed with the June Letter and is part of Exhibit A.

COMPLAINT FOR DECLARATORY AND
INJUNCTION RELIEF AND FOR DAMAGES - 19

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

89.     Coalview has retained the undersigned counsel to represent it in this matter and has agreed to pay such counsel a reasonable fee for their services.

90.     All conditions precedent to the bringing of this action have been complied with, waived, or otherwise satisfied.

## COUNT I – DECLARATORY RELIEF

91.     Coalview adopts and realleges the allegations set forth in Paragraphs 1 through 90 above as if fully set forth herein.

92.     This is an action for Declaratory Relief pursuant to 28 U.S.C.A. § 2201.

93.     There is an actual controversy between Coalview on the one hand, and TransAlta on the other hand, regarding: (a) whether TransAlta can now properly raise objections to Coalview's invoices dated as long ago as December **2014** (and to all invoices from that date forward through March 15, 2018), (b) whether TransAlta can properly setoff under Article 7.03 of the MSA $15,815,591.00 previously and properly paid to Coalview against further Work to be done by Coalview, and (c) whether TransAlta may terminate the MSA because of "Coalview's [claimed] inaccurate invoices", all as claimed by TransAlta in its June 25, 2018 Letter.

94.     Based upon TransAlta's June 25, 2018 Letter, it appears that TransAlta does not understand the operation of the MSA, the Tendering Agreement, and the Processing Agreement.

95.     Coalview submits that the MSA (a) prohibits TransAlta from objecting to the invoices from 2014 forward as stated in its June 25, 2018 Letter (and as it reserved in its July 30, 2018 Letter), (b) requires TransAlta to pay Coalview forthwith for the Outstanding Invoices and for Coalview's continued Work as there is no right of setoff available to

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 20

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

TransAlta and the Outstanding Invoices are overdue, and (c) prohibits TransAlta from terminating the Master Services Agreement.

96.     Article 11 of the MSA governs termination of the MSA.  Article 11 provides that a non-defaulting Party may terminate the MSA based on any of the Events of Default listed in Articles 11.02(a) - (e).  None of the noted Events of Default apply to Coalview and therefore TransAlta has no right or ability to terminate the MSA.

97.     Further, Article 7.03 of the MSA provides that "All claims for monies due or to become due from [TransAlta] to [Coalview] shall be subject to deduction or set-off by [TransAlta] by reason of any claim or counterclaim arising out of this Agreement . . . ." TransAlta has no claim against Coalview under the MSA or other contract documents and therefore has no right of set-off against Coalview's Outstanding Invoices or further Work.

98.     Lastly, in all events, the MSA requires TransAlta to pay for Coalview's Outstanding Invoices and to continue to pay for Coalview's Work on a going forward basis notwithstanding the current dispute:

> **Notwithstanding any Disputes** arising out of the [MSA], or any activities being conducted pursuant to [the MSA's Dispute Resolution procedures, **Coalview and TransAlta]** <u>**shall diligently proceed with performance**</u> of this Agreement.

MSA, Article 12.04 (emphasis added).

99.     Based on TransAlta's June 25, 2018 and July 30, 2018 Letters, TransAlta does not agree with Coalview's understanding and interpretation of the MSA and related contracts and seeks to cease its performance thereunder.

100.    Accordingly, there is a bona fide, actual, present practical need for the declaration sought herein.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES - 21

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

101.    The foregoing declaration concerns a present, ascertained, or ascertainable state of facts or present controversy to a state of facts.

102.    Coalview's rights are dependent on the facts and/or the law applicable to the facts recited herein.

103.    The parties have an actual, present, adverse, and antagonist interest in the subject matter hereof, either in fact or law.

104.    An immunity, power, privilege, or right of Coalview is dependent upon the facts or the law applicable to the facts.

105.    The antagonistic and adverse interests are all properly before this Court, and the relief sought herein is not merely the giving of legal advice by the court or the answer to questions propounded from curiosity.

**WHEREFORE**, Coalview respectfully requests a declaration from this Court as follows: (a) that TransAlta cannot now raise objections to Coalview's invoices dated from December 2014 through March 15, 2018 as such objections are time barred under the parties' agreements, (b) that the Outstanding Invoices are properly due and owing, (c) that TransAlta has no current right to setoff any sums against further Work to be done by Coalview, and has no right of setoff under Article 7.03 of the MSA regarding the $15,815,591.00 (or any part of it) as such sums were properly paid to Coalview, (d) that TransAlta may not terminate the MSA, and (e) that TransAlta must "diligently proceed with performance of" the MSA as it requires, and for such other and further relief as this Court deems just and appropriate.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

## COUNT II – BREACH OF CONTRACT
### Outstanding Invoices

106.    Coalview adopts and realleges the allegations set forth in Paragraphs 1 through 90 above as if fully set forth herein.

107.    This is an action based upon TransAlta's breach of its payment obligations to Coalview under the MSA.

108.    Coalview has performed Work under the MSA, the Tendering Agreement and the Processing Agreement.

109.    Coalview properly invoiced TransAlta for its Work in the Outstanding Invoices.

110.    TransAlta failed to object or to properly object to the Work or to Coalview's Outstanding Invoices.

111.    TransAlta failed to pay the Outstanding Invoices as required, in breach of the MSA.

112.    Coalview has been proximately damaged as a result of TransAlta's breaches.

**WHEREFORE**, Coalview respectfully requests this Court to enter judgment against TransAlta for damages in the amount of the Outstanding Invoices, interest, costs, and for such other and further relief as this Court deems just and proper.

## COUNT III – ANTICIPATORY REPUDIATION

113.    Coalview adopts and realleges the allegations set forth in Paragraphs 1 through 90 above as if fully set forth herein.

114.    TransAlta has declared in writing through its June 25, 2018 Letter and its July 30, 2018 Letter its intention not to comply with its duties under MSA, and claiming it is terminating the MSA before the term of the MSA has expired.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 23

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

115.    TransAlta's written declarations of its intent not to perform and not to further perform under the MSA, and its claim to terminate the MSA, is wrongful, positive, and unequivocal.

116.    TransAlta's disavowal of the MSA constitutes an anticipatory breach and repudiation of the MSA.

117.    The MSA provides that based on TransAlta's breach and repudiation of the MSA, TransAlta owes Coalview compensatory damages (*see,* MSA Article 11.01(b)), and the Termination Payment provided for in Article 11.07 of the MSA.

118.    Coalview has been, and will continue to be, proximately damaged as a result of TransAlta's repudiation of the MSA.

**WHEREFORE**, Coalview respectfully requests this Court to enter judgment against TransAlta for damages, interest, costs and for such other and further relief as this Court deems just and proper.

### <u>COUNT IV – BREACH OF GUARANTEE</u><br><u>(Against TransAlta Parent)</u>

119.    Coalview adopts and realleges the allegations set forth in Paragraphs 1 through 90 above as if fully set forth herein.

120.    TransAlta Parent "unconditionally and irrevocably guarantee[d] the prompt and punctual payment when due" of TransAlta's "obligations and liabilities" owed to Coalview under the parties' contracts, including the MSA.  Guarantee Agreement, p.1.

121.    TransAlta has outstanding and overdue obligations and liabilities to Coalview represented by the Outstanding Invoices.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

122.    TransAlta has failed and refuses to pay Coalview for the Outstanding Invoices and has improperly repudiated the MSA.

123.    Pursuant to its Guarantee Agreement, TransAlta Parent is obligated to pay the Outstanding Invoices owed to Coalview by TransAlta and Coalview's losses from TransAlta's repudiation of the MSA.

124.    Coalview has been damaged as a proximate result of TransAlta's failure to pay Coalview in the amount of the Outstanding Invoices and Coalview's damages resulting from TransAlta's repudiation of the MSA.

125.    To the extent any notice or demand is required to TransAlta Parent, such notice or demand would have been futile under the circumstances.

**WHEREFORE**, Coalview, respectfully requests this Court to enter judgment against TransAlta Parent for damages in the amount of the Outstanding Invoices and all other sums adjudicated to be due to Coalview, including as a result of TransAlta's repudiation of the MSA, interest, costs and for such other and further relief as this Court deems just and proper.

## <u>COUNT V – PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>

126.    Coalview adopts and realleges the allegations set forth in Paragraphs 1 through 90 above as if fully set forth herein.

127.    In reliance on its business relationship with TransAlta, Coalview sought and obtained a $26,500,000.00 loan from the Authority, and invested over $31,500,000.00 to build a processing plant, establish a dredging operation, and to purchase and build additional infrastructure to perform its Work for TransAlta.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

128.   The MSA is absolutely critical to Coalview's business because TransAlta is Coalview's sole customer and the MSA is Coalview's sole source of income.

129.   As a direct result of TransAlta's wrongful repudiation and abandonment of the MSA, Coalview is faced with the imminent risk and unavoidable harm of being forever forced out of business, being forced to lay off its entire workforce, losing more than $90 million of revenue over the remaining life of the project, and losing more than $31,500,000 of its investment.

130.   Without being able to continue operations and receiving the revenue provided by the MSA and its related agreements, Coalview will, among other things, (a) be forced out of business within approximately the next 60 days, (b) be forced to lay off its entire workforce, (c) be in default of its Loan Agreement with the Authority, (d) be forced to stop performing the important safety and environmental services it provides to the residents of Centralia, Washington and beyond in connection with the reclamation of the Ponds, and (e) face the foreclosure and seizure of its assets, including all of its plant, property, and equipment that it pledged.

131.   Coalview would no longer exist as an ongoing entity, and could never recover from the dire results arising from TransAlta's improper repudiation of the MSA.

132.   Indeed, the MSA prohibits TransAlta from repudiating and terminating the MSA and requires TransAlta to pay for Coalview's Outstanding Invoices and to continue to pay for Coalview's Work on a going forward basis notwithstanding the current dispute:

> **Notwithstanding any Disputes** arising out of the [MSA], or any activities being conducted pursuant to [the MSA's Dispute Resolution procedures, **Coalview and TransAlta] shall diligently proceed with performance** of this Agreement.

MSA, Article 12.04 (emphasis added).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 26

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

133.    Coalview is entitled to preliminary (and thereafter permanent) injunctive relief because (a) Coalview will suffer irreparable injury if the relief is denied, (b) Coalview will probably prevail on the merits, (c) the balance of potential harm favors Coalview, and (d) the public interest favors granting Coalview relief.

134.    Alternatively, Coalview is entitled to preliminary (and thereafter permanent) injunctive relief (a) because it can demonstrate a combination of probable success and the possibility of irreparable injury, or (b) because serious questions are raised and the balance of hardships tips sharply in Coalview's favor.

135.    Coalview is likely to succeed on the merits by showing that (a) TransAlta has improperly sought, and declared its intent, to terminate the MSA; (b) Coalview is not in breach of the MSA, (c) TransAlta is not entitled to set off prior payments against Coalview's future Work, (d) TransAlta owes Coalview the amounts billed in the Outstanding Invoices, and (e) TransAlta anticipatorily repudiated the MSA.

**WHEREFORE**, Coalview respectfully requests this Court to enter preliminary and permanent injunctive relief against TransAlta, and TransAlta's officers, agents, servants, employees, and attorneys; and all other persons who are in active concert or participation with TransAlta and TransAlta's officers, agents, servants, employees, and attorneys as follows: (a) immediately requiring TransAlta to proceed under the MSA and the parties' related agreements according to their terms, (b) immediately requiring TransAlta to pay Coalview the Outstanding Invoices, (c) requiring TransAlta to timely pay Coalview for the Work done or to be done under the MSA and the parties' related agreements according to their terms, and (d) prohibiting TransAlta from setting off any prior payments made to Coalview against any of

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

Coalview's future Work, and for such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Coalview hereby demands trial by jury of all issues so triable.

DATED this 8th day of August, 2018.

GARVEY SCHUBERT BARER, P.C.


By  *s/David R. West*
    David R. West, WSBA #13680

By  *s/Donald B. Scaramastra*
    Donald B. Scaramastra, WSBA #21416

By  *s/Daniel J. Vecchio*
    Daniel J. Vecchio, WSBA #44632
    1191 Second Avenue, 18th Floor
    Seattle, WA  98101
    Telephone:  (206) 464-3939
    Fax:  (206) 464-0125
    Email:  drwest@gsblaw.com
    Email: dscaramastra@gsblaw.com
    Email:  dvecchio@gsblaw.com
    *Attorneys for Plaintiff*

KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.


By  *s/Steve I. Silverman*
    Steve I. Silverman, Fla. Bar No. 516831
By  *s/Philippe Lieberman*
    Philippe Lieberman, Fla. Bar No. 27146
    Miami Center, 27th Floor
    201 South Biscayne Boulevard
    Miami, FL  33131
    Telephone:  (305) 379-9000
    Fax:  (305) 379-3428
    Email:  ssilverman@klugerkaplan.com
    Email:  plieberman@klugerkaplan.com
    *Of-Counsel for Plaintiff*
    *(Pending Admission Pro Hac Vice)*

GSB:9620824.4

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND FOR DAMAGES  - 28

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*