UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COALVIEW CENTRALIA, LLC,

           Plaintiff,

    v.

TRANSALTA CENTRALIA MINING LLC,

           Defendant.

CASE NO. C18-5639 RBL

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER is before the Court on Plaintiff Coalview's Motion for a Preliminary Injunction [Dkt. # 3].

The case arises out of a dispute over the performance of series of agreements related to the environmental cleanup (reclamation) of Defendant TransAlta Central Mining's coal mine and associated power plant near Centralia. The mine closed in 2006. The power plant is scheduled to begin shutting down in 2020. Under the Department of Labor Mine Safety and Health Administration (MSHA)'s supervision, and with its approval, the site is to be cleaned up and restored by 2030.

In 2013, TCM hired Coalview to perform the reclamation work, and specifically to clean up and restore three waste coal slurry impoundment sites, or "ponds." Each pond is more than

100 acres. Because the ponds had usable, fine coal solids within the slurry, the parties planned to recover and use that coal at the power plant, which would offset the cost of the reclamation project. In general terms, the plan was to dredge the ponds, extract the usable coal fines, and deliver the remaining slurry to a new and presumably better reclamation pond for final disposal. Coalview was to be paid based on the *weight* (not the volume) of the waste slurry (and coal) it removed from the ponds. The mechanisms and formulae for measuring this removed and recovered slurry are technical, complicated and disputed. Coalview claims it invested more than $31 million[1] to build a processing plant and the dredging operation preparing to perform the contracts.

The contract specifically at issue is the Master Services Agreement (MSA). Coalview claims and demonstrates that the MSA contemplated that Coalview would regularly invoice TCM for the work it was performing (and TCM's agreement to promptly pay those invoices), to pay for Coalview's capital investments in the project. To the same end, TCM agreed that Coalview would continue the Work through 2025. Coalview's monthly invoices were based on the weight of the slurry removed and the weight of the usable coal recovered, and TCM was obligated to pay the greater price within 30 days. The MSA also imposed a strict deadline on TCM to review and object to any invoice, and provide that any invoice was final after one year.

From Coalview's perspective, a critical feature of the MSA was the parties' agreement to "diligently" continue working (and paying for work) in the event of "any dispute" arising out of the agreement:

> **12.04** Notwithstanding any Disputes arising out of this Agreement, or any activities being conducted pursuant to this Article 12, Contractor and Owner shall diligently proceed with performance of this Agreement.

---

[1] Of this, Coalview obtained a $26,500,000 loan funded by bonds issued by the Washington Economic Development Finance Authority. Coalview pledged is assets as security for the loan.

[Dkt. # 4-7 (Fish Affidavit), Exhibit G (MSA), at 17].

A dispute arose in May of this year. Coalview claims it sent three[2] invoices totaling about $850,000, which TCM has refused to pay. In June, TCM sent Coalview a letter objecting to invoices dating to December 2014, claiming it had already overpaid Coalview by some $16,000,000[3], advising Coalview would not pay any more, and purporting to terminate the parties' contractual relationship if Coalview did not refund the excess payments in 30 days:

> This letter is to advise you that TransAlta intends to exercise its right of setoff as provided in Section 7.03 of the Master Agreement. Starting with Coalview's current invoice and continuing until the entire sum of $15,815,591 is repaid, TransAlta will set off and deduct the full amount of all invoices issued by Coalview.
>
> In addition, TransAlta hereby notifies Coalview that the amount of $15,815,591 is immediately due from Coalview to TransAlta; that Coalview's failure to pay this amount constitutes an Event of Default under Section 11.02 of the Master Agreement; and that pursuant to Section 11.02, if Coalview does not cure its default within 30 days of its receipt of this notice, TransAlta intends to terminate the Master Agreement immediately upon expiration of that time period.

[Dkt. # 4-11 (Fish Affidavit), Exhibit K (TCM's June Letter), at 17].

Attached to the letter was a report by Santec (a consultant), estimating the volume of coal slurry and coal fines *left in* the three ponds—far more than should have remained, based on TCM's initial estimates of the total volume, and on the amount Coalview removed and invoiced. The implication of Santec's report is that Coalview actually removed far less slurry and coal fine solids than it claimed, and that TCM paid far too much for the work actually accomplished.

Coalview sued, claiming TCM breached the parties' agreements. It now seeks to enjoin TCM from terminating the relationship, and requiring TCM to comply with the "continuing to diligently perform while the dispute is resolved" aspect of the MSA. It seeks to preserve the

---

[2] The number is presumably higher as of the date of this Order. As the parties now know, the Court has had medical issues that delayed the resolution of this Motion, precluded oral argument, and led to the relatively truncated nature of this Order.

[3] At the time of the letter, TCM had paid Coalview something over $30,000,000 under the agreements.

*status quo ante*, and claims (and demonstrates) that unless it is so enjoined Coalview and its investment and its business will cease to exist. It argues that Coalview's current dispute of old invoices is time-barred, and that the MSA requires it to continue to perform diligently notwithstanding the dispute. It argues the MSA specifically prohibits TCM from "sitting quietly by while Coalview performs the work, then objecting years later to the invoices it already paid"—exactly, it claims, what is happening here. It also argues that the billing issue results from the fact Santec measured what was left, not what Coalview removed from the ponds. And it argues that TCM has anticipatorily breached the MSA by stating that it would be terminated if the $16,000,000 "overpayment" was not re-paid by the end of July.

TCM argues that the agreements place squarely on Coalview the obligation to use good practices, to correctly determine the dry weight of the recovered coal fine solids, and to submit accurate invoices. It claims that the agreements also specifically provide that the failure to "pay any amount due" is an event of default, permitting it to terminate the agreements. It also argues that to the extent Coalview is unable to pay its debts (is insolvent), that too is a default under the MSA. TCM argues that because Coalview has not paid (and apparently cannot pay) the $16,000,000 TCM claims it owes, it is in default. TCM argues that it is entitled to invoke the agreements' set off provision, setting off Coalview's $16,000,000 debt against its accruing invoices[4].

Of course, these arguments pre-suppose that Coalview *does* owe TCM $16,000,000. TCM's primary claim is that it recently learned that Coalview "deliberately" "cheated" it out of that money, and that Coalview 'does not dispute' that it did so—instead, it claims, Coalview

---

[4] TCM made the same argument in its June Letter, which claimed the right to offset the debt against current and future invoices, while simultaneously demanding full payment within 30 days, under threat of termination.

claimed only that it was "too late" for TCM to re-visit prior invoices. TCM claims that

Coalview's work has been slowed by technical challenges, and that it has repeatedly missed

target completion dates (specifically with respect to Pond 3C). TCM claims that, despite the

amount of work and WCS it has paid for, it realized this spring that Pond 3C still seemed to be

"half full." TCM claims it estimated at the start that Pond 3C contained about 3.7 million tons of

WCS, and Coalview had already billed it for removing about 3.7 million dry tons of WCS

through March of this year.

TCM engaged Santec to evaluate the situation. It claims Santec confirmed the accuracy

of TCM's initial estimate, and that Santec and TCM then each independently estimated that

Coalview removed only about *1.65* million tons. They arrived at this figure by subtracting the

WCS amount they estimate remains (apparently, 2.05 million tons) from the WCS amount it

estimated at the start (3.7 million tons). Based on this arithmetic, TCM claims that Coalview

deliberately overcharged it by more than 100% for the WCS it actually removed from Pond 3C.

TCM does not directly address the amount of WCS that Coalview removed (and

contemporaneously measured) over time. It describes a number of historical technical measuring

flaws, discrepancies, problems, and potential mis-calibrations. And it claims that since the Santec

report, it has been "closely" monitoring Coalview's dredging and measuring, and Coalview's

invoice amounts are "down"—a reduction it attributes to Coalview no longer fraudulently

inflating its invoices. It does not claim that the measuring equipment was off by more than

100%; instead, it claims that Coalview flatly lied about the amount of slurry it removed and

about how much useable coal fine solids it recovered for use in the power plant. TCM claims it

agreed to set off only the last year's worth of overpayment ($5.65 million) against current and

accruing invoices, but that instead of responding, Coalview sued.

Coalview emphasizes that the MSA (1) imposes a strict period for objecting to an invoice and (2) requires continued performance while the dispute is resolved, but it does *not* "concede" that it overcharged TCM. It also points out inconsistencies in TCM's position: though it now seeks to re-visit invoices dating to December 2014, its own narrative is that until 2016, Coalview's work was proceeding apace and it was on schedule to finish Pond 3C at the end of 2017. Coalview claims the calibration or measuring issue that arose (in 2016) was quickly resolved, and it claims that the new 2017 'Ronan" Meter was properly calibrated despite TCM's claim to the contrary.

Most importantly, Coalview emphasizes what was apparent on the Court's first reading of TCM's response: Its "deliberate overcharging" claim necessarily depends on (1) the accuracy of its pre-reclamation estimates of the volume of the waste coal slurry and coal fine solids in the ponds, (2) the accuracy of its estimates about the volume remaining today, and (3) the deliberate inaccuracy of the far-more-carefully measured WCS that Coalview removed from Pond 3C.

Coalview demonstrates that TCM initially estimated the ponds together contained 47 million tons. But—perhaps in an effort to secure government approval for its clean-up plan in the first place—it reduced that estimate to 21 million tons (based on historic records of coal use by the power plant), and then to the current figure, 18 million tons (for reasons that are unclear). Coalview also argues that it told TCM that its estimates were low, and that TCM acknowledged that the environmental clean-up costs were more than it anticipated earlier this year. Coalview also claims its own expert does not agree with the 18 million ton estimate, and emphasizes that the contract pays based on the weight of the removed coal slurry, not its volume. Finally, Coalview emphasizes that under the contracts, TCM (the owner of problem and the entity liable for the clean-up) bore the risk of under-estimating the size or cost of the problem, not Coalview.

1    TCM filed a Surreply [Dkt. # 26], arguing primarily that Coalview was required to

2    dispute TCM's claim that Coalview cheated it out of $16,000,000 in its initial motion, and that it

3    is too late to do so in reply to the Response that first made that accusation. This argument is not

4    persuasive. TCM's Motion to Strike the Reply (and the Supplemental Fish Declaration) is

5    DENIED.

6    **A. Preliminary Injunction Standard.**

7        To obtain a TRO or a preliminary injunction, the moving party must show: (1) a likelihood of

8    success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of

9    preliminary relief; (3) that a balance of equities tips in the favor of the moving party; and (4) that

10   an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

11   (2008).

12       Traditionally, injunctive relief was also appropriate under an alternative "sliding scale"

13   test. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). However, the Ninth

14   Circuit overruled this standard in keeping with the Supreme Court's decision in *Winter*.

15   *American Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)

16   (holding that "[t]o the extent that our cases have suggested a lesser standard, they are no longer

17   controlling, or even viable"). Nevertheless, as Coalview argues and TCM seems to concede,

18   injunctive relief is warranted if the movant raises "serious questions" going to the merits, and

19   demonstrates that the balance of hardships that tips sharply in its favor (coupled with the other

20   factors). *See Alliance for the Wild Rockies v Cottrell*, 632 F.3d 1127,1131-36 (9th Cir. 2011).

21   **B. Likelihood of Success on the Merits.**

22       TCM argues that Coalview cannot show any chance of success on the merits. The Court

23   does not agree. First, Section 7.04 and provides TCM a 30 day window to "dispute" an invoice

24   and to explain what it is objecting to and why. Section 7.04 also provides a one-year period for

1  correcting invoice "inaccuracies." These provisions are not in conflict. The parties clearly

2  contemplated substantive disputes over the Work, and the possibility of invoicing errors, and

3  they agreed in advance how (and when) any errors or disputes would be handled. Coalview's

4  pointing to these intentionally short time frames in seeking an injunction (in response to a

5  termination letter) is not a "concession" that it defrauded TCM; it is simply a cleaner path. The

6  contract imposes a bright line deadline, while the accuracy of various estimates and

7  measurements raises far more complicated factual questions.

8          More importantly from Coalview's perspective, TCM agreed to that "notwithstanding

9  any Disputes" the parties "shall diligently proceed with performance of [the MSA]." Even if

10  TCM can substantively object to Coalview's weighing and billing issues going back more than

11  30 days, it is patently clear that they agreed to keep performing in the meantime. The contract's

12  "set off" procedure does not trump this provision when one party unilaterally claims the other

13  has defrauded it. The accuracy of TCM's "cheating" accusation is an open question; it certainly

14  has not been resolved in TCM's favor based on the Santec report. The MSA did not envision or

15  permit the "self-help" set off that TCM is seeking to impose.

16          It is not surprising that a major, long-term environmental clean-up turned out to be more

17  involved, slower, bigger, and more expensive than the parties thought it would be when they

18  started. That is often, if not typically, the case. Coalview points out (and TCM implicitly

19  concedes) that the contracts imposed those risks on TCM.

20          At the very least, there are serious questions going to the merits of Coalview's claims.

21  Coalview has met the first requirement for injunctive relief.

22  **C.  Irreparable injury.**

23          TCM's response to Coalview's claim that it will be irreparably harmed in the absence of

24  injunctive relief is a little bit unusual. It does not dispute that its termination of the MSA and

other contracts will put Coalview out of business, cause it to lay off its employees, and to lose its substantial investment in the project. Instead, it claims that that result is likely even if the Court enjoins the termination and requires the parties to "diligently proceed" while they resolve the underlying contract dispute.

Coalview claims that if TCM pays for current work it will 'continue as a going concern." Coalview has demonstrated that it will suffer irreparable harm in the absence of injunctive relief.

**D. Balancing of Equities.**

TCM argues that the equities tip in its favor: If it is required to continue to perform the MSA (by permitting Coalview to continue to dredge the ponds and clean up the site, and to pay Coalview for doing so) it is unlikely it will ever recover the debt it claims Coalview owes.

Coalview points out that in the absence of in injunction, Coalview will cease to exist and its secured creditors will take its assets. In that case, TCM has no chance of recovering the alleged debt, and it will have to find a new contractor to clean up the site. The balance of hardships tips sharply in favor of Coalview, and in favor of an injunction.

**E. Public Interest.**

TCM similarly claims that the public has an interest in permitting it unilaterally to terminate the MSA primarily because Coalview's pace of work is "slow." This too is counterintuitive. Stopping work altogether is slower than whatever pace is occurring now. The MSHA has not weighed in on this dispute, but it appears that it is forcing TCM to clean up the site. The public interest is not served by having the clean-up work stop altogether, having it delayed pending a lengthy litigation, or while a new contractor is located selected and hired to continue the work, at an unknown pace and cost. This factor too weighs heavily in favor of injunctive relief.

**F. Bond.**

TCM asks the Court to require Coalview to post a $5.6 million bond in order to obtain injunctive relief. This amount is based on what it claims is one year of Coalview's inflated invoices. Coalview advocates no bond, arguing that the contract requires TCM to do what Coalview asks the Court to force it to do—continue working while the underlying dispute is resolved. It argues that a bond is supposed to protect a party from an improvidently entered injunction, not to secure the other parties' compensation—compensation that, in the absence of an injunction, TCM is not likely to recover. *See Metro PCS Mew York LLC v. 35-36 Broadway, Inc.,* 2018 WL 3455500 at *1 (W.D. Wash, July 18, 2018).

The Court will require Coalview to post a **$500,000 bond** as security for the injunction. It should do so within seven days. Effective as of the date the bond is posted, Coalview's Motion for a Preliminary Injunction preserving the *status quo ante* is **GRANTED**:

TransAlta Central Mining LLC and its officers, agents, servants, employees, and attorneys; and all other persons who are in active concert or participation with TransAlta and TransAlta's officers, agents, servants, employees, and attorneys, **ARE ENJOINED** as follows: (a) TransAlta is immediately required to proceed under the MSA and the parties' related agreements according to their terms, (b) TransAlta is immediately required to pay Coalview its Outstanding Invoices, (c) TransAlta is required to timely pay Coalview for the Work done or to be done under the MSA and the parties' related agreements according to their terms, and (d)

//

//

//

TransAlta is prohibited from setting off any prior payments made to Coalview against any of Coalview's future Work absent Order of this Court.

**IT IS SO ORDERED**.

Dated this 30th day of October, 2018.

_____
Ronald B. Leighton
United States District Judge