1

2                                                    THE HONORABLE RONALD B. LEIGHTON

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10

COALVIEW CENTRALIA, LLC,
11   a Delaware limited liability company,          NO. 3:18-cv-05639

12                                    Plaintiff,    PLAINTIFF'S MOTION FOR
                                                    SUMMARY JUDGMENT
13            v.
                                                    NOTE ON MOTION CALENDAR:
14   TRANSALTA CENTRALIA MINING LLC,
     a Washington limited liability company, and   AUGUST 2, 2019
15   TRANSALTA CORPORATION, a Canadian
     corporation,                                   ORAL ARGUMENT REQUESTED
16
                                     Defendants.
17

18

19

20

21

22

23

24

25

26

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

Plaintiff, COALVIEW CENTRALIA, LLC ("**Coalview**"), pursuant to Fed. R. Civ. P. 56, moves for summary judgment with respect to Defendant, TransAlta Centralia Mining LLC's ("**TCM**") Amended Counterclaim (D.E. 140) (the "**Counterclaim**"). There is no genuine issue of material fact and TCM's counterclaims are barred as a matter of law under the parties' unambiguous contracts. Accordingly, summary judgment should be entered in Coalview's favor on all three counts of TCM's Counterclaim.[1]

## I.   <u>INTRODUCTION</u>

This action involves a dispute over Coalview's invoices issued for work performed by Coalview pursuant to several highly negotiated, lengthy, and all-encompassing contracts that dictate all of the parties' respective rights, remedies, and responsibilities.[2] TCM's Counterclaims allege claims for (I) Breach of Contract; (II) Breach of the Duty of Good Faith and Fair Dealing; and (III) Fraud, all arising under the same theory that Coalview's invoices, issued pursuant to the parties' agreements, were inflated. D.E. 140. Thus, notwithstanding their labels, these Counterclaims present a pure issue of contract interpretation regarding the parties' unambiguous agreements, and more specifically, regarding when TCM is permitted to lodge objections to Coalview's invoices under the Master Services Agreement (the "**MSA**").

Accordingly, TCM's Counterclaims present a question of law, exclusively within the purview of the Court, which can and should be decided upon summary judgment. In fact, the

---

[1] While Coalview has intended to file this motion for some time, as soon as Coalview informed TCM of its intent to file this motion, TCM, although not having done so for the prior eight months, immediately sought leave to amend its Counterclaim to add a fraud claim. D.E. 112. Coalview subsequently moved to dismiss the fraud claim (D.E. 132) because, as acknowledged by TCM, the purported fraud claim "is based on the same basic practices and conduct that underpin TransAlta's original counterclaim." D.E. 112 at 8. The Court denied the motion to dismiss on July 8, 2019. D.E. 152. Thus, this motion is now ripe to be brought.

[2] While this case also involves TCM's repeated and improper efforts to terminate the parties' agreements, that dispute is not the subject of this motion.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

Court has already performed the relevant legal analysis and made the relevant legal findings in its October 30, 2018 Order Granting Motion for Preliminary Injunction (the "**Injunction Order**") (D.E. 34). Accordingly, if the Court, consistent with its legal conclusions made in the Injunction Order, maintains that "Section 7.04 [of the MSA] [   ] provides TCM a 30 day window to 'dispute' an invoice and to explain what it is objecting to and why", D.E. 34 at 7, and that this deadline is "a ***strict [or bright line] deadline*** on TCM to review and object to any invoice" D.E. 34 at 2 and 8 (emphasis added), then summary judgment should be entered in Coalview's favor on TCM's Counterclaims, all of which arise from TCM's untimely objection to Coalview's invoices. Accordingly, summary judgment should be entered against TCM regarding its June 20**18** objection to Coalview's invoices dating back to 20**14**, with TCM's Counterclaims being limited to the period thirty days prior to TCM's June 2018 objection, as provided by the parties' unambiguous agreements and as previously determined by the Court.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

### a.  The Centralia Mine and the Business of the Parties

1.      In May 2000, Tecwa Fuel, Inc., the sole member of TCM, purchased the Centralia Mine, which is a sub-bituminous surface coal mine located in Centralia, Washington, located about six miles northeast of the city of Centralia, Washington (the "**Mine**"). *See* D.E. 140 (TCM's Answer), ⁋9 and 18.[3]

2.      The Mine, which began commercial operation in 1971, *id.*, ⁋19, supplied coal to TCM's Centralia Power Plant (owned and/or operated by TCM or a related entity) (the "**Power Plant**") until November 2006, when active mining operations at the Mine stopped. *Id.*, ⁋20.

---

[3] Each reference in the Statement of Undisputed Material Facts to TCM's Answer is to TCM admitting, in part or in whole, the corresponding allegation in Coalview's Amended Complaint (D.E. 135), unless otherwise noted.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

3.      As is common with coal mines that feed power plants, the mine generated waste coal slurry ("**WCS**")[4]. *Id.*, ⁋21. The WCS was stored in three impoundment structures referred to by the parties as 3B, 3C, and 3D (each structure is commonly referred to as a "**Pond**", and ponds 3B, 3C, and 3D may collectively be referred to as the "**Ponds**"). According to reports compiled by Norwest Corporation (now known as Stantec Consulting Services, Inc. ("**Stantec**")) on behalf of TCM, TCM estimated in 2009 that Ponds 3B, 3C, and 3D contained approximately 18 million of tons of WCS. *Id.*, ⁋22.

4.      TCM owns the fee simple estate in the land upon which the Mine, the Power Plant, and the Ponds are located (the "**Land**"). *Id.*, ⁋23. As required and as a condition of its mining permit, TCM agreed to reclaim WCS in the Ponds contemporaneously with the operation of the Mine, and further upon closure of the Mine. Once TCM announced the closure of the Mine, it was obligated to develop a broad based reclamation plan for the WCS and the Ponds.  Reclamation entails (a) reducing risk of human injury and loss of lives, and (b) returning the land back to its approximate original contour and conditions that support the approved post-mining land use of forestry and wetlands. *Id.*, ⁋24.

5.      TCM considered removing the water from the ponds, putting dirt over the slurry, and vegetating the surfaces as one option for reclaiming the ponds, but determined that this option was not cost-effective. *Id.*, ⁋⁋25 and 26. In order to offset the significant cost of the reclamation project, TCM developed a plan to dredge the WCS from the Ponds, separate the remaining fine coal from the WCS, transfer the remaining waste slurry to a more suitable storage place, and transfer the refined fine coal retrieved from the WCS to the Power Plant. It

---

[4] Coal slurry is the waste product from the processing of mined coal top produce energy.  Coal slurry consists of a mixture of solids, including fine coal particles, rock, and water.  D.E. 140, ⁋21.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

was envisioned that the value of the refined fine coal retrieved from the WCS could create an offset of the total reclamation cost. *Id.*, ¶28. The plan was submitted to and approved by the United States Department of Labor, Mine Safety and Health Administration ("**MSHA**") and the Office of Surface Mining Reclamation and Enforcement ("**OSME**"). *Id.*, ¶29.

6.     In connection with its plan approved by MSHA, TCM desired to hire Coalview on an exclusive basis to process the WCS from the Ponds "(a) into Refined Coal for use in the Centralia Power Plant, and (b) to deliver the non [sic]-Coal Slurry to a reclamation pond designated by" TCM (the "**Work**"). *Id.*, ¶30.

7.     The reclamation pond designated by TCM to store the Non-Coal Slurry is a large "pit", referred to by the parties as Pond 3E[5]. *Id.*, ¶31.

8.     In order to accomplish the Work, Coalview informed TCM that it would be investing considerable sums to build a processing plant and dredging operation. *Id.*, ¶32.

9.     Coalview secured part of the funding to build the processing plant and dredging operation necessary to do the Work from the proceeds of $26,500,000.00 in revenue bonds issued by the Washington Economic Development Finance Authority, an independent agency within the executive branch of the Washington State government established by the legislature to act as a financial conduit to businesses through the issuance of revenue bonds (the "**Authority**"). *Id.*, ¶33.

**The Parties' Master Services Agreement and Related Contracts**

10.     The parties memorialized their rights and obligations regarding the Work in several agreements. The pertinent agreements at issue include the MSA (attached as **Exhibit**

---

[5] Although referred to by the parties as Pond 3E, Pond 3E is not a true impoundment.  Pond 3E is an abandoned mining area consisting of a large pit that could be filled with waste slurry without the need for a dam customarily found in impoundment structures. D.E. 140, ¶31.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

"**A**"), the Exclusive Waste Coal Slurry Recovery and Processing Agreement (the "**Processing Agreement**") (attached as **Exhibit "B"**), and the Exclusive Coal Tendering Agreement (the "**Tendering Agreement**") (attached as **Exhibit "C"**). *Id.*, ¶36.

### *The Master Services Agreement*

11. Coalview and TCM entered into the MSA, which was signed by both parties as of December 15, 2013.  *Id.*, ¶46. Pursuant to the MSA, TCM hired Coalview on an "exclusive basis" to do the Work. Ex. A (MSA), p. 1, Recitals, Second Whereas Clause.

12. Pursuant to the MSA, TCM knew and acknowledged that Coalview was "going to invest considerable sums to (a) build a Processing Plant and dredging operation, (b) Process [TCM's] WCS into Refined Coal for use in the Centralia Power Plant, and (c) deliver the Non-coal Slurry to a reclamation pond [Pond 3E] designated by [TCM]". Ex. A (MSA), p. 1, Recitals, Third Whereas Clause; *see also* D.E. 140, ¶48 (stating MSA speaks for itself).

13. The MSA is intended to "define **_all_** requirements of the Parties related to" Coalview's Work. Ex. A (MSA), p. 1, Recitals, Sixth Whereas Clause (emphasis added).

14. The term of the MSA "continue[s] in effect until December 31, 2025". Ex. A (MSA), Article 2.01; *see also* D.E. 140, ¶49 (stating MSA speaks for itself).

15. Pursuant to the MSA, Coalview was to "prepare calculations to support an invoice" to TCM "for all WCS dredged or in any way recovered by [Coalview] for Processing" in accord with the formula set forth in the parties' Processing Agreement (the "**Slurry Payment Calculation**."). Ex. A (MSA), Article 6.01; *see also* D.E. 140, ¶50 (stating MSA speaks for itself).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

16.     Also pursuant to the MSA, Coalview was to "prepare calculations to support an invoice" to TCM "for all Refined Coal Tendered to [TCM]" in accord with the formula set forth in the parties' Tendering Agreement (the "**Refined Coal Payment Calculation**.").  Ex. A (MSA), Article 6.02; *see also* D.E. 140, ₱51 (stating MSA speaks for itself).

17.     Once Coalview determined the Slurry Payment Calculation and Refined Coal Payment Calculation, it was to submit an invoice for those amounts to TCM (the "**Period Invoice**"). After making required adjustments, "[t]he Period Invoices will require [TCM] to pay [Coalview] the greater of the Refined Coal Payment Calculation or the Slurry Payment Calculation that corresponds to each Ton of Refined Coal Tendered for such Period Invoice." Ex. A (MSA), Article 6.03; *see also* D.E. 140, ₱52 (stating MSA speaks for itself).

18.     The MSA further provides that "[TCM] shall pay [Coalview] net thirty (30) days from date of Contractor's Period Invoice." Ex. A (MSA), Article 7.03; *see also* D.E. 140, ₱53 (stating MSA speaks for itself).

19.     Paragraph 7.04 of the MSA imposes a strict deadline and procedure by which TCM must dispute Coalview's invoices:

> **In the event a Party in good faith disputes upon all or part of an invoice** issued under this Agreement, **written notice of the disputed portion, with reasons for dispute, must be given to the other Party prior to the due date of the invoice** and the undisputed portion shall be paid by the due date. . . .

Ex. A (MSA), Article 7.04 (emphasis added); D.E. 140, ₱54 (stating MSA speaks for itself).[6]

---

[6] While here, and in other instances, TCM also "specifically denies" that the agreements provide the deadline or procedure stated therein, as TCM admits, the agreements speak for themselves, and TCM's denial of unambiguous contract language does not create any issue of fact.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

**The Processing Agreement**

20.     Coalview and TCM entered into the Processing Agreement as of December 2013 in connection with the MSA and the performance of its Work. D.E. 140, ⁋56.

21.     The Processing Agreement again acknowledges the importance of TCM's required regular periodic invoice payments to Coalview in order for Coalview to maintain its continued economic viability and to continue in business:

> [t]he fees relating to the Processing of WCS and delivering Refined Coal are a critical part of the compensation to [Coalview] for (a) building and operating the Processing Plant, (b) Processing [TCM's] WCS, (c) tendering the Refined Coal to [TCM] and (d) delivering the Non-coal Slurry to [TCM's] Pond 3E[.]

Ex. B (Processing Agreement), p. 1, Recitals, Ninth Whereas Clause; *see also* D.E. 140, ⁋57 (stating Processing Agreement speaks for itself).

22.     In the Processing Agreement, TCM also acknowledges the importance of contractual clarity regarding its payments to Coalview:  "the Parties believe it will be mutually beneficial to set the terms and conditions under which the Contractor will be compensated for Processing the WCS into Refined Coal and Non-coal Slurry".  Ex. B (Processing Agreement), p. 2, Recitals, Eleventh Whereas Clause; *see also* D.E. 140, ⁋58 (stating Processing Agreement speaks for itself).

23.     The Processing Agreement provides that TCM is to pay Coalview a base price of nine dollars ($9.00) for each dry ton of WCS recovered:

> For all WCS dredged or in any way recovered by [Coalview] for processing pursuant to this Agreement, Owner [TCM] shall pay [Coalview] the WCS base price of nine dollars ($9.00) per "dry" Ton ("WCS Base Price"), as adjusted in accordance with this Article 6.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

Ex. B (Processing Agreement), Article 6.01; *see also* D.E. 140, ¶59 (stating Processing Agreement speaks for itself).

24.    The Processing Agreement has several provisions regarding the weighing and invoicing of recovered WCS slurry.  Ex. B (Processing Agreement); *see also* D.E. 140, ¶60 (stating Processing Agreement speaks for itself).

25.    The Processing Agreement provides that Coalview shall "Process WCS at a volume that it determines to be commercially appropriate over the Term" because Coalview "will be incentivized to remove as much Refined Coal from the WCS as commercially practicable because [Coalview] will receive payments for the Refined Coal pursuant to the Tendering Agreement.  Correspondingly, **[Coalview] makes no representation and warranty and shall have no responsibility or liability to [TCM] for the failure to remove Refined Coal from the WCS or the failure to meet its projections for removing Refined Coal**."  Ex. B (Processing Agreement), Articles 3.02, 3.03 (emphasis added)[7]; *see also* D.E. 140, ¶62 (stating Processing Agreement speaks for itself).

26.    The Processing Agreement also provides that "[Coalview's] weights shall govern for purposes of invoicing and payment." Ex. B (Processing Agreement), Article 5.04; *see also* D.E. 140, ¶63 (stating Processing Agreement speaks for itself).

27.    The Processing Agreement sets forth express terms for the weighing of the WCS and for TCM's monitoring of the weighing process:

> [Coalview] shall cause, at its expense, the WCS to be processed and to be weighed on a continuous basis at, or as close as practically possible to, the point

---

[7] The Processing Agreement also provides that "[TCM] shall not object to the amount processed in variance from [Coalview's] estimates . . . ."  Ex. B (Processing Agreement), Article 4.04. D.E. 140, ¶62 (stating Processing Agreement speaks for itself).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

of dredging in accordance with current ASTM Standards, or another mutually agreed upon location or method.

Ex. B (Processing Agreement), Article 5.01.

The calculation will be made by using data from the mass flow meter and density gauge located on each dredge's discharge pipe and calculated through the PLC of the processing system to determine the dry tons process. [TCM] will be enabled to access and monitor weighing equipment and the weighing process each processing day. [TCM] shall have the right to analyze and verify the weighing.

*Id.*, Article 5.02; *see also* D.E. 140, ¶64 (stating Processing Agreement speaks for itself).

28. The Processing Agreement further provides that "[b]ased on [Coalview's] weights, [Coalview] will invoice [TCM] on a semi-monthly basis for all WCS Processed by [Coalview]" after any adjustments required by Article 6 of the MSA (*i.e.*, the Slurry Payment Calculation defined above). Ex. B (Processing Agreement), Article 7.01; *see also* D.E. 140, ¶65 (stating Processing Agreement speaks for itself).

29. The Processing Agreement provides a strict deadline and procedure by which TCM must dispute Coalview's weighing calculations, and a mechanism by which TCM must resolve any such disputes:

In the event a dispute arises between [TCM] and [Coalview] **within forty-five (45) days of the date of the weighing**, due to a difference between [TCM's] and [Coalview's] calculation of the quantity of WCS that was withdrawn from Processing, **either party may retain an independent expert, mutually agreeable to [TCM] and [Coalview], to ascertain the accuracy of [Coalview's] density and flow equipment and to recalculate the tonnage of the WCS transported for processing by [Coalview]** (the "**Referee Determination**"). **The Referee Determination shall govern for the delivery in question.** In such case, the cost incurred in arriving at the Referee Determination shall be borne by the Party whose calculation of tonnage is furthest from the Referee Determination. In the event both Parties' tonnages differ from the independent testing laboratory result by the same amount, the Parties' shall share equally the cost of the independent expert.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

Ex. B (Processing Agreement), Article 5.05; *see also* D.E. 140, ¶66 (stating Processing Agreement speaks for itself).

### The Tendering Agreement

30.     Coalview and TCM entered into the Tendering Agreement as of December 2013 in connection with the MSA and the performance of Coalview's Work. D.E. 140, ¶68.

31.     Like in the MSA, the Ground Lease, and the Processing Agreement, in the Tendering Agreement, TCM acknowledges Coalview's investment of considerable sums in order for Coalview to build and acquire the infrastructure to do the Work, that the Tendering Agreement is a material inducement for Coalview to obtain the loan from the Authority and to build the Processing Plant, and that the fees Coalview is to receive pursuant to the Tendering Agreement are "critical" to Coalview.  Ex. C (Tendering Agreement), p. 1, Recitals; *see also* D.E. 140, ¶69 (stating Tendering Agreement speaks for itself).

32.     TCM agreed to pay Coalview $42.00 per ton of any coal received, regardless of quantity, subject to certain adjustments. Ex. C (Tendering Agreement), Article 8.01; *see also* D.E. 140, ¶70 (stating Tendering Agreement speaks for itself).

33.     The Tendering Agreement provides that "[b]ased on [Coalview's] weights, [Coalview] will invoice [TCM] on a semi-monthly basis for all Refined Coal Tendered . . . ." Ex. C (Tendering Agreement), Article 9.01; *see also* D.E. 140, ¶71 (stating Tendering Agreement speaks for itself).

34.     The Tendering Agreement has several provisions pertaining to the weighing and invoicing of any recovered coal delivered to TCM's Power Plant.  Ex. C (Tendering Agreement); *see also* D.E. 140, ¶72 (stating Tendering Agreement speaks for itself).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

35.     The Tendering Agreement sets forth express terms for the weighing of the recovered coal and for TCM's monitoring of the weighing process, and provides TCM access to the weighing, the equipment, and the right to analyze and verify the weighing and further provides that Coalview's analysis shall control for purposes of invoicing and payment:

> [Coalview] shall provide certified commercial scales at its Processing Plant to determine Refined Coal weights.  Such scales shall be calibrated and tested approximately every six (6) months in accordance with the guidelines outlined in the National Institute of Standards and Technology Handbook #44.  …  [TCM] will be enabled to access and monitor the weighing equipment and process each Processing Day that [Coalview] is processing the WCS.  [TCM] shall have the right to analyze and verify the weighing.  [Coalview] shall cause within eight (8) hours after the end of the Processing Day, the previous Processing Day's Refined Coal Tonnage to be provided to [TCM] by a mutually agreed upon method of electronic communication.  Subject to Section 5.02 below, **[Coalview's] analysis shall govern for purposes of confirmation compliance, including for purposes of invoicing and payment**.  All Refined Coal will be weighed at the delivery point by [Coalview] or its agent or affiliate in accordance with current ASTM Standards.

Ex. C (Tendering Agreement), Article 5.01 (emphasis added); *see also* D.E. 140, ¶75 (stating Tendering Agreement speaks for itself).

36.     Like the analogous provision in the Processing Agreement, the Tendering Agreement provides a deadline by which TCM must dispute Coalview's weighing calculations, and a mechanism by which TCM must resolve any such disputes:

> In the event a dispute arises between [TCM] and [Coalview] **within forty-five (45) days of the date of the weighing** due to a difference between [TCM's] and [Coalview's] calculation of tonnage, **either Party may retain any independent expert, mutually agreeable to [TCM] and [Coalview], to ascertain the accuracy of [Coalview's] scale and to recalculate the tonnage of refined coal tendered to the delivery point by [Coalview] ("Referee Determination"). The Referee Determination shall govern for the delivery period in question**. In such case, the cause of the analysis made by such independent expert will be borne by the Party whose analysis is furthest from the Referee Determination. In the event both Parties' calculation of the tonnage differs from the independent expert's result by the same amount, the Parties shall share equally the cost of the independent expert.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

Ex. C (Tendering Agreement), Article 5.02 (emphasis added); *see also* D.E. 140, ⁋76 (stating Tendering Agreement speaks for itself).

37.     The Tendering Agreement further provides that Coalview's "analysis [of the Refined Coal] shall govern for purposes of compliance, including for purposes of conformance, invoicing and payment", Ex. C (Tendering Agreement), Article 6.01, and provides the same dispute notice and resolution mechanism for any complaint about Coalview's analysis as is applied to a dispute regarding weighing.  *Id.*, Article 6.03; *see also* D.E. 140, ⁋77 (stating Tendering Agreement speaks for itself).

**The Work**

38.     In or about December 2014, Coalview began dredging Pond 3C and invoicing TCM for the work performed. D.E. 140 (Counterclaim), ⁋11.

**TCM's June 25, 2018 Letter**

39.     On June 25, 2018, TCM sent a letter to Coalview stating, in material part:

Coalview invoiced TransAlta a total of approximately $30,674,591 for fine coal refuse solids and slurry as part of the Fine Coal Recovery Project from December 20**14** through March 15, 2018. Based on a review performed for TransAlta by Stantec Consulting Services Inc., **TransAlta has determined that Coalview's inaccurate invoices have resulted in an overpayment by TransAlta of $15,815,591 over this time**.

This letter is to advise you that TransAlta intends to exercise its right of setoff as provided in Section 7.03 of the Master Agreement. Starting with Coalview's current invoice and continuing until the entire sum of $15,815,591 is repaid, TransAlta will set off and deduct the full amount of all invoices issued by Coalview.

In addition, TransAlta hereby notifies Coalview that **the amount of $15,815,591 is immediately due from Coalview to TransAlta; that Coalview's failure to pay this amount constitutes an Event of Default under Section 11.02 of the Master Agreement; and that pursuant to Section 11.02, if Coalview does not cure its default within 30 days of its receipt of this notice, TransAlta intends**

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

**to terminate the Master Agreement immediately upon expiration of that time period**.

D.E. 135-1, Ex. A (emphasis added). The June 25, 2018 Letter is attached as **Exhibit "D"**.

40.    TCM's June 25, 2018 Letter enclosed an estimate from its agent, Stantec, of the "total weight of fine coal refuse tailings solids" contained in Ponds 3B, 3C, and 3D. *Id.* In the attached estimate, Stantec states that:

> This memorandum provides details which focus on the volume of FCR solids which have been removed from Pond 3C **from project inception (December 2014) to March 20, 2018**, when a pond sounding survey of Pond 3C was completed by TransAlta. **Stantec has been tasked with estimating the volume of FCR slurry solids removed from Pond 3C based on the March 20, 2018 bathymetric survey and the pond solids model generated in May 2018 by Stantec**.

*Id.* (emphasis added).

**TCM's Counterclaim**

41.    TCM's Counterclaim alleges three causes of action: (1) Breach of Contract; (2) Breach of the Duty of Good Faith and Fair Dealing; and (3) Fraud.

42.    In each of its three counts, TCM seeks "approximately $15,815,591 or such other amount as it may prove at trial", all relating to the period of "December 2014 to March 15, 2018." D.E. 140 (Counterclaim), ¶¶ 16, 31, 37, and 44 (emphasis added).

43.    TCM admits it was not until June 2018 that it first lodged an objection seeking approximately $16 million from Coalview based on objections to invoices going back to December 2014. D.E. 140 (Counterclaim), ¶27, and see generally, *id.* at ¶¶ 16, 31, 37, and 44.

**The Lawsuit and the Injunction Order**

44.    On August 8, 2018, Coalview filed its Complaint (D.E. 1) and Motion for Preliminary Injunction (D.E. 3).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

45.     On October 30, 2018, after extensive briefing by the parties, the Court entered its Injunction Order. D.E. 34. A copy of the Injunction Order is attached as **Exhibit "E."**

46.     The Injunction Order required TCM (1) to immediately proceed under the parties' agreements according to their terms; (2) to immediately pay Coalview its Outstanding Invoices (as therein defined); (3) to timely pay for work going forward pursuant to the parties' agreements, and (4) prohibiting Coalview from setting off any prior payments made to Coalview against future work absent order of the Court. D.E. 34 at 11-12.

47.     Further, in the Injunction Order, the Court reviewed and thoroughly analyzed the parties' contracts, and agreed with Coalview that the MSA requires TCM to raise any objection to an invoice within 30 days.  Thus, the Court determined "Section 7.04 [of the MSA] [  ] provides TCM a 30 day window to 'dispute' an invoice", D.E. 34 at 7, which is "a ***strict deadline*** on TCM to review and object to any invoice." D.E. 34 at 2 (emphasis added); *see also id.* at 8 ("The contract imposes a ***bright light deadline***" for TCM to object) (emphasis added).

### III.     ARGUMENT AND AUTHORITIES

**A. Summary Judgment Standard**

A motion for summary judgment should be granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Cox v. Cash Flow Investments, Inc.,* C17-5495 RBL, 2018 WL 6724767, at *1 (W.D. Wash. Dec. 21, 2018) (Leighton, J.) (granting plaintiff's motion for partial summary judgment as to defendants' counterclaim) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986)). A court may construe a contract and grant summary judgment when contractual language is "plain and unambiguous." *Zurich Am. Ins. Co. v. ABM Indus., Inc.,* 397 F.3d 158,

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

164 (2d Cir. 2005); *see also Ion Audio, LLC v. Bed, Bath & Beyond, Inc.,* 15-CV-8292 (KMW), 2019 WL 1494398, at *4 (S.D.N.Y. Apr. 2, 2019) (granting summary judgment because contract was unambiguous, and there was no dispute as to any material fact).[8]

Here, the undisputed facts are to be applied to the parties' unambiguous contract language, which dictates that TCM's objection, made in June 2018, to invoices dating back to 2014, is untimely, and, thus, TCM's Counterclaims are barred as a matter of law.

**B.  TCM's Invoice Objection was Indisputably <u>Untimely</u>**

TCM's June 25, 2018 Letter improperly sought to raise an objection to Coalview's invoices from December **2014** through March 15, 2018*,* claiming that TCM overpaid Coalview by almost sixteen million dollars, beginning on the very first day that Coalview commenced work.  There is no issue of law or fact, let alone a material issue, that TCM's objection to invoices dated more than 30 days prior to its June 2018 objection was not timely under Section 7.04 of the MSA.

Paragraph 7.04 of the MSA imposes a strict, bright line 30 day deadline for TCM to object to Coalview's invoices. Ex. A (MSA), Article 7.04 ("**In the event a Party in good faith disputes upon all or part of an invoice** issued under this Agreement, **written notice of the disputed portion, with reasons for dispute, must be given to the other Party prior to the due date of the invoice** and the undisputed portion shall be paid by the due date.") (Emphasis added); *see also* D.E. 34 at 7-8. Under Article 7.03 of the MSA, payment on invoices is due

---

[8] All of the parties' agreements, including the MSA, the Processing Agreement, the Tendering Agreement, and the Guarantee Agreement (the "**Guarantee**") provide that New York law governs. *See* MSA, §20.01; Processing Agreement, §11.01; Tendering Agreement, §13.01; Guarantee, §8.01. In any event, the same principle applies under Washington law: "[i]nterpretation of an unambiguous contract is a question of law, thus summary judgment is appropriate." *DiNardo v. Wow 1 Day Painting, LLC*, C16-1600JLR, 2018 WL 513584, at *10 (W.D. Wash. Jan. 23, 2018) (granting summary judgment based on "plain language" of agreement) (citing *Dice v. City of Montesano*, 128 P.3d 1253, 1257 (Wash. Ct. App. 2006)).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

"net thirty (30) days." Ex. A (MSA), Article 7.03. If TCM had any objection to Coalview's invoices, including the objection TCM raised in June 2018, it had to provide written notice, *with reasons for the dispute, **prior to the due date of the invoice**, i.e., within 30 days*. Ex. A (MSA), Article 7.04. The Agreements detail at length the clear and unambiguous terms and conditions governing the parties' relationship. The Agreements specifically outline Coalview's Work, and the method to calculate Coalview's invoices. *Id.*, Article 6.01-6.03. The Agreements also state the method and deadlines to voice any objection to the weighing of materials, and to the accuracy of invoices issued. *Id.*, Article 7.04; Ex. B (Processing Agreement), Article 5.05; Ex. C (Tendering Agreement), Article 5.02. These provisions intentionally provide Coalview with security that TCM could not stay quiet while Coalview performs the Work, and then object to Coalview's invoices years later, exactly as has happened here.

Moreover, any issue regarding historical invoices, including, without limitation, any disputes about "calculation of Tonnage" or "calculation of the quantity of WCS that was withdrawn for Processing"[9] over 45 days old is unquestionably untimely and now barred pursuant to Article 5 of the Processing Agreement and Article 5 the Tendering Agreement. *See* Exs. B and C. Additionally, the MSA provides that Coalview will be paid, *within 30 days of invoicing,* the greater of the amount calculated based on the *weight of slurry removed* from the Ponds and the amount calculated based on *the weight of coal recovered* from the Ponds and delivered to the Power Plant. Ex. A (MSA), Article 6.03.

**C. Summary Judgment is Properly Entered Against TCM on its Breach of Contract Claim (Count I)**

---

[9] TCM's belated objection in its June 2018 letter was based on Stantec's estimate of the "total weight of fine coal refuse tailings solids" contained in Ponds 3B, 3C, and 3D that was attached to TCM's June 25, 2018 Letter. Ex. D.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

As the Court determined in its Injunction Order, the MSA clearly and definitively "imposes a [30 day] bright line deadline" within which TCM must object to an invoice. D.E. 34, at 8.  Here, it is undisputed that TCM did not timely raise any objection within 30 days of an invoice in accordance with the MSA (or any other Agreement) to invoices or work dating back to 2014 that it now claims to object to. To the contrary, TCM sat in wait, allowing Coalview to perform the Work for years and at considerable cost, until June 25, 2018 when it first objected to invoices dating back to the first day that Coalview began its Work in December 2014—long after the time for raising objections had passed. Thus, TCM unequivocally failed to meet the "bright line deadline" of the MSA, and TCM's breach of contract claim contesting such invoices fails as a matter of law.

The fundamental objective when interpreting contract terms is to give effect to the intention of the parties as expressed in the unambiguous language of the agreement. *USI Ins. Services LLC v. Miner*, 801 F. Supp. 2d 175, 185 (S.D.N.Y. 2011).  A court must give effect to all of the provisions of a contract, and an interpretation that renders a term superfluous or meaningless must be avoided if possible. *Id.* The Court has already interpreted the contract terms in its Injunction Order, giving effect to the intention of the parties as expressed in the unambiguous language of the agreement, and giving effect to all of the provision of the contracts. D.E. 34. Accordingly, the Court need only apply its findings from the Injunction Order as a roadmap to granting this motion for summary judgment in Coalview's favor on TCM's breach of contract claim.[10]

---

[10] Coalview refers to, and incorporates by reference, its briefing on the preliminary injunction. D.E. 3 (Motion for Preliminary Injunction); D.E. 4 (Affidavit of Roger Fish in Support of Motion for Preliminary Injunction); D.E. 21 (Reply in Support of Motion for Injunction); D.E. 23 (Supplemental Declaration of Roger Fish in Support of Motion for Preliminary Injunction).

[PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT] - 18

The record is clear and unambiguous that TCM did not timely raise any objection to the weighing of slurry or coal. *See*, *e.g.*, Ex. D; *see also* D.E. 140 (Counterclaim), ¶27. Accordingly, TCM's breach of contract claim fails as a matter of law because New York law is clear that TCM cannot avail itself of a claim under the contract where it failed to comply with its terms. *See Frontier Communications of the W., Inc. v. N. Am. Long Distance Corp*., 2001 WL 1397856, at *4 (W.D.N.Y. Oct. 24, 2001) (granting summary judgment as defendant "lost its right to avail itself of the dispute resolution mechanism provided for in the Agreement" where defendant failed to comply with clear and explicit mechanism to dispute invoices set forth in contract). In *Frontier*, the plaintiff sued for unpaid fees billed pursuant to a contract, and the defendant asserted a defense claiming plaintiff breached the contract by improperly billing it. Plaintiff argued that defendant failed to timely dispute the invoices in writing with supporting documentation within sixty days of receipt as required by the contract. The *Frontier* court granted summary judgment in favor of plaintiff, finding the underlying contract to be unambiguous:

> *Pursuant to the clear and explicit terms of the Agreement*, <u>NALD Canada</u> <u>was required to pay the invoices</u>-including the disputed portions-in full and ***then dispute them in writing,*** with supporting documentation, ***within sixty*** ***days***. It is undisputed that NALD Canada did not pay the disputed invoices-as it was required to do and as it had agreed to do pursuant to paragraph 4 of the Agreement; accordingly NALD Canada breached the Agreement. Furthermore, because the Agreement required NALD Canada to pay the invoices timely and in full and then dispute any contested charges in writing, with supporting documentation, within 60 days of the invoice date and ***because this time frame has long since expired, NALD Canada has lost its*** ***right to avail itself of the dispute resolution mechanism provided for in the*** ***Agreement***.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

*Id.* at *4 (emphasis added). The *Frontier* court entered summary judgment because "when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." *Id.*

Further similar to the case at hand, in *McFadyen Consulting Group, Inc. v. Puritan's Pride, Inc.*, 928 N.Y.S.2d 87, 89 (2011), plaintiff, McFadyen, entered into a master services agreement with defendant, PPI, to perform computer programming services. Under the terms of the contract, McFadyen was to submit invoices to PPI on a semimonthly basis. Further pursuant to the contract, PPI was required to notify McFadyen of any dispute with respect to any invoice, in writing, within 15 days after submission of the invoice. PPI terminated the contract because it allegedly was dissatisfied with McFadyen's performance.[11] At the time, PPI had not paid for several of McFadyen's outstanding invoices. Accordingly, McFadyen filed suit based on the unpaid invoices, and PPI asserted counterclaims for breach of contract and fraudulent misrepresentation. The trial court entered summary judgment in favor of McFadyen (and the appellate court affirmed) because PPI failed to "dispute th[e] invoices in the manner provided in the contract and did not pay the amounts due." *Id.* (citing *Castle Oil Corp. v. Bokhari*, 861 N.Y.S.2d 730, 731 (2008) (summary judgment proper where defendant failed to object in ordinary course of business to invoices)). The court further entered judgment dismissing PPI's counterclaims for breach of contract to recover the amounts paid to McFadyen under the contract and for fraudulent misrepresentation. *Id.*[12]

---

[11] Unlike here, the contract in *McFayden* permitted either party to terminate the contract with 30 days' notice.

[12] *See also Brunelle & Hadjikow, P.C. v. O'Callaghan,* 126 A.D.3d 584, 584–85, 6 N.Y.S.3d 49 (N.Y. App. Div. 2015) (affirming summary judgment where plaintiff performed extensive services for defendant, defendant made approximately thirty payments between 2003 and 2006 without objection, and agreed to pay outstanding amount, which precluded current objection to how majority of invoices were calculated, and finding that defendant failed to raise issue of fact where letter sent in 2006 failed to comply with the contract's objection requirements); *Rayham*

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1   Here, where TCM's time to dispute invoices has long since expired under the clear,

2   explicit, and unambiguous terms of the MSA, and TCM indisputably failed to "dispute th[e]

3   invoices in the manner provided in the contract", *McFadyen*, 928 N.Y.S.2d at 89, TCM "has

4   lost its right to avail itself of the dispute resolution mechanism provided for in the

5   Agreement[s]." *Frontier*, 2001 WL 1397856, at *4. Indeed, the Court has already determined

6   that the MSA provides a clear and express 30 day "bright line deadline" within which TCM

7   must object to an invoice, D.E. 34 at 7-8, which deadline TCM admittedly failed to meet.

8

9   **D.  Summary Judgment is Properly Entered Against TCM on its Breach of Duty of Good Faith and Fair Dealing Claim (Count II)**

10

11   Just as TCM's breach of contract claim fails as a matter of law, TCM's breach of duty

12   of good faith and fair dealing claim cannot survive and summary judgment must be entered

13   against TCM on Count II. "New York law ... does not recognize a separate cause of action for

14   breach of the implied covenant of good faith and fair dealing when a breach of contract claim,

15   based upon the same facts, is also pled." *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 15-CV-

16   8292 (KMW), 2019 WL 1494398, at *10 (S.D.N.Y. Apr. 2, 2019). In *Ion*, the court entered

17   summary judgment on an implied covenant of good faith and fair dealing claim because it was

18   "duplicative of" the breach of contract claim, and "there [wa]s no meaningful distinction

19   between the facts underlying each claim." *Id.* The court further held that "where claims for

20   breach of contract and breach of the implied covenant are both pled, the implied covenant claim

21   can survive dismissal 'only 'if it is based on allegations different than those underlying the

22

23

24

25   *v. Multiplan, Inc.*, 153 A.D.3d 865, 868, 61 N.Y.S.3d 90, 93 (N.Y. App. Div. 2017) (affirming summary judgment dismissing complaint where defendants established they did not breach agreement as defendants afforded plaintiffs contractually-required notice and opportunity to object; plaintiff's claim failed because it failed to object in writing within 30-day notice period to amendment of contract, as required under contract).

26

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

accompanying breach of contract claim' and if the relief sought is not 'intrinsically tied to the damages allegedly resulting from the breach of contract.'" *Id.*[13]

Here, only a cursory review of TCM's Counterclaim is needed to determine that TCM's breach of good faith and fair dealing claim is wholly duplicative of, and rests on the same alleged practices as, its contract claim, and seeks the exact same damages. *See*, e.g. D.E. 140, ¶35 ("TCM reasonably expected that Coalview would fulfill its contractual obligations in good faith without TCM's oversight"); ¶36 (Coalview's actions described above [comprising TCM's breach of contract claim] breached the covenant of good faith and fair dealing implied in the Agreements"); ¶37 (claiming exact same damages as in breach of contract claim). Indeed, permitting TCM's breach of good faith claim to survive would be inconsistent with the parties' unambiguous contract language (including the "bright line" deadline provided in the MSA), in violation of governing law. *See Gill v. Bowne Glob. Sols., Inc.,* 777 N.Y.S.2d 712, 713 (2004) (affirming dismissal of complaint for breach of contract and breach of implied covenant of good faith and fair dealing, as "[w]hile under appropriate circumstances an obligation of good faith and fair dealing may be implied, *no obligation will be implied which would be inconsistent with the terms of the contract*") (emphasis added). Here, TCM's claim in Count II is flatly inconsistent with the covenants it agreed to in the MSA because TCM seeks in Count II to ignore the 30 day deadline to object to Coalview's invoices, and indeed seeks to wholly

---

[13] *See also Simon v. Unum Group*, 2008 WL 2477471, at *2 (S.D.N.Y. June 19, 2008) (dismissing good faith and fair dealing claim as "[i]f the allegations underlying the breach of the implied covenant of good faith claim and the breach of contract claim are the same, then the good faith claim is 'redundant' and cannot survive a motion to dismiss"); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (affirming dismissal with prejudice claim for breach of implied covenant of good faith and fair dealing claim because good faith and fair dealing claim and breach of contract claim "clearly rest[ed] on the same alleged deceptive practices").

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

negate it. Accordingly, summary judgment should be entered against TCM on its Counterclaim in Count II for breach of the duty of good faith and fair dealing.

**E.  Summary Judgment is Properly Entered Against TCM on its Fraud Claim (Count III)**

Similar to its breach of good faith count, TCM's fraud claim is wholly duplicative of its breach of contract claim. Indeed, TCM's fraud claim is premised entirely on the _exact same_ allegations as TCM's contractual claims, and is inextricably intertwined with, and duplicative of, TCM's contract claim and the damages the contract claim seeks to recover.[14] Indeed, the purported fraud claim is alleged in only six new paragraphs in addition to all of the contract allegations that the count incorporates wholesale, and even all of those six paragraphs relate _only_ to the parties' contracts and the alleged obligations arising therefrom. _See_ D.E. 140, ¶ 39 (claiming Coalview misrepresented amounts of WCS removed from Pond 3C [pursuant to the contracts]; ¶41 ("The amounts of WCS that Coalview has removed from Pond 3C are material because **such amounts are the basis under the Agreements** for how much Coalview may invoice TCM") (emphasis added); ¶42 (TCM relied on representations when deciding whether to pay or challenge Coalview's invoices [issued pursuant to the agreements]); ¶43 ("**the Agreements** do not compel TCM to monitor Coalview's activities or verify **Coalview's fulfillment of its contractual obligations**") (emphasis added).[15] Additionally, in addition to

---

[14] Significantly, TCM's purported fraud claim incorporates by reference allegations 1 through 37 of the Counterclaim, which includes not only the exact same general allegations that _support_ TCM's contract claims, but also all of the allegations contained _in_ the contract claims. _See_ D.E. 140, ¶38 (incorporating wholesale all of the allegations of its contract claims into the fraud count). Thus, TCM's pleading itself demonstrates that the contract and fraud claims are based on identical facts and are identical, but for their title.

[15] Moreover, while TCM may allege that the Agreements do not compel TCM to monitor the activities, it is an allegation without any teeth or substance.  The agreements do authorize TCM to access and monitor the "testing, calibration and certification of [Coalview's] scales" and the "weighing equipment and processes" D.E. 140 at ¶9 (citing Tendering Agreement, ¶5.1 and Processing Agreement, ¶5.02).  There is no allegation that TCM tried to do so and was prevented by Coalview. D.E. 140, _in passim_.

GARVEY SCHUBERT BARER, P.C.
_eighteenth floor_
_1191 second avenue_
_seattle, washington  98101-2939_
_206 464 3939_

incorporating its breach of contract allegations in its fraud claim, TCM seeks the same exact

damages in that claim as it does in its breach of contract claim. D.E. 140, ¶¶ 31 and 44 (seeking

"approximately $15,815,591").

Accordingly, summary judgment is also proper on TCM's duplicative fraud claim. *See*

*McFadyen*, 928 N.Y.S.2d 87, 89 (affirming summary judgment dismissing counterclaims for

breach of contract to recover amounts paid under contract and for fraudulent misrepresentation

where counter-claimant failed to "dispute th[e] invoices in the manner provided in the contract

and did not pay the amounts due") (citing *J.M. Builders & Associates, Inc. v. Lindner*, 67

A.D.3d 738, 741, 889 N.Y.S.2d 60 (2009) ("A cause of action alleging fraud does not lie where

the only fraud claim relates to a breach of contract").[16] *Breco Envtl. Contractors, Inc. v. Town

of Smithtown*, 762 N.Y.S.2d 822, 823 (2003) is also on point. *Breco* involved a contract

between Breco and the Town of Smithtown for closure and capping of a landfill, where Breco

was to be paid based on a fixed price for each unit or cubic yard of contour material brought to

the site. The parties each estimated the amount of materials that would be needed, with the

respective parties' estimates varying. The Town sought to assert a counterclaim for fraud based

on its claim that Breco misrepresented the amount of materials delivered to the site.  The

appellate court rejected the Town's counterclaim for fraud because "the gist of the fraud

counterclaim is nothing more than a claim of breach of contract, which is not independently

viable." *Id.* Additionally, the court found that the Town could not have justifiably relied on any

alleged misrepresentations by Breco concerning the fill requirement because it was on notice

---

[16] *See also Weatherguard Contractors Corp. v. Bernard*, 63 N.Y.S.3d 692, 693 (N.Y. App. Div. 2017) (motion for summary judgment dismissing fraud claim properly granted as fraud claim was duplicative of breach of contract claim); *AFP Mfg. Corp. v. AFP Imaging Corp*., 2018 WL 3329859, at *10 (S.D.N.Y. July 6, 2018) (dismissing plaintiff's fraud claim because it was in essence, a restatement of breach of contract claim, as "no action for fraud [can stand] when the only fraud charged relates to breach of a contract").

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

that a certain amount would be required and because the Town could have devised a method of monitoring the quantities of fill actually delivered. *Id.* Here, TCM had an explicit right to monitor and inspect, *see* n. 15, but it failed to do either.

Similarly, like here where "the gist of [TCM's] fraud counterclaim is nothing more than a claim of breach of contract" and where TCM had the right to monitor the work performed by Coalview, D.E. 140 (Counterclaim), ⁋ 9 (Agreements authorize TCM to witness and monitor work) and *see* n. 15, TCM's fraud claim fails as a matter of law, and TCM could not "have justifiably relied on any alleged misrepresentations." *Breco*, 307 A.D.2d at 332; *see also Preston v. Northside Collision-Dewitt, LLC,* 70 N.Y.S.3d 653, 655 (N.Y. App. Div. 2018) ("It is well settled that a cause of action for fraud does not arise where the only fraud alleged merely relates to a party's alleged intent to breach a contractual obligation"). The only "fraud" alleged by TCM is nothing more than Coalview's alleged intent to breach the parties' contractual obligations. And as set forth in the authorities *supra*, such conduct does not create a fraud count. Moreover, the parties' unambiguous contracts provide a 30 day "bright line" deadline that forecloses TCM's years-late objection to Coalview's invoices. TCM cannot change its contract covenants by alleging a claim for fraud, particularly where the fraud allegations sound in contract. Accordingly, summary judgment should be entered in Coalview's favor on TCM's claim for fraud in Count III.

WHEREFORE, Coalview respectfully requests that the Court enter summary judgment in Coalview's favor with respect to TCM's Counterclaim, and grant such other and further relief for Coalview as the Court deems just and proper.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

1   DATED this 11th day of July 2019.

2                                       KLUGER, KAPLAN, SILVERMAN,
                                        KATZEN & LEVINE, P.L.

3                                       By  s/Steve I. Silverman
4                                           Steve I. Silverman, Fla. Bar No. 516831
                                            Philippe Lieberman, Fla. Bar No. 27146
5                                           Miami Center, 27th Floor
                                            201 South Biscayne Boulevard
6                                           Miami, FL  33131
                                            Telephone:  (305) 379-9000
7                                           Fax:  (305) 379-3428
                                            Email:  ssilverman@klugerkaplan.com
8                                           Email:  plieberman@klugerkaplan.com
                                            *Attorneys for Plaintiff*
9                                           *(Admitted Pro Hac Vice)*

10                                      GARVEY SCHUBERT BARER, P.C.

11                                          David R. West, WSBA #13680
12                                          Daniel J. Vecchio, WSBA #44632
                                            1191 Second Avenue, 18th Floor
13                                          Seattle, WA  98101
                                            Telephone: (206) 464-3939
14                                          Fax: (206) 464-0125
                                            Email:  drwest@gsblaw.com
15                                          Email:  dvecchio@gsblaw.com
                                            *Attorneys for Plaintiff*

16

17                            **<u>CERTIFICATE OF SERVICE</u>**

18       I hereby certify that on July 11, 2019, I electronically filed the foregoing motion with

19  the Clerk of the Court using the CM/ECF system which will send notification of this filing to

20  all parties registered to receive such notice.

21                                          *s/ Steve I. Silverman*
22                                          Steve I. Silverman

23

24

25

26

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939