THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COALVIEW CENTRALIA, LLC,
a Delaware limited liability company,

Plaintiff,

v.

TRANSALTA CENTRALIA MINING LLC,
a Washington limited liability company, and
TRANSALTA CORPORATION, a Canadian
corporation,

Defendants.

NO. 3:18-cv-05639

PLAINTIFF'S SECOND MOTION
FOR PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR:

AUGUST 23, 2019

ORAL ARGUMENT REQUESTED

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

Plaintiff, COALVIEW CENTRALIA, LLC ("**Coalview**"), pursuant to Fed. R. Civ. P. 65 and LCR 7, moves the Court for the entry of a preliminary injunction (or enforcement of the Injunction Order in place, D.E. 34) against Defendant, TRANSALTA CENTRALIA MINING LLC ("**TCM**") to maintain the *status quo ante*, and in support thereof, states as follows:

## I.    INTRODUCTION

Despite the fact that there is _an injunction already in effect requiring TCM's continued performance_ even while claiming a breach or seeking to disavow or terminate the parties' agreements [D.E. 34 at 10-11], TCM has forced Coalview to once again seek a preliminary injunction *pendente lite* because TCM has again wrongfully claimed to have terminated the parties' contractual relationship in its continued attempts to force Coalview out of business.[1] As predicted in Coalview's first motion for injunctive relief (D.E. 3, the "**First Injunction Motion**"), and recognized by the Court, TCM is continuing its unfounded efforts to terminate the parties' contracts because TCM is simply unhappy with the contractual deal that it bargained for.[2] TCM's latest improper claim that the parties' contracts are terminated is premised on its unsupported and unfounded claim that Coalview is insolvent. But TCM "is incorrect in its allegation that Coalview was insolvent on and around December 31, 2018, (or more recently)" Wilson Dec. at ¶6. However, even assuming, *arguendo*, TCM was correct,

---

[1] In support of this motion, Coalview files contemporaneously the declarations of Coalview's president/CEO, Roger Fish ("**Fish Dec**."); the Managing Director of the forensic and litigation consulting segment of FTI Consulting, Inc., an independent global consulting and corporate finance advisory firm, Garrett Wilson ("**Wilson Dec.**"); and Coalview's counsel, Steve Silverman, Esq. ("**Silverman Dec.**").

[2] *See* D.E. 3 at 4 (noting Coalview is seeking to "escape the Agreements it no longer finds advantageous"); D.E. 4 (Affidavit of Roger Fish) at ¶62 (TransAlta infers Agreements no longer financially advantageous because of smaller amount of coal recovered to offset cost of dredging WCS and reclamation of Ponds, which is not a basis to terminate agreements, as TCM assumed all risk relating to quantity of coal that would be recovered); D.E. 34 at 8 ("It is not surprising that a major, long-term environmental clean-up turned out to be more involved, slower, bigger, and more expensive than the parties thought it would be when they started. That is often, if not typically, the case. _Coalview points out (and TCM implicitly concedes) that the contracts imposed those risks on TCM_.") (emphasis added); Fish Dec., ¶23.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

such insolvency is excused as a matter of law and under the parties' contracts because any claimed insolvency (a) was a direct result of TCM's improper failure to remit payment for six months of Coalview's services, and/or (b) the unfortunate sinking of Coalview's dredge and catastrophic loss of the operator's life and the government's subsequent investigation causing Coalview's operation to remain closed and is excused by the force majeure clause in Article 9 of the parties' Master Services Agreement (the "**MSA**"). *Id.;* Fish Dec., ¶¶ 4-11, 27, 28.

Thus, despite any reason TCM asserts (or recycles) to try and put Coalview out of business, no basis exists for TCM to terminate the agreements. Indeed, as already determined by the Court, the very agreements that TCM again wrongfully seeks to terminate *expressly* prohibit such conduct, and provide that the parties "shall" continue performance pending the solvency dispute. D.E. 34 at 4, 8. TCM's position now is especially specious given that TCM already opposed Coalview's First Injunction Motion based on the *exact same failing argument* on which TCM now again relies. D.E. 17 (TCM's Opposition to First Injunction Motion) at 10 (arguing that "an event of default occurs if Coalview is 'unable to pay its debts as they fall due or, if able, fails to do so'"). The Court *expressly considered and rejected TCM's insolvency argument* in granting the Injunction. D.E. 34 at 4 ("[TCM] also argues that to the extent Coalview is unable to pay its debts (is insolvent), that too is a default under the MSA.").[3] Significantly, after losing this argument, TCM initially refused to pay Coalview the monies required to be paid under the parties' agreements and the Injunction Order, stringing Coalview

---

[3] While Coalview anticipates that TCM will try to claim that this time is purportedly different, arguing insolvency is a non-curable default, any such argument will fall short. First, the Court already rejected Coalview's insolvency argument. D.E. 34 at 4. Moreover, even if, *arguendo*, insolvency was non-curable, as the Court has already determined, TCM cannot, once again, attempt to resort to self-help rather than litigating and ultimately prevailing on any such argument. *See* D.E. 34 at 8 ("The MSA did not envision or permit the "self-help" set off that TCM is seeking to impose.").

[PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION] - 3

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

1  along until, when faced with a hearing on Coalview's Motion to Compel Payment (D.E. 62),

2  finally paying Coalview only a portion of the monies owed. Fish Dec., ¶27. Now, despite

3  TCM's own misconduct contributing to what it now complains of, TCM recycles its same

4  rejected argument, looking to take advantage of its own breach of the agreements and the tragic

5  incident that occurred at the project. The Court should put an end to TCM's repeated improper

6  and slippery conduct, enforcing its Injunction Order and the parties' unambiguous agreements.

7

8       Additionally, as set forth *infra* at 9, TCM also expressly agreed years ago <u>*with Coalview*</u>

9  <u>*and the project's Trustee*</u> that TCM is prohibited from terminating the MSA and is required to

10  continue to perform with Coalview under the current circumstances. *See* Consent to Collateral

11  Assignment of Project Agreements and Guarantee Agreement (the "**Consent Agreement**")

12  between TCM, Coalview, and U.S. Bank National Association, as Trustee at 4; Fish Dec., ¶13.[4]

13

14       All of these bargained-for provisions exist because the project is an important

15  environmental clean-up, overseen by the Mine Safety and Health Administration ("**MSHA**").

16  D.E. 34 at 1, 8-9; Fish Dec., ¶15. Through these agreements and specific covenants, the parties

17  acknowledged the importance of the continuity of Coalview's performance, and that premature

18  termination could have grave repercussions. *Id.* TCM ignores that all of this was already

19  recognized by the Court in its Injunction Order and that nothing has changed that would change

20  the legal findings in, or impact of, the Injunction Order. D.E. 34 at 4, 8-11; Fish Dec., ¶16.

21  Moreover, it is through no fault of Coalview that its performance was first hampered by TCM's

22  month's long lack of payment, and more recently by the sinking of Coalview's dredge and

23  operator's loss of life, and MSHA's issuance of the control order (Section 103(k) of the Mine

24  Safety and Health Act of 1977) (the "**K Order**") that has halted Coalview's operation for

25

26

---

[4] A copy of the Consent Agreement was filed at D.E. 4-6.

[PLAINTIFF'S SECOND MOTION FOR PRELIMINARY
INJUNCTION] - 4

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

months.[5] Fish Dec., ¶5. None of these issues are the fault of Coalview and the agreements TCM signed do not permit it to capitalize on (a) TCM's wrongful conduct in not paying Coalview for months, *see* D.E. 34 at 9-11; D.E. 62 (Coalview's Motion to Compel TCM to pay monies owed pursuant to Injunction Order), and D.E. 92 (Joint Status Report reporting that TCM finally paid Coalview the majority of the monies that TCM initially refused to pay following the Injunction Order)[6], or (b) the tragic dredge sinking and issuance of the K Order.

Indeed, the Court has already reviewed and analyzed the parties' agreements and determined that Section 12.04 of the MSA prohibits TCM's latest attempt to terminate the agreements. D.E. 34 at 2, 8. Yet, incredibly, directly contradicting Section 12.04 and the Injunction Order, TCM claims again to have terminated the MSA, now purporting (again) that Coalview is insolvent. The true reasoning behind TCM's purported termination of the contracts – TCM's dissatisfaction with the amount or pace of coal being recovered – are not risks TCM can shift to Coalview; as determined by the Court, neither were risk factors assumed by Coalview in the agreements. D.E. 34 at 8; Fish Dec., ¶ 23; D.E. 3 at 4.

TCM's breaches and economic hardball, if condoned, will have irreparable effects. ; Fish Dec., ¶ 24. As TCM knows and the Court has already recognized, Coalview will be vaporized as a going concern if the agreements are terminated, as TCM is Coalview's only

---

[5] Section 103(k) reads: "In the event of any accident occurring in a coal or other mine, an authorized representative of the Secretary, when present, may issue such orders as he deems appropriate to insure the safety of any person in the coal or other mine, and the operator of such mine shall obtain the approval of such representative, in consultation with appropriate State representatives, when feasible, of any plan to recover any person in such mine or to recover the coal or other mine or return affected areas of such mine to normal."

[6] For months TCM refused to make payment for Coalview's invoices, until February of 2019, when TCM executed a settlement with Coalview wherein it paid $1,522,789.49 (with all payments totaling approximately 90% of Coalview's invoices) to settle the overdue invoices that "includes part of June, 2018 through and including December 31, 2018." Fish Dec., ¶27.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

customer. D.E. 34 at 8-9; Fish Dec., ¶ 24.  Thus, if TCM unilaterally terminates the agreements as it has claimed to have done while the parties dispute the purported solvency dispute and TCM's wrongful declaration of default, Coalview will be forced to permanently shutter its operations, layoff all its employees, lose its entire investment in the Project to lienholders to whom Coalview pledged its assets, Coalview's equity investors will be wiped out, and Coalview's important environmental reclamation work will be derailed.  D.E. 34 at 8-9; Fish Dec., ¶24.  And while TCM will likely try to point to the fact that Coalview's operations have been temporarily halted due to MSHA's investigation and the K Order, as further set forth *infra*, it is anticipated that Coalview will imminently be back in production, but for TCM's improper attempts to prevent same and terminate the parties' agreements. Fish Dec., ¶¶8-11.

Given (a) the immense and irreparable harm to Coalview by TCM's attempted termination of the parties' agreements - the indisputable inability of Coalview to survive as a going concern - and (b) the significant likelihood that Coalview will prevail on both (i) the merits and (ii) the issue of whether the agreements require TCM to continue to perform while this dispute is resolved, Coalview meets its burden for the continuation of the *status quo ante* through the mechanism of temporary injunctive relief.

## II.    BACKGROUND AND FACTS SUPPORTING INJUNCTIVE RELIEF

The background facts regarding the Mine, the parties' business, and the relevant agreements are set forth in detail in Coalview's First Injunction Motion, D.E. 3 at 5-13, and the Affidavit of Roger Fish filed in support thereof (with relevant agreements attached as exhibits). D.E. 4. Those background facts and agreements are incorporated by reference herein, with Coalview highlighting or supplementing the following facts:

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

**A. October 30, 2018 Injunction Order**

1.     On August 8, 2018, Coalview filed its Complaint (D.E. 1) and First Injunction Motion (D.E. 3), seeking an injunction *pendente lite* because TCM threatened to terminate the parties' agreements based on its purported claim that Coalview overbilled TCM. D.E. 1 & 3.

2.     The Court found in Coalview's favor, and entered the Injunction Order, enjoining and requiring TCM (1) to immediately proceed under the parties' agreements according to their terms; (2) to immediately pay Coalview its Outstanding Invoices (as therein defined); (3) to timely pay for work going forward pursuant to the parties' agreements, and (4) prohibiting Coalview from setting off any prior payments made to Coalview against future work absent order of the Court. D.E. 34 at 11-12.[7]

3.     An important basis for the Court's Injunction Order was its finding that "[f]rom Coalview's perspective, a critical feature of the MSA was the parties' agreement to "diligently" continue working (and paying for work) in the event of "***any dispute***" arising out of the agreement: [citing Section 12.04 of the MSA in full]." D.E. 34 at 2 (emphasis added); *see also id.* at 8 ("More importantly from Coalview's perspective, TCM agreed to that 'notwithstanding any Disputes' the parties '**shall diligently proceed with performance of [the MSA**].' Even if TCM can substantively object to Coalview's weighing and billing issues going back more than 30 days, **it is patently clear that they agreed to keep performing in the meantime**.") (Emphasis added).

---

[7] The Court also required Coalview to post a $500,000 injunction bond, which Coalview has posted and which remains in place. D.E. 34 at 10; D.E. 39 (Notice of Filing $500,000.00 bond).

[PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION] - 7

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

4.     The Court further found that "TCM agreed that Coalview would continue the Work through 2025" and that Coalview "demonstrate[d] that unless [TCM] is so enjoined Coalview and its investment and its business will cease to exist." *Id.* at 3-4, 9.

5.     TCM's latest improper attempt to oust Coalview from the Project flies in the face of the Injunction Order and the MSA, as well as TCM's agreement with the Trustee, all of which prohibit TCM's current attempt to terminate Coalview from the Project.

6.     Significantly, the Court, in entering its Injunction Order, **already considered and rejected TCM's very position regarding insolvency:** "[TCM] also argues that to the extent Coalview is unable to pay its debts (is insolvent), that too is a default under the MSA." D.E. 34 at 4.

7.     Moreover, the Court recognized what is driving TCM's repeated attempts to weasel out of the contracts. *Id.* at 8 ("It is not surprising that a major, long-term environmental clean-up turned out to be more involved, slower, bigger, and more expensive than the parties thought it would be when they started. That is often, if not typically, the case. Coalview points out (and TCM implicitly concedes) that the contracts imposed those risks on TCM.").

8.     Nothing has changed that would change the legal findings in, or impact of, the Injunction Order. Fish Dec., ¶16.

**B.  The Agreements Unambiguously Require TCM to Continue to Perform**

9.     Importantly, and as the Court has already determined, TCM and Coalview expressly agreed that any dispute arising out of the MSA, including, without limitation, regarding Coalview's solvency, would *not stop* Coalview's Work or TCM's payments to Coalview:

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Notwithstanding any Disputes** arising out of this Agreement, or any activities being conducted pursuant to this Article 12 [pertaining to Dispute Resolutions], **Contractor [Coalview] and Owner [TCM] shall diligently proceed with the performance of this Agreement**.

MSA, Article 12.04 (emphasis added); D.E. 34 at 4, 8; Fish Dec., ¶12.

10.     Additionally, Coalview, TCM, TransAlta Parent, the Trustee and the Authority entered into the Consent Agreement, which further and independently requires TCM to continue to perform with Coalview.[8] Fish Dec., ¶13.

---

[8] Article I(c) of the Consent Agreement provides:

TA Mining and Guarantor agree to deliver duplicates or copies of all notices of default and any other material notices delivered by TA Mining or Guarantor under or pursuant to the Project Agreements (including any notice that a Force Majeure event described in Section 9.01 of the Master Services Agreement has occurred or a notice of termination under Article 11 of the Master Services Agreement) to Secured Party simultaneously with delivery thereof to Borrower under the Project Agreements. In the event of a default by Borrower under the Project Agreements, TA Mining will give written notice of such default to Secured Party at the address set forth in Section 5.2 hereof. **Neither TA Mining or Guarantor will terminate any Project Agreement or the Guarantee Agreement as a result of any default or breach of Borrower thereunder without written notice to Secured Party and Borrower and first providing to Secured Party: (i) ninety (90) days after the expiration of the cure period,** if any, provided for under the Project Agreement to cure such default if such default is the failure to pay amounts to TA Mining which are due and payable by Borrower under such Project Agreement, or (ii) **if the default is reasonably susceptible of cure by Secured Party but the breach or default cannot be cured by the payment of money to TA Mining so long as Secured Party shall have commenced to cure the breach or default within such ninety (90) day period and thereafter diligently prosecutes such cure to completion and continues to perform or causes to be performed any monetary obligations under such Project Agreements, and all other obligations under such Project Agreements that are to be performed by Borrower**; provided, however, that if Secured Party cannot cure the default within one (1) year following the expiration of the aforementioned ninety (90) day period, then TA Mining may terminate the applicable Project Agreement. If possession of the Project is necessary to cure such breach or default, and Trustee declares Borrower in default under the Indenture within such ninety (90) day period, such cure period shall include any time required to obtain possession of the Real Property and equipment by foreclosure of the Deed of Trust, Uniform Commercial Code sale or by other appropriate means by reasonable diligence. If Secured Party is prohibited or stayed by any court order or bankruptcy or insolvency proceedings from curing the default or from commencing or prosecuting foreclosure proceedings, the foregoing time periods shall be extended by the period of such prohibition or stay; provided, however, that if Secured Party is prohibited or stayed from curing the default for a period of one (1) year following the expiration of the aforementioned ninety (90) day period, then TA Mining may terminate the applicable Project Agreement. Secured Party shall have the right, but not the obligation, to cure Borrower's default under such Project Agreement and TA Mining and Guarantor agree to accept cure of such default by Secured Party, any court-appointed receiver, or Secured Party's designee or assignee including any purchaser at foreclosure sale or deed in lieu thereof; provided that such designee, assignee or purchaser has the financial and operational capability to perform under the Project Agreements as required in Section I(e). **If requested by Secured Party in writing**

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

11.     U.S. Bank has asserted its rights under the Consent Agreement, demanding that TCM continue to perform under the MSA. Indeed, on June 27, 2019, counsel for U.S. Bank sent a letter to TCM, stating that "[p]ursuant to Section I of the Consent, pending the exercise of remedies, the Secured Party hereby requires TA Mining and the Guarantor to continue to perform their respective obligations under the Project Agreements and the Guarantee Agreement." *See* Silverman Dec., ¶¶ 11-12 & Ex. G thereto; Fish Dec., ¶14.

12.     Thus, these agreements unambiguously provide Coalview and the Trustee with economic certainty to proceed with Coalview's operations without fear that TCM can invent a dispute as a ruse to prematurely or wrongfully terminate the agreements.  Fish Dec., ¶15.

**Force Majeure Event(s)**

13.     On or about December 29, 2018, and subsequent thereto, a Force Majeure event(s) (as defined in Article 9 of the MSA) occurred that has "prevent[ed] the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties." MSA, § 9.01; Fish Dec., ¶14.

14.     The Force Majeure involves the unexplained sinking of Coalview's dredge, followed by the tragic fatality of Coalview's employee, followed by the subsequent MSHA government investigation and K Order requiring that Coalview temporarily cease work, as well as Coalview's inability to obtain, maintain, renew or operate under necessary permits, licenses,

---

**within such ninety (90) day period following receipt of such notice and if Secured Party or court-appointed receiver is otherwise fulfilling obligations under this Section I(c), then irrespective of *any* default by Borrower under such Project Agreement, TA Mining and Guarantor shall continue performance of their respective obligations under the Project Agreements and the Guarantee Agreement**.
(emphasis added).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

and governmental or third-party approvals after applying for same using its reasonable commercial efforts. MSA, § 9.01; Fish Dec., ⁋5.

15.     Coalview provided TCM with notice of the Force Majeure). Fish Dec., ⁋6.

16.     The MSA provides that TCM, as "the Party not affected by the Force Majeure," may not terminate the Project Agreements until the Force Majeure situation exceeds "two hundred seventy (270) consecutive days in duration." MSA, § 9.02. Two hundred seventy (270) consecutive days have not passed since the occurrence of the Force Majeure event(s). [9] Fish Dec., ⁋7.

17.     Coalview has made, and continues to make, good faith efforts to eliminate any Force Majeure and to minimize its effects or impacts on TCM insofar as reasonably possible, with a minimum of delay. MSA, § 9.02; Fish Dec., ⁋8.

18.     Coalview has made TCM aware of these facts. Fish Dec., ⁋9.

19.     Indeed, MSHA has now indicated that it will permit the K Order to be lifted, at least in part, to permit Coalview to build a ramp to continue production. Fish Dec., ⁋10. Coalview has already submitted a plan, approved by MSHA, and performed a visual inspection of Pond 3C and determined that building the ramp is feasible. Coalview further has a rental dredge lined up and that can be installed and operational within approximately 30 days. Moreover, Coalview's workforce and vendors are on standby, ready, willing, and able to continue business with Coalview, with minimal delay. Fish Dec., ⁋11.

---

[9] At the earliest, this date is September 25, 2019 (270 days from December 29, 2018).

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

20.     Moreover, counsel for the bondholders has confirmed that "[i]n the event TA Mining is enjoined from terminating [the MSA], the holders would agree to permit Coalview to continue to operate pursuant to the terms of the bond documents and Project Agreements." Silverman Dec., Ex. H.

21.     Despite being on notice of the Force Majeure event(s), the two hundred seventy day period not having expired, and the requirements of Section 12.04 of the MSA and the Court's Injunction Order, TCM has wrongfully attempted to terminate the Agreements and Coalview's continued work on the site. Fish Dec., ¶17.

22.     Despite knowledge of Coalview's efforts to eliminate the Force Majeure, TCM has indicated that it will not permit Coalview to continue operations. Fish Dec., ¶18.

23.     On July 24, 2019, TCM's Bob Nelson sent an email to Roger Fish stating:

> As I understand it, Coalview has submitted a plan to MSHA to visually inspect Pond 3C for the purpose of assessing the feasibility of constructing a new access into the pond, MSHA approved this request, and Coalview has retained a contractor to assist in the inspection.  Please be advised, as our counsel stated in the attached June 4 and May 6 letters:  given the termination of the MSA, *TransAlta objects to Coalview resuming any work at the site.*

Fish Dec., ¶19 & Ex. A thereto (emphasis added).[10]

**D. TCM's Anticipatory Repudiation and Improper Declaration of Termination**

24.     On March 29, 2019, TCM sent a letter to Coalview, purporting to terminate the MSA pursuant to Section 11.02(c) of the MSA.  Fish Dec., ¶20 & Ex. B thereto.

25.     Thereafter, the parties, through counsel, exchanged several correspondence in which Coalview denied that an Event of Default has occurred, highlighting (a) the existence of Force Majeure (for which TCM was already on notice); (b) that Article 12.04 of the MSA and

---

[10] *See also* letters sent by TCM's counsel attached as exhibits to the Silverman Dec.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

the Court's Injunction Order both require TCM to proceed under the Agreements; and (c) requesting a meeting between the Senior Representatives pursuant to Section 12.02 of the MSA, which requirement of the MSA TCM failed to make or comply with before purporting to declare the Agreements terminated. TCM took the position that no force majeure event had occurred, threatening Rule 11 sanctions if Coalview sought to amend its complaint, and stating the "effective termination date was and remains April 3"; that TCM "will not allow Coalview to resume operations when MSHA eventually concludes its investigation and terminates the 103(k) Order." Silverman Dec., at ¶¶ 4-10 & Exs. A-F thereto.

26.    At Coalview's urging, the Senior Representatives met on May 21, 2019, but TCM refused to withdraw its assertions that the MSA has been terminated.  Fish Dec., ¶21.

27.    Accordingly, on June 7, 2019, Coalview filed its Amended Complaint, D.E. 135.

28.    Although purporting to proceed under the guise of a claim based on Coalview's solvency (and despite this argument already being rejected by the Court), TCM apparently once again finds the Agreements to no longer be financially advantageous because the amount of coal recovery from the Ponds has been less than it had hoped, resulting in a smaller offset to the cost of reclamation of the Ponds. As determined by the Court, such is not a basis to terminate the Agreements, as TCM assumed all risk relating to the quantity of coal that would be recovered and the timing of that work.  D.E. 34 at 8; Fish Dec., ¶23.

29.    As already determined by the Court in granting the Injunction Order, the Agreements are critical to Coalview's business, serving as Coalview's only source of revenue, a fact well known to TCM. Fish Dec., ¶24. As a direct result of TCM's wrongful repudiation and abandonment of the MSA, Coalview is faced with the imminent risk and unavoidable harm

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

of (a) being forever forced out of business, (b) being forced to lay off its entire workforce, (c) being forced to stop performing the important safety and environmental services it provides to the residents of Centralia, Washington and beyond in connection with the reclamation of the Ponds, and (d) facing the foreclosure and seizure of all of its assets, including all of its pledged plant, property, and equipment, causing Coalview to lose more than $90 million of revenue over the remaining life of the project and to lose more than $31,500,000 of its investment. Fish Dec., ¶24; D.E. 34 at 8-9.   TCM's repudiation of the MSA will also put a halt to the environmental reclamation project. *See* Fish Dec, ¶24; D.E. 34 at 9.

### III. ARGUMENT AND AUTHORITIES

**A. Standard for Granting Coalview Preliminary Injunctive Relief**

As the Court set forth in its Injunction Order, "[t]o obtain a TRO or a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that a balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest." D.E. 34 at 7 (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). Further, "injunctive relief is warranted if the movant raises 'serious questions' going to the merits, and demonstrates that the balance of hardships that tips sharply in its favor (coupled with the other factors)." D.E. 34 at 7 (citing *Alliance for the Wild Rockies v Cottrell,* 632 F.3d 1127, 1131-36 (9th Cir. 2011)). As demonstrated below, and as already determined by this Court, Coalview meets the injunctive relief standards in this Circuit, making a preliminary injunction maintaining the *status quo ante* appropriate - directing TCM to honor its obligations with each party preserving all rights with respect to the current solvency dispute.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### 1. Coalview Is Likely to Succeed On the Merits

#### (a) The Agreements and the Court's Injunction Require TCM to Continue to Perform

TCM asserts that the MSA has been terminated on the basis that it claims Coalview is insolvent or unable to pay its debts as they fall due. *See* Fish Dec., ¶20 & Ex. B thereto. However, the Court, in its Injunction Order, has already reviewed and analyzed the parties' agreements, finding that Section 12.04 clearly and unambiguously requires TCM to continue to perform even while seeking to terminate the agreements. D.E. 34 at 8 ("from Coalview's perspective, TCM agreed to that 'notwithstanding any Disputes' the parties 'shall diligently proceed with performance of [the 'MSA].' . . . it is patently clear that they agreed to keep performing in the meantime"). Article 12.04 of the MSA requires TCM to continue to "diligently proceed with the performance of [the] Agreement," "[n]otwithstanding any Disputes arising out of this Agreement." *Id.* This provision is to ensure that a dispute such as the one at issue over insolvency does not hold up the reclamation project. Fish Dec., ¶15. In fact, the Court already rejected TCM's insolvency default argument in granting the Injunction. D.E. 34 at 4 ("[TCM] also argues that to the extent Coalview is unable to pay its debts (is insolvent), that too is a default under the MSA").

Section 12.01 broadly defines "Dispute" and requires that "[a]ny dispute, controversy or claim (a "**Dispute**") arising out of this Agreement or any of the Project Agreements that cannot be resolved by the Steering Committee at the operating level shall be resolved according to this Article 12." Despite the parties' exchanging various correspondence regarding this issue, TCM has offered no explanation, nor does one exist, for why this situation is any different than the Injunction Order already in place prohibiting TCM from terminating the Agreements. Nor can

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

any argument be raised that TCM's insolvency claim is not a "dispute, controversy or claim arising out of [the MSA] or any of the Project Agreements" MSA, §12.01, and therefore not governed by Section 12.04 of the MSA. Additionally and independently of Section 12.04, TCM's continued performance under its agreements with Coalview is also required under Section I of the Consent Agreement between TCM and the Trustee. *See supra* at 9.

Accordingly, for any of the foregoing reasons, an injunction is proper, requiring TCM's continued performance pending resolution of the Dispute. Thus, it is clear that Coalview has a strong likelihood of succeeding on the merits. As the Court determined in the Injunction Order, here again, "[a]t the very least, there are serious questions going to the merits of Coalview's claims. Coalview has met the first requirement for injunctive relief." D.E. 34 at 8.

(b) Coalview Disputes that it is Insolvent

In addition to Section 12.04 and this Court's Injunction Order requiring TCM to continue to perform, the Court should not condone TCM's latest ruse to try to terminate the Agreements on the basis of insolvency because Coalview disputes that it is insolvent as claimed by TCM. *See* Fish Dec.,¶25; *see also* Wilson Dec., at pp. 2, 7-16 (setting forth various reasons, under both balance sheet test and cash flow analysis, why TCM "is incorrect in its allegation that Coalview was insolvent on and around December 31, 2018, (or more recently)"). For example, Coalview's assets exceeded its liabilities by millions of dollars as of December 31, 2018. *See* Fish Dec., ¶26; *see also* Wilson Dec., ¶28. As a result, Coalview was solvent on and around December 31, 2018. *Id.* Moreover, Coalview, based on this analysis, was projected to continue to be solvent going forward, but for the force majeure. *Id.* Nor would any technical

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

breach of Coalview's agreements with the bondholders equate to Coalview being insolvent or the default that TCM claims. *See* Wilson Dec., ¶7; Fish Dec., ¶29.

Moreover, TCM admits in its purported notice of default that it does not have the entire picture, and that it is speculating "based on information available to TransAlta." Fish Dec., Ex. B. Indeed, TCM acknowledges in its March 29, 2019 letter that its conclusion is not based on Coalview' current financial position, but that TCM relies entirely on financials dating back to December 31, 2018 and before. *Id.* In fact, the letter states that "[w]e recognize that the information above is as of December 31, 2018; the exact numbers and circumstances have changed since then." *Id.* As proof of just how far-fetched TCM's theory is, TCM conjectures that Coalview must be insolvent based on payments dating back to June 2017, for which TCM acknowledges are the subject of a forbearance agreement. TCM further speculates, based on admittedly outdated information, that it is "highly unlikely" that Coalview is in compliance with certain provisions of that forbearance agreement. The Letter further states that "*[w]e believe* that the above facts demonstrate or constitute an Event of Default by Coalview for which no cure period is allowed." *Id.* (emphasis added). The Letter further states that TCM "*assume[s]*" that a default has occurred. *Id.* (emphasis added). TCM's counsel also sent correspondence stating that TCM's claim of default is based on "reasonable inferences." Silverman Dec., Ex. B. Yet, TCM's unfounded "beliefs", "assumptions" and "inferences" are wholly insufficient to terminate the agreements, prevent Coalview from performing Work, and halting the important environmental reclamation, certainly, at the very least, not in the face of Section 12.04 without adjudication of the dispute. Nor would a technical breach of Coalview's agreement with the bondholders mean a default under the MSA or equate to Coalview being

[PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION] - 17

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

insolvent. Fish Dec., ¶29.TCM's position is especially tenuous in the face of Section 12.04 and the Injunction Order requiring TCM's continued performance.

(c) <u>Alternatively, but for TCM's failure to timely pay Coalview for work and/or Force Majeure, Coalview Would be Solvent, but, in any event, Force Majeure Prevents TCM from Terminating the Agreements</u>

In any event, even if, *arguendo*, Coalview were insolvent, such insolvency is the result of TCM's failure to timely pay Coalview for work and/or Force Majeure. *See* Wilson Dec., at pp. 10-16; Fish Dec., ¶¶ 27-28. In other words, but for TCM's breach of the MSA by failing to pay Coalview for its work, and but for the Force Majeure surrounding the dredge and the K Order, Coalview's solvency would not be at issue because Coalview would not be insolvent. *See* Wilson Dec., at pp. 10-16; Fish Dec, ¶¶ 27-28. Indeed, any purported insolvency or claimed Event of Default under Section 11.02(c) is the result of Force Majeure, and which TCM agreed is therefore excused under the MSA. It is beyond any reasonable dispute that the sinking of the dredge and/or the MSHA investigation and K Order have "prevent[ed] the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties." D.E. 4-7 (MSA), § 9.01. The MSA provides that "the Party not affected by the Force Majeure" may not terminate the Project Agreements until the Force Majeure situation exceeds "two hundred seventy (270) consecutive days in duration." *Id.*, § 9.02. Two hundred seventy (270) consecutive days in duration have not passed since the occurrence of Force Majeure. Yet, TCM has wrongfully sought, once again, to terminate the agreements.  Fish Dec., ¶¶4-7.

Section 9.01 of the MSA provides a broad set of circumstances that constitute Force Majeure, "including **without limitation**, acts of God; acts of the public enemy; insurrections;

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

riots; labor disputes; boycotts; unusual geologic conditions; fires; explosions; floods; embargoes; acts of judicial or military authorities; **acts of governmental authorities; inability to obtain, maintain, renew or operate under** necessary permits, licenses, and **governmental** or third-party **approvals** after applying for same using their reasonable commercial efforts; **or other such similar acts, conditions, or events which prevent the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties.**" D.E. 4-7 (MSA), § 9.01 (emphasis added).

"Force majeure clauses are to be interpreted in accord with their purpose, which is 'to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties'" *Constellation Energy Services of New York, Inc. v. New Water St. Corp.*, 146 A.D.3d 557, 559, 46 N.Y.S.3d 25, 28 (N.Y. App. Div. 2017).  "[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure" *Id.* (citing *Route 6 Outparcels, LLC v. Ruby Tuesday, Inc.,* 88 A.D.3d 1224, 1225, 931 N.Y.S.2d 436 [3d Dept.2011]).

In *Constellation*, the court found that the "force majeure clause [wa]s expansive in scope" and like here, the examples given in the force majeure provision in *Constellation* were "qualified by the statement that they [we]re 'without limitation,' and do not limit the application of the clause to [a certain] scenario" *Id.* (finding that determination of force majeure event was not suitable for determination on a motion to dismiss); *see also Osborn v. Wilson & Co., Inc.*, 118 Misc. 379, 193 N.Y.S. 241 (Sup 1922), *aff'd*, 206 A.D. 787, 200 N.Y.S. 938 (4th

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

Dep't 1923) (where contract provided buyer was to accept *pro rata* delivery of crops "in the event of floods, drought, or other unavoidable cause preventing Seller from filing this contract in full", phrase "or any other unavoidable cause" included any other cause due to the elements, and seller was excused for crop shortage caused by dryness, frost, and wind).

The unexplained sinking of Coalview's dredge, followed by the tragic fatality of Coalview's employee, followed by the subsequent MSHA investigation and K Order requiring that Coalview cease work, as well as MSHA's refusal to provide approval for Coalview to operate, despite Coalview applying for same using reasonable commercial efforts, individually or collectively, is certainly included within and contemplated by the scope of Force Majeure under the MSA. Indeed, the Force Majeure provision expressly includes governmental acts and inability to operate under or obtain governmental approval. Coalview has been ready, willing, and able to resume Work, but for the conclusion of MSHA's investigation and/or lifting the K Order and/or MSHA otherwise providing governmental approval. Thus, the situation is wholly out of Coalview's control. *See In re Whistler Energy II, LLC*, 571 B.R. 199 (Bankr. E.D. La. 2017), *supplemented*, 16-10661, 2017 WL 1380467 (Bankr. E.D. La. Apr. 17, 2017), aff'd, CV 17-5470, 2018 WL 3528312 (E.D. La. July 20, 2018) (force majeure event where drilling operations on offshore oil platform shut down by government agency one day after accident on rig resulting in death of employee did not end until agency lifted drilling suspension order and approved plan it required parties to develop to recommence drilling).

Moreover, even if TCM somehow within the bounds of Rule 11 can contest whether these events qualify as Force Majeure, Section 12.04 of the MSA, which requires TCM to continue to perform "[n]otwithstanding **any** Disputes" applies, and prohibits TCM from

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

terminating the agreements pending resolution of any dispute over the application of Force Majeure. *See also* D.E. 34 at 8. Thus, at the very least, a temporary injunction is proper until the Force Majeure dispute is resolved by the Court. But again, in granting the Injunction Order, the Court already considered and rejected TCM's argument that insolvency permitted TCM to immediately terminate the Agreements, at least not without proving same. D.E. 34 at 4.

(d) <u>TCM's Breaches</u>

In its letters and in its counsel's letters, TCM has unequivocally again declared its intention not to comply or continue with the MSA. Accordingly, as set forth in Coalview' First Injunction Motion, granted by the Court (D.E. 34 at 4) (Coalview "argues that TCM has anticipatorily breached the MSA by stating that it would be terminated . . . ."), TCM is both in breach and anticipatory breach of the Agreements. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 619-620 (S.D.N.Y. 2013) (anticipatory repudiation occurs when party declares intention not to comply with duties under contract before time for performance of duties has expired); *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150, (N.Y. 1978) (anticipatory repudiation "of the contract can be determined to have occurred whenever there is an 'overt communication of intention' not to perform"). Under the unambiguous language of the MSA, as well as the standards and findings in the Court's Injunction Order, D.E. 34 at 4, 7-8, 10-11, Coalview has a likelihood of success on its claims for breach of contract and anticipatory repudiation.

2. <u>Coalview Will Suffer Irreparable Harm and Be Forced out of Business</u>.

As the Court has already recognized in its Injunction Order, and as still remains, if the Court does not again enjoin TCM from terminating Coalview under the MSA and other agreements and maintain the status quo, Coalview will unquestionably suffer irreparable harm

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

by being put out of business. D.E. 34 at 8-9; Fish Dec., ¶¶ 16, 24. Coalview has one customer and one source of revenue: TCM. *Id.* Thus, Coalview's business and its livelihood as a going concern are entirely dependent on TCM's continued performance of its exclusive Agreements with Coalview. *Id.*

These are facts not subject to dispute and are well known to TCM. *Id.* Indeed, as acknowledged in the Injunction Order, "TransAlta does not dispute that its termination of the MSA and other contracts will put Coalview out of business, cause it to lay off its employees, and to lose its substantial investment in the project." D.E. 34 at 8-9. If TCM wrongfully terminates the agreements or suspends all future payments, Coalview will immediately lose its only source of revenue, be forced to lay off all of its employees, and lose all its assets to secured parties who hold lien rights in all of Coalview's plant, property, and equipment. D.E. 34 at 8-9; Fish Dec., ¶¶16, 24.[11]

As the Court already determined, there is little question that Coalview will suffer irreparable harm should TCM be permitted to terminate the MSA and prevent Coalview from resuming its performance as it has repeatedly threatened.  D.E. 34 at 8-9.

### 3. The Balance of Equities Tips Heavily in Favor of a Preliminary Injunction.

As already determined by the Court, the balance of equities still tip decidedly in favor of granting a preliminary injunction. D.E. 34 at 9 ("in the absence of an injunction, Coalview will cease to exist and its secured creditors will take its assets. In that case, TCM has no chance

---

[11] As set forth in its First Injunction Motion, and adopted by the Court in granting the Injunction, it is well-settled that a dire financial situation more than sufficiently constitutes irreparable harm. *See Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125 (2d Cir. 1984) (reversing denial of preliminary injunction where loss of ongoing business representing many years of effort and livelihood of owners constituted irreparable harm); *see also* D.E. 3 at 18-19 and n.15 (collecting cases that going out of business constitutes irreparable harm).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

of recovering the alleged debt, and it will have to find a new contractor to clean up the site. The *balance of hardships tips sharply in favor of Coalview, and in favor of an injunction*.") (emphasis added).[12]  Here, nothing has changed since the Injunction Order with respect to this factor, as Coalview cannot suffer any greater harm than if an injunction is not entered, as Coalview's business will be completely destroyed. Fish Dec., ¶¶16, 24.

While Coalview will lose its business if a preliminary injunction is not entered, no different than at the time the Injunction Order was entered, TCM stands to lose very little.  If the status quo is maintained, Coalview will continue the work (as soon as permitted), including dredging the WCS and providing TCM with coal that it can burn at its Power Plant. Fish Dec., ¶11.  TCM's only claim is about Coalview's solvency. However, Coalview's claimed insolvency cannot cause any damages to TCM; indeed, assuming such to be true, any insolvency was caused by TCM's failure to pay Coalview, and then by Force Majeure. Instead, if TCM pays Coalview for Work (as it is required to do so under the MSA and the Injunction Order) once it receives government approval to resume, Coalview's continued performance will have the opposite effect, permitting Coalview to make money (and thus, to cure any purported insolvency).  In short, there will be no harm to TCM as it will not only receive the exact benefits that it bargained for, but continuing to permit Coalview to Work is in TCM's and the State's best interest, first in terms of keeping the reclamation project moving forward and second in terms of any concerns TCM has regarding solvency. D.E. 34 at 9.

In fact, maintaining the status quo pending the solvency dispute was specifically contemplated and bargained for under Article 12.04 of the MSA. *See Guinness-Harp Corp. v.*

---

[12] *See also* D.E. 3 at 19-21 and n.15 (collecting cases supporting balance of harms tipping in Coalview's favor and irreparable harm absent an injunction).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

*Jos. Schlitz Brewing Co.*, 613 F.2d 468, 472 (2d Cir. 1980) (granting injunction to preserve status quo where contract contemplated that status quo was to be maintained until determination made in arbitration regarding right to terminate agreement).

<u>4. Issuing an Injunction Is in the Public's Interest.</u>

The Court has already determined that an injunction is in the public interest. D.E. 34 at 9. Once again, "[t]he public interest is not served by having the clean-up work stop altogether, having it delayed pending a lengthy litigation, or while a new contractor is located selected and hired to continue the work, at an unknown pace and cost. This factor too weighs heavily in favor of injunctive relief." *Id.* And while TCM will likely argue that Coalview is currently not operational, as set forth *supra*, MSHA has indicated that Coalview will promptly be back in operation. Fish Dec., ¶¶ 10-11.

**D. Any Bond Should Be Minimal.**

No good faith argument exists that TCM will suffer damages caused by an "improvidently entered injunction" if TCM were to prevail on its claim that Coalview is insolvent and that no Force Majeure exists. *See*, D.E. 34 at 10.  Little or no bond should be required for the issuance of a preliminary injunction because TCM will continue to receive the benefits it bargained for under the Agreement, and is at no risk of suffering any damages by the Court entering another injunction. Indeed, there is already a $500,000.00 bond in place pursuant to the Court's existing Injunction Order as security to TCM. D.E. 34 at 10; D.E. 39 (Notice of Filing $500,000.00 bond). Thus, TCM will not be harmed by the requested preliminary injunctive relief because it will be able to continue its business regardless of whether the Court grants Coalview's motion. *See METROPCS NEW YORK, LLC, v. 35-46 BROADWAY, INC.*, 2018 WL 3455500, at *1 (W.D. Wash. July 18, 2018) (no bond because

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

plaintiff demonstrated strong probability of success on merits, and sought only to enjoin defendants from doing what they had no right to do under agreement).

**IV. CONCLUSION**

The Court should grant Coalview's second motion for a preliminary injunction and continue to enjoin TCM and TCM's officers, agents, servants, employees, and attorneys; and all other persons who are in active concert or participation with TCM and TCM's officers, agents, servants, employees, and attorneys, as follows: (a) enjoining TCM from terminating the agreements on the basis of insolvency as claimed in TCM and TCM's counsel's letters, including, without limitation, the March 29, 2019 letter; (b) immediately requiring TCM to proceed under the MSA and the parties' related agreements according to their terms, (c) requiring TCM to permit Coalview to continue operating upon receiving MSHA approval and thereafter timely paying Coalview for work done under the MSA and the parties' related agreements according to their terms; (d) preventing TCM from interfering with Coalview's efforts to get back into operation, to eliminate the Force Majeure and/or obtain MSHA approval, and (e) for such other and further relief in Coalview's favor as this Court deems just and proper.

DATED this 29th day of July, 2019.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1

2                          KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.

3                          By  *s/Steve I. Silverman*

4                              Steve I. Silverman, Fla. Bar No. 516831
Philippe Lieberman, Fla. Bar No. 27146

5                              Miami Center, 27th Floor
201 South Biscayne Boulevard

6                              Miami, FL  33131
Telephone:  (305) 379-9000

7                              Fax:  (305) 379-3428
Email:  ssilverman@klugerkaplan.com

8                              Email:  plieberman@klugerkaplan.com
*Attorneys for Plaintiff*

9                              *(Admitted Pro Hac Vice)*

10                        GARVEY SCHUBERT BARER, P.C.

11                              David R. West, WSBA #13680

12                              Daniel J. Vecchio, WSBA #44632
1191 Second Avenue, 18th Floor

13                              Seattle, WA  98101
Telephone: (206) 464-3939

14                              Fax: (206) 464-0125
Email:  drwest@gsblaw.com

15                              Email:  dvecchio@gsblaw.com
*Attorneys for Plaintiff*

16

17                      **<u>CERTIFICATE OF SERVICE</u>**

18       I hereby certify that on July 29, 2019, I electronically filed the foregoing motion with

19  the Clerk of the Court using the CM/ECF system which will send notification of this filing to

20  all parties registered to receive such notice.

21                             *s/ Steve I. Silverman*
                                      Steve I. Silverman

22

23

24

25

26

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*