The Honorable Ronald B. Leighton

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

9
10

COALVIEW CENTRALIA, LLC, a Delaware
limited liability company,

11

Plaintiff,

12

v.

13
14

TRANSALTA CENTRALIA MINING LLC, a
Washington limited liability company, and
TRANSALTA CORPORATION, a Canadian
corporation,

15
16

Defendants.

17
18
19
20
21
22
23
24
25
26
27

NO.    3:18-CV-05639-RBL

**TRANSALTA CENTRALIA MINING
LLC'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
AUGUST 2, 2019

ORAL ARGUMENT REQUESTED

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

### **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 2

    A.    Prior Dispute over Invoices More than 30 Days Old ............................ 3

    B.    Subsequent Operations and Origin of 2018 Dispute ............................. 5

III.   ARGUMENT ...................................................................................................... 6

    A.    The Court Should Deny Coalview's Motion for Summary Judgment on
        TransAlta's Contract Claims ................................................................. 6

        1.    As a matter of law, MSA Article 7.04 is not a limitation of actions ...... 7

        2.    To the extent that MSA Article 7.04 is ambiguous, it must be
            construed against Coalview ................................................................ 10

        3.    Coalview's bad-faith actions deprived TransAlta of its ability to
            object to invoices in a timely fashion .................................................. 12

        4.    Even if MSA Article 7.04 clearly and unambiguously barred
            invoice disputes more than 30 days old, it would not preclude
            TransAlta's contract claims here ......................................................... 13

    B.    TransAlta's Claim for Breach of the Covenant of Good Faith and Fair
        Dealing is Permitted under New York Law ....................................... 14

    C.    TransAlta's Fraud Claim is Permitted under Applicable Washington Law ..... 15

        1.    Under the terms of the Master Services Agreement, New York
            Law does not apply to tort claims ......................................................... 16

        2.    Under ordinary choice-of-law principles, TransAlta's fraud claim
            is governed by Washington law ........................................................... 17

        3.    TransAlta had the right to rely on Coalview's statements .................. 18

IV.    CONCLUSION ................................................................................................ 21

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - i
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

## I.    INTRODUCTION

Plaintiff's Motion for Summary Judgment (the "Motion") asks the Court to interpret the Master Services Agreement ("MSA")[1] so as to erect a time-bar to any claim for any breach by Coalview that results in overbilling not discovered within 30 days.  Coalview's interpretation is contrary to New York law, would render other provisions of the MSA and the parties' other agreements superfluous or nonsensical, and is at odds with the parties' own prior conduct.

New York law requires that any contractual limitation of actions must expressly, clearly, and unambiguously state that it bars "claims," "actions," "suits," or the like.  Article 7.04 of the MSA does no such thing.  Moreover, reading such a limitation into Article 7.04 would make other dispute-resolution provisions in the parties' agreements meaningless.  For these reasons, the Court should rule that, as a matter of law, the MSA does *not* bar TransAlta's claims in this case.

Even if Article 7.04 were ambiguous, however, ambiguities are strictly construed against the party seeking to impose a limitation of actions.  Moreover, the extrinsic evidence shows that, in prior invoice disputes regarding invoices more than 30 days old, Coalview never claimed that MSA Article 7.04 barred TransAlta's objections.  Rather, both parties recognized that the dispute-resolution provisions in Article 12 applied, not Article 7.04.  At the very least, this extrinsic evidence of intent makes resolving any ambiguity an issue of material fact precluding summary judgment in Coalview's favor.

Coalview's motion to dispose of TransAlta's good-faith and fair-dealing claim is premised on Coalview's own erroneous characterization of the claim as entirely duplicative of TransAlta's contract claims.  But the characterization is false.  Coalview's breach of contract can be established based on its failure to use industry best practices so as to accurately measure the coal removed from Pond 3C.  But the agreements lack detail regarding the means and process for measurement.  Implicit in them, however, is the understanding that Coalview would

---

[1] Each of the agreements cited in this brief is attached as an exhibit to Coalview's Motion for Summary Judgment, ECF No. 157.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 1
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1  not intentionally fail to calibrate or tamper with the meters or take density readings so as to

2  skew the results; while not expressly prohibited in the parties' agreements, such actions would

3  constitute bad faith.

4  　　　As for Coalview's motion to dispose of TransAlta's fraud claim, the Court has already

5  ruled on the issue—twice.  As it did in opposing TransAlta's motion for leave to amend to add

6  the fraud claim, and again in moving for dismissal of the fraud claim the Court had just allowed

7  TransAlta to add, Coalview once again argues that, under New York law, a party cannot claim

8  fraud based on the conduct giving rise to a claim for breach of contract.  This argument is

9  premised on New York's independent-duty doctrine.  But as TransAlta has now twice argued

10 and Coalview has yet to rebut, New York law does not apply to TransAlta's fraud claim, and

11 Washington's independent duty doctrine allows it.

12 　　　For all of these reasons, the Court should enter summary judgment that MSA Article

13 7.04 does not preclude TransAlta's claims in this case and otherwise deny Coalview's motion

14 for summary judgment.

15 　　　　　　　　　　**II.**　　　**STATEMENT OF FACTS**

16 　　　Coalview's motion is predicated on an interpretation of the MSA that is contradicted by

17 Coalview's prior conduct in a 2016 dispute between the parties concerning invoices much more

18 than 30 days old.  At no time during this dispute did Coalview invoke Article 7.04 as a bar to

19 TransAlta's objections.  Part II.A addresses these facts.

20 　　　In addition, Coalview argues that TransAlta's reliance on its misrepresentations was not

21 reasonable because TransAlta could have monitored Coalview's work.  But even if "you should

22 have known better than to believe me" were a valid defense to fraud in Washington, the fact is

23 that TransAlta has monitored Coalview's work and taken numerous other steps to try to ensure

24 the accuracy of its measurements.  Part II.B addresses these facts.

25

26

27

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 2
No. 3:18-CV-05639-RBL

**A.      Prior Dispute over Invoices More than 30 Days Old**

Coalview has insisted throughout this litigation that MSA Article 7.04 serves as a limitation of actions, barring TransAlta from disputing any invoice more than 30 days after it is issued.  But Coalview's own prior conduct and admissions contradict this interpretation.

In September of 2015, approximately 10 months after extraction of Waste-Coal Slurry ("WCS") from Pond 3C began, Ken Johnson and Roger Fish met to discuss discrepancies in Coalview's invoices—specifically, the tonnage reported removed by Coalview did not square with TransAlta's own measurement and analysis of the work done, and TransAlta wanted an explanation.  (Decl. Ken Johnson Opp. Mot. Summ. J. ("Johnson Decl.") ¶ 11.)  At this meeting, TransAlta raised issues with invoices dating all the way back to December 2014, and continuing through the then-present invoices for September 2015.  (*Id.*)  Specifically, TransAlta alleged that Coalview had miscalculated the dry tonnage of the WCS it removed and had only actually removed 62.7% of the WCS for which it had invoiced TransAlta, resulting in a $3.4 million overpayment to Coalview.  (*Id.* ¶¶ 8–10.)

At the September 2015 meeting, Mr. Fish acknowledged the discrepancy, acknowledged that it was a serious problem, and indicated Coalview's intent to correct it.  (*Id.* ¶ 11.)  Following the meeting, Mr. Fish confirmed that the error had been caused by improper conversion of Coalview's raw-measurement data into dry tonnage of WCS.[2]

By June of 2016, however, Coalview had not repaid TransAlta.  (*Id.* ¶ 13.)  Thus, on June 2, 2016, TransAlta served Coalview with a demand letter formally stating the nature of the problem and the period of the overbilling (December 2014 to September 2015), directing Coalview to reduce all future invoices by 10% until the overpayment was recouped. (*Id.* Ex. B.)

---

[2] Coalview later characterized the error as having occurred because: "[t]he PLC calculation and totalization of dry tons processed appears to have been incorrectly programmed by CVC's construction contractor resulting in an overpayment for waste coal slurry by TCM to CVC."  (*Id.* Ex. D, at 1.)

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 3
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1    Coalview responded to this demand by requesting that TransAlta take an equity stake in

2    Coalview as satisfaction of the acknowledged overpayment obligation.[3]  (*Id.* Ex. D.)  TransAlta

3    refused this offer in a letter dated July 5, 2016 and again asked that Coalview adjust down all

4    future invoices as requested in the June 2 letter.  (*Id.* Ex. E.)

5        Tellingly, Coalview's response was not to invoke Article 7.04 of the MSA, which

6    Coalview now contends bars any dispute over invoices more than 30 days old.  Rather,

7    Coalview requested an opportunity to verify the tonnage claim through an independent party.

8    (*Id.* Ex. F.)  In further correspondence, Coalview emphasized that it was operating at a loss and

9    at risk of insolvency and suggested a 7-year graduated repayment plan that would have made

10   TransAlta whole by 2022.  (*Id.* Ex. G.)  Coalview then invoked ***Article 12*** of the MSA—the

11   MSA's dispute-resolution section—to suggest that, if TransAlta did not approve of the

12   proposed repayment plan, Coalview would move the dispute to binding arbitration.  (*Id.*)

13       The arbitration never took place.  Instead, the parties continued to negotiate.  On

14   September 30, 2016, TransAlta declared Coalview in default and notified Coalview that it

15   would exercise its right of setoff as provided in MSA Article 7.03 to unilaterally withhold

16   payment of Coalview's invoices until the overpayment was recouped, beginning with

17   Coalview's October 16, 2016 invoice.  (*Id.* Ex. I.)  TransAlta began withholding payment in

18   October, as promised.

19       Again, rather than invoking MSA Article 7.04 and taking the position that TransAlta

20   was not within its rights to withhold payment because it had not disputed the invoices within 30

21   days, counsel for Coalview conceded the overpayment amount and agreed to TransAlta's

22   offset.  (*Id.* Ex. J.)  Coalview's counsel suggested, however, that TransAlta set off only half the

23   overpayment amount, and offered that Coalview would pay the other half in a lump sum prior

24   to October 31, 2016.  (*Id.*)

---

26
27   [3] In this proposal, Coalview states that "CVC concurs that CVC is obligated to provide TCM reimbursement of a
     mutually agreed upon amount, which TCM currently believes is approximately $3.5 million." *Id.*  Coalview later
     confirmed that, based on its own calculations, Coalview had been overpaid by $3,429,280.72.  (*Id.* Ex. H, at 8.)

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 4
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1    Coalview never made the lump-sum payment.  On November 1, 2016 TransAlta

2    therefore notified Coalview and the bondholders that Coalview was still in default under the

3    MSA and informed Coalview that, if it did not cure its default within 90 days, the MSA and

4    related agreements would be automatically terminated.  (*Id.* Ex. K.)  In the meantime,

5    TransAlta continued to set off Coalview's invoices, eventually recouping the full $3.4 million

6    (and curing Coalview's default) in December 2016.  (*Id.* ¶ 27.)

7    At no time did the parties enter into a formal settlement agreement or release of claims.

8    Instead, the dispute—a dispute over invoices then between one and two years old—was

9    resolved informally, without recourse to either litigation or arbitration.  And, at no time during

10   this dispute did Coalview ever suggest that MSA 7.04 applied to TransAlta's claim.  (*Id.* ¶ 28)

11   **B.**    **Subsequent Operations and Origin of 2018 Dispute**

12   Following this dispute, TransAlta continued to work with Coalview to improve the

13   yield and productivity of their reclamation operation.  This included efforts to ensure that

14   Coalview's measurement data was accurate.  Thus, in December 2016, TransAlta purchased for

15   Coalview a pair of Ronan nuclear density meters.  (Johnson Decl. ¶ 30.)  These meters came

16   online in May 2017 and provided input data for Coalview's corrected calculation methodology

17   through the outset of this lawsuit.  (*Id.*)  It was not until April of 2018 that TransAlta learned

18   that Coalview had tampered with the Ronan meters, had willfully miscalibrated the Ronan

19   meters, and had fabricated Marcy scale measurements.  (*Id.* ¶ 32.)  These realizations indicated

20   that Coalview's tonnage calculations were now being made on bad input data, again raising

21   concerns about the validity of its invoices, and precipitating the present dispute.  (*Id.* ¶ 33.)

22

23

24

25

26

27

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 5
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1

## III.    ARGUMENT

2
3

**A.    The Court Should Deny Coalview's Motion for Summary Judgment on
TransAlta's Contract Claims**

4

To create the limitation of actions that Coalview claims it does,[4] MSA Article 7.04

5

would have to clearly and unambiguously state that the failure to object to invoices precludes

6

subsequent legal action.  It does not, and nor would such an interpretation comport with the

7

other provisions in the parties' agreements.  For this reason, the Court should hold as a matter

8

of law that Article 7.04 does not bar TransAlta's claims, as discussed in part III.A.1 below.  In

9

the alternative, as discussed in part III.A.2, Article 7.04 is ambiguous in this regard, in which

10

case genuine issues of material fact preclude summary judgment in Coalview's favor.  Part

11

III.A.3 argues that Coalview is precluded from asserting that an objection within 30 days is a

12

prerequisite to filing suit, because its own wrongful conduct prevented TransAlta from raising

13

such an objection.  And finally, part III.A.4 makes clear that TransAlta's contract claim is not a

14

pure invoice dispute within the meaning of MSA Article 7.04 in any event:  Coalview's

15

breaches concern the data collection; while the inaccurate data translated into inflated invoices,

16

the invoices themselves are not the issue.

17

None of these issues was the focus of Coalview's initial motion for a preliminary

18

injunction or the Court's preliminary injunction order.  There, the issue was whether TransAlta

19

could withhold payments as an offset and the nature of the harm if it did, in light of the

20

eventual likelihood of success on the merits.  The parties did not brief the issue of whether, as a

21

matter of law, Article 7.04 created an enforceable limitation of actions, and thus the Court has

22

not decided this issue, as Coalview argues.

23
24

_____

25

[4] Coalview's prior briefing argues that MSA Article 7.04 is not a limitation of actions clause subject to the *Hurlbut*
standard because it does not limit the time to *sue*, merely the time to *initiate a dispute*, which might lead to

26

litigation in the future.  (*See* ECF No. 138, at 10–11.)  Thus Coalview claims that all MSA Article 7.04 does is
limit the *subject matter* of a dispute, not the time to bring suit.  But this is a distinction without a difference.

27

Semantics aside, Coalview's position is that MSA Article 7.04 effectively bars TransAlta from ever bringing suit
over any invoice it did not dispute within 30 days.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 6
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1.   **As a matter of law, MSA Article 7.04 is not a limitation of actions**

    a.   **Under New York law, the language of MSA Article 7.04 itself does not create a limitation of actions**

Under well-settled New York law, for a contract to limit the time in which a party may pursue legal action for breach, it must do so clearly and unambiguously.  *Hurlbut v. Christiano*, 405 N.Y.S.2d 871, 873 (1978).  In *Hurlbut*, for example, the plaintiff sued for a breach of a contract for the sale of a nursing home.  The parties' contract represented, among other things, that the nursing home was not operating in violation of New York health care regulations.  Under the contract, this representation survived for only three years.  After a protracted effort to resolve approximately 42 violations of the New York State Hospital Code, the plaintiff sued defendant—four years after the execution of the contract.

Like Coalview here, the defendant in *Hurlbut* argued that the plaintiff's claim was time-barred: any dispute regarding the defendant's representations about nursing home's regulatory compliance should have been initiated within the three-year period.  *Id.* at 872.  The New York Court of Appeals rejected the argument, because the contract did not contain language indicating that there was a time limit for parties to ***litigate*** a dispute arising out of the contract.  *Id.* at 873.  Thus, the agreement was clear and unambiguous that it ***not*** create a limitation of actions, and the plaintiff's suit was not time-barred.  *Id.*

Similarly, in *Fitzpatrick & Weller, Inc. v. Miller*, 765 N.Y.S.2d 555, 556 (2003), the plaintiff sued following delivery of a shipment of lumber that did not meet the standards promised by the defendant.  The defendant moved for summary judgment, pointing to a provision in the parties' contract that allegedly required plaintiff to dispute the defendant's invoices within 14 days, arguing—just as Coalview does here—that this clause served as a time bar to the plaintiff's claims.  *Id.*  Specifically, the contract required that "the buyer [] report any difference between the amount of the seller's invoice and the value of the shipment computed from the buyer's measurement and inspection within 14 days after [delivery]."  *Id.*  The trial court denied the motion, and the Appellate Division affirmed; citing *Hurlbut*, the court noted

1  that there was nothing in the language of the contract from which a limited time to sue over an

2  invoice could be inferred.  *Id.*

3      By contrast, in *Wechsler v. HSBC Bank USA, N.A.*, 674 Fed. Appx. 73, 75 (2d Cir.

4  2017) (applying New York law), the contract expressly provided that "legal action" must be

5  commenced within one year of an alleged breach.  Accordingly, the court held the contract

6  created an unambiguous limitation of actions.  *Id.*; *see also Backus v. Nationwide Mut. Ins. Co.*,

7  392 N.Y.S.2d 765, 766 (1977) (affirming dismissal where contract provided that "no such

8  action shall be brought at all" if not brought within a certain time); *Elliott-McGowan Prods. v.*

9  *Republic Prods., Inc.*, 145 F. Supp. 48, 49 (S.D.N.Y. 1956) (granting summary judgment

10  dismissing claim for breach where contract provided that "claim or demand shall have been

11  asserted and such action, suit or proceeding shall have been commenced within two years").

12      Here, Article 7.04 of the MSA says nothing about claims, actions, suits, litigation, or

13  anything of the sort.  Rather, it provides a process for resolving invoice disputes requiring that

14  "written notice of the [dispute] . . . must be given to the other Party prior to [30 days]," and the

15  undisputed portion of the invoice must be paid.[5]  As in *Hurlbut* and *Fitzpatrick & Weller, Inc.*,

16  such language does not clearly and unambiguously create a time-bar for legal actions and

17  thus—as a matter of law—does not preclude TransAlta's from bringing suit on claims for

18  damages based on invoices not objected to within 30 days.

19      Indeed, this case is more compelling than *Hurlbut* or *Fitzpatrick & Weller, Inc.,* because

20  the MSA expressly provides for non-waiver of rights not expressly waived.  In Article 7.05—

21  immediately following Article 7.04—the MSA states that "[each party] reserves to itself [all

22  rights] not expressly disclaimed or waived herein."  As Article 7.04 contains no express waiver,

23  Article 7.05 says that it cannot serve to limit TransAlta's right to bring this suit.  Thus, the

24  parties' own contract says what New York law says about a contractual limitation of actions:  if

25  not expressly and clearly stated, there is no such limitation.

26

27  [5] *See* ECF No. 157, Ex. A.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 8
No. 3:18-CV-05639-RBL

TransAlta agrees that there is no issue of material fact here; the Court should enter summary judgment in favor of TransAlta that MSA Article 7.04 does not bar TransAlta's claims in this case.

> **b.** **Taken in the context of the parties' agreements as a whole, MSA 7.04 does not create a limitation of actions**

New York law requires that courts interpreting contracts give "effect and meaning . . . to every term of [a] contract" and strive "to harmonize all of its terms." *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005). Interpretations "that render provisions of a contract superfluous" are particularly disfavored. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002). TransAlta's interpretation of the contract displays this consistency, whereas Coalview's interpretation conflicts with or renders superfluous the parties' agreements in several respects.

First, TransAlta's interpretation is consistent with the terms of Article 7.04 itself. The plain language of the article provides that, after receiving an invoice, TransAlta can dispute it within 30 days. It follows that, to dispute an invoice, there must be something evident on the face of the invoice to dispute. After making such a dispute, Article 7.04 provides that TransAlta shall pay the undisputed portion, and the parties will determine the validity of the disputed portion and adjust the invoice as needed. Thus, the MSA contemplates that, in a dispute, the invoice shall be divisible into disputed and undisputed portions—again based on the face of the invoice. As discussed above, nowhere does Article 7.04 say that TransAlta loses the right to sue after 30 days elapse.

Second, TransAlta's interpretation is consistent with Article 12, entitled "Dispute Resolution." Article 12 applies to "***[a]ny dispute, controversy, or claim***" arising out of the project agreements. (Emphasis added.) This article provides detailed guidance on the parties' legal remedies, setting forth options for both arbitration and litigation of disputes. Though it generally requires binding arbitration to resolve disputes, Article 12.03(h) provides that, for disputes over $1 million, a party may bring a lawsuit without first submitting to arbitration.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 9
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1    Nothing in Article 12 purports to limit the time to bring a suit, and nothing in Article 12

2    purports to limit the time period that may be the subject of a suit.  If the parties had intended a

3    hard 30-day limit on all claims relating to invoice amounts, surely the parties would have

4    included such language in the section of the MSA governing dispute resolution, but they did

5    not.

6           Third, the parties' other agreements also support TransAlta's interpretation.  Article

7    5.05 of the Exclusive Waste Coal Slurry Recovery and Processing Agreement ("Processing

8    Agreement")[6] states that, "[i]n the event a dispute arises between [the parties] within forty-five

9    [days] of the date of the weighing, due to a difference between [the parties'] calculation of the

10   quantity of WCS that was withdrawn for Processing, either Party may retain an independent

11   expert … to ascertain the accuracy of [Coalview's] density and flow equipment and to

12   recalculate the Tonnage of WCS."  Because invoices cover a semi-monthly period and are

13   issued immediately upon the end of each period (*see* ECF No. 4, Ex. J, invoice for June 1–15,

14   2018, issued June 16, 2018), Article 5.05 of the Processing Agreement would allow TransAlta

15   to dispute a measurement reflected in an invoice more than 30 days after the invoice date.

16   Under Coalview's interpretation, this provision would be superfluous because it allows for a

17   "dispute . . . due to a difference [in tonnage calculations]" after Coalview's alleged 30-day

18   window.  Article 5.02 of the Exclusive Coal Tendering Agreement[7] contains similar language,

19   also permitting independent verification of tonnage after more than 30 days.

20        **2.      To the extent that MSA Article 7.04 is ambiguous, it must be construed
              against Coalview**

21

22           In a contract dispute, a motion for summary judgment may be granted only where the

23   agreement's language is unambiguous and conveys a definite meaning.  *Sayers v. Rochester

24   Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).  Contract

25   language is ambiguous if it is "capable of more than one meaning when viewed objectively by

26

27   _____

     [6] *See* ECF No. 157, Ex. B.
     [7] *See* ECF No. 157, Ex. C.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 10
No. 3:18-CV-05639-RBL

1   a reasonably intelligent person who has examined the context of the entire integrated agreement

2   and who is cognizant of the customs, practices, usages and terminology as generally understood

3   in the particular trade or business." *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*,

4   818 F.2d 260, 263 (2d Cir. 1987).  Put more simply, a contract is ambiguous if it is subject to

5   two or more reasonable interpretations.

6        As discussed in part III.A.1.b above, TransAlta's interpretation of MSA 7.04 is

7   reasonable in that it provides a process and rules regarding invoice disputes—i.e., disputes

8   about the proper amount of a particular invoice, apparent from the face of the invoice.  It is also

9   reasonable when considered within the larger context of the parties' contracts.

10       Thus, even if Coalview's interpretation of MSA Article 7.04 were reasonable, at best

11   this would create an ambiguity in the contract.  And where a party claims that a contractual

12   provision sets a limitations period for legal actions, any such ambiguity must be strictly

13   construed against the party asserting the limitation.  *Hurlbut*, 405 N.Y.S.2d at 873; *Fitzpatrick*

14   *& Weller, Inc*, 765 N.Y.S.2d at 556.  On the basis of this strict construction alone, the Court

15   should deny Coalview's motion and grant summary judgment in TransAlta's favor that MSA

16   Article 7.04 does bar TransAlta's claims.

17       Even without the benefit of a strict-construction rule, however, the parties' conduct

18   provides further support for TransAlta's interpretation that MSA Article 7.04 does not bar its

19   claims.  In 2016, TransAlta notified Coalview that it intended to exercise its right of setoff to

20   recoup the overpayment of invoices that, at the time the dispute was initiated, were between 9

21   and 18 months old.  TransAlta initiated this dispute under the terms of the MSA, which

22   expressly allow for such setoffs.  (*See* MSA Art. 7.03.)  Rather than invoking MSA Article 7.04

23   and claiming that TransAlta was barred from disputing any invoice more than 30 days old

24   under any circumstances, Coalview responded by recognizing TransAlta's ability to set off

25   invoices and suggesting that—if it came to a formal dispute—Article 12 provided the

26   appropriate mechanisms for resolution.  At no point did Coalview take the position that MSA

27   Article 7.04 somehow barred TransAlta's claims.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 11
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1
2
3
4
5
6
7
8
9
10

Thus, even if the Court does not grant summary judgment in TransAlta's favor on this issue, it must deny Coalview's motion. Where a contract is ambiguous and "there is relevant extrinsic evidence of the parties' actual intent," then the contract's meaning becomes an issue of fact precluding summary judgment. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). Moreover, in resolving a summary judgment motion, a court must resolve all ambiguities against the movant. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). Given the parties' prior course of performance, and drawing all reasonable inferences in the light most favorable to TransAlta, there are at least genuine issues of material fact as to the interpretation of MSA Article 7.04 that preclude summary judgment in Coalview's favor.

11
12

### 3. Coalview's bad-faith actions deprived TransAlta of its ability to object to invoices in a timely fashion

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Coalview's position is that TransAlta must dispute any invoice within 30 days or forever lose the right to claim overpayment. Under this interpretation, if MSA Article 7.04 does not create a time-bar, then it creates a condition precedent. *See Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 467 (S.D.N.Y. 2007) (treating contractual period requiring plaintiff to object to defendant's conduct within set time period as condition precedent). But "[a] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." *Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of the City of N.Y.*, 28 N.Y.2d 101, 106–07 (1971). Accordingly, "one who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. *He will not be permitted to take advantage of his own wrong.*" *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (emphasis added); *see also Ferguson*, 478 F. Supp. 2d at 476, 80) (denying summary judgment where evidence showed that defendant's misleading statements precluded plaintiff from making timely objections). Moreover, the implied covenant of good faith and fair dealing requires that parties "will not intentionally and purposely do anything to prevent the other party from

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT - 12
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1   carrying out the agreement on his part." *Kader v. Paper Software Inc.*, 111 F.3d 337, 342 (2d

2   Cir. 1997) (internal quotation marks omitted).

3          Here, Coalview's bad-faith actions prevented TransAlta from satisfying the requirement

4   that it dispute invoices within 30 days.  On the face of the invoices, the charges aligned with the

5   measurements.  Thus, the invoices concealed the bad-faith and fraudulent practices that went

6   into the underlying data collection and calculations.  TransAlta raised the dispute at issue here

7   only after it became apparent from extrinsic evidence—TransAlta's observation and

8   measurement of Pond 3C—that something was amiss.  By skewing the measurements and

9   thereby concealing its breaching conduct, Coalview prevented TransAlta from timely objecting

10  to the invoices under MSA Article 7.04.  As in *Spanos*, to grant Coalview's motion would

11  permit Coalview to take advantage of its own wrong.  The Court should deny Coalview's

12  motion for summary judgment on this basis as well.

13          **4.      Even if MSA Article 7.04 clearly and unambiguously barred invoice
                       disputes more than 30 days old, it would not preclude TransAlta's contract
14                     claims here**

15          TransAlta's breach of contract claim is not a simple dispute over the accuracy of

16  invoices.  Rather, TransAlta's breach claim is rooted in allegations that Coalview failed in its

17  obligations to carry out the project in a commercially reasonable fashion and in good faith.

18  (ECF No. 126, Counterclaim ¶¶ 30–37.)  The inflated invoices are not the breach per se; they

19  are the means by which the breach caused damages.  Thus, MSA Article 7.04 does not govern

20  the present dispute (just as Coalview never argued that it controlled the prior billing dispute,

21  based on the faulty algorithm).

22          For this reason, Coalview's reliance on *Frontier Communications of the W., Inc. v. N.*

23  *Am. Long Distance Corp.*, 2001 WL 1397856 (W.D.N.Y. Oct. 24, 2001), is misplaced.  That

24  case was a simple billing dispute, with no counterclaim by the defendant that the plaintiff had

25  breached its contract.  There, the plaintiff sued for unpaid invoices after defendant withheld

26  payment, and the defendant asserted—as an affirmative defense—that the plaintiff had billed at

27  higher rates than promised.  *Id.* at 1–2.  Because the parties' contract required defendant to pay

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 13
No. 3:18-CV-05639-RBL

invoices before disputing them, the court ruled that the defendant's affirmative defense was barred.  Additionally, the contract at issue in *Frontier* required the defendant to dispute the invoice within 60 days or else "irrevocably waive" the challenge—thereby satisfying *Hurlbut's* requirement for express language limiting legal remedies.

**B.     TransAlta's Claim for Breach of the Covenant of Good Faith and Fair Dealing is Permitted under New York Law**

New York law recognizes that a covenant of good faith and fair dealing inheres in every contract.  *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (1995).  This covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."  *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978).  In carrying out one's performance, then, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933).  Thus the covenant provides protection against conduct that, while not expressly prohibited by the terms of the parties' contract, is nevertheless inconsistent with proper performance of the breaching party's obligations.

This distinction is illustrated in *Dalton v Educational Testing Service*, 87 N.Y.2d 384 (1995).  There, the defendant testing service ("ETS") rejected one of the plaintiff's SAT scores based on a large discrepancy with his score on a prior test and the conclusion of a handwriting expert that the two tests were not completed by the same person.  *Id.* at 387.  The plaintiff's contract with ETS allowed him to contest such a conclusion by submitting additional information, which he did.  *Id.* at 388.  But ETS deemed the information to be irrelevant and did not consider it or investigate further.  *Id.*  This failure to consider information the contract entitled the plaintiff to submit deprived him of the benefits of the agreement and thus was a breach of the duty of good faith and fair dealing.  *Id.* at 389, 93.

By contrast, in *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 2019 WL 1494398 (S.D.N.Y. April 2, 2019) (on which Coalview relies), the contract between the plaintiff supplier

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 14
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1   and defendant retailer set forth in detail how pricing and payment would be determined,

2   addressing such things as volume rebates, return credits, payment holds, and early pay

3   discounts.  The litigation was about interpreting the terms of various agreements, addenda, and

4   correspondence and calculating the proper payment amount.  And the plaintiff's good-faith-

5   and-fair-dealing claims parroted its contact claims, merely tacking on the conclusory allegation

6   that the defendant "conceal[ed] material information, deliberately miscalculat[ed] set formulas

7   and misrepresent[ed] facts."  *Id.* at *10–*11.

8        Here, the parties' agreements provided, among other things, that Coalview would weigh

9   the WCS removed from the pond using a mass flow meter and density gauge and use those

10  measurements for purposes of invoicing.  (*See* ECF No. 157, Ex. B (Processing Agreement)

11  Arts. 5.01, 5.02 & 5.04.)  The agreement does not, however, expressly prohibit Coalview from

12  taking measurements so as to skew the results or tampering with or failing to calibrate the

13  density meter.  Such actions constitute bad faith conduct that goes beyond a mere breach and

14  deprives TransAlta of the right to receive the fruits of the contract.  Among other things, as

15  discussed above in part III.A.3, this deceptive conduct deprived TransAlta of the ability to

16  make informed, timely objections to Coalview's invoices—a right that it had under the parties'

17  agreements.[8]  Taking these facts in the light most favorable to TransAlta, and drawing all

18  inferences in TransAlta's favor, the Court should deny Coalview summary judgment on

19  TransAlta's good-faith-and-fair-dealing claim.

20  **C.    TransAlta's Fraud Claim is Permitted under Applicable Washington Law**

21        Ever since TransAlta brought its motion for leave to amend back in early April of this

22  year, Coalview has asserted without justification or meaningful argument that New York law

23  controls the entirety of the parties' relationship and, therefore, any claims that may arise

24  _____

25  [8] Coalview's argument that TransAlta's good-faith-and-fair-dealing claim seeks to impose obligations inconsistent with the terms of the agreement because it "ignores" the alleged 30-day limitation period in MSA Article 7.04 is misguided for two reasons.  First, it assumes that there is such a limitation, which is wrong.  (*See supra* part

26  III.A.1.)  Second, expecting Coalview to act in good faith would in no way be inconsistent with a 30-day limitation period for objecting to invoices, even if one existed.  Following Coalview's logic, no breach by Coalview—no

27  matter how egregious—could be the basis for any cause of action unless discovered and objected to within 30 days of its most recent invoice.

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1   between the parties—whether in contract or not.  This argument was unconvincing when

2   presented in Coalview's opposition to TransAlta's motion for leave to amend (which the Court

3   granted); it was unconvincing when presented in Coalview's motion to dismiss TransAlta's

4   fraud claim (which the Court denied); and it has not improved with age or repetition.

5       The fatal flaw in Coalview's argument is that it is built upon the unsupported premise

6   that New York law applies to TransAlta's tort claims.[9]  TransAlta requests that the Court refer

7   to its opposition to Coalview's motion to dismiss, which addressed these choice-of-law issues

8   in detail (*see* ECF No. 141, at 4–9), but provides a brief review here.

9       **1.      Under the terms of the Master Services Agreement, New York Law does
               not apply to tort claims**

10

11      A contractual choice-of-law provision applies only to contract claims, not to tort claims

12  such as fraud.  This is true under both Washington law and New York law.  *J & J Celcom v.*

13  *AT&T Wireless Servs., Inc.*, 215 F. App'x 616, 619 (9th Cir. 2006); *Lazard Freres & Co. v.*

14  *Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997).  While parties can expressly agree

15  otherwise, a choice-of-law provision stating only that "this agreement shall be governed by and

16  construed in accordance with the laws of [a given state]" extends only to contract claims.  *See*

17  *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1126 (W.D. Wash. 2010); *PetEdge, Inc. v. Garg*,

18  234 F. Supp.3d 477, 486 n.4 (S.D.N.Y. 2017).

19      Here, MSA Article 20.01 reads, in its entirety: "This Agreement shall be governed by

20  and construed in accordance with the laws in the State of New York."  Thus TransAlta's fraud

21  claim is not subject to the contractual choice-of-law provision, and instead is subject to

22  ordinary choice-of-law principles.

23

24

25

26
    _____
27  [9] As TransAlta has noted before, the entirety of Coalview's efforts at grappling with this critical threshold issue are
    contained in a footnote, appearing now in several of its briefs, stating in its entirety that "New York law governs
    the parties' dispute. MSA, ¶20.01."  (*See, e.g.*, ECF No. 132, at 5, n.1.)

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 16
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

**2.** **Under ordinary choice-of-law principles, TransAlta's fraud claim is governed by Washington law**

In the absence of an applicable choice-of-law provision in the parties' contract, federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010). Under Washington law, courts will only engage in a choice-of-law analysis where there is "an actual conflict between the laws or interests of Washington and the laws or interests of another state." *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012) (citing *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676 (2007)).

Such a conflict arguably exists here: as Coalview repeatedly has pointed out, under New York's independent-duty doctrine, fraud claims generally are subsumed within a claim for breach of contract. *See generally J.M. Builders & Associates, Inc. v. Lindner*, 889 N.Y.S.2d 60, 63 (2009). In contrast, Washington law explicitly recognizes that there is "an independent duty not to engage in fraud or negligently misrepresent facts that exists separately from the terms of [a] contract." *Superwood Co., Ltd. v. Slam Brands, Inc.*, 2013 WL 4401830 (W.D. Wash. Aug. 15, 2013) (denying summary judgment) (citing *Elcon Construction, Inc. v. Eastern Washington University*, 174 Wn.2d 157, 165–66 (2012)).

Where a conflict of laws exists, Washington courts apply the most-significant-relationship test to determine which state's law to apply. *Rice v. Dow Chem. Co.*, 124 Wn.2d 205, 213 (1994) (citing Restatement (Second) of Conflict of Laws § 145 (1971)). This test considers (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship between the parties is centered. *Bryant v. Wyeth*, 879 F. Supp. 2d 1214, 1220 (W.D. Wash. 2012). Applying this test to the circumstances of the present case, it is clear that Washington has the most significant relationship to the relevant events, and therefore Washington law applies. (*See* ECF No. 141, at 7–8.) Indeed, other than the choice-of-law provision in the MSA, there is no nexus between the parties, their relationship, or their conduct, and New York.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 17
No. 3:18-CV-05639-RBL

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1    Thus, under applicable Washington law, TransAlta's fraud claim is not barred by the

2    independent-duty doctrine, and Coalview's motion for summary judgment must fail as a matter

3    of law.

4         **3.    TransAlta had the right to rely on Coalview's statements**

5         A party is entitled to rely on a positive, distinct, and definite representation and need not

6    make further inquiry concerning the particular facts involved.  *Bite Tech Inc. v. X2 Impact, Inc.*,

7    2012 WL 13018749, at *3 (W.D. Wash. Dec. 21, 2012) (citing *Douglas Northwest, Inc. v. Bill*

8    *O'Brien & Sons Constr., Inc.*, 64 Wn. App. 661, 679 (1992)).  This rule applies where

9    misrepresentations are made to induce conduct, the misrepresentations succeed in inducing

10   conduct, and the complaining party was actually misled by the misrepresentations.  *Id.* (citing

11   *Jenness v. Moses Lake Dev. Co.*, 39 Wn.2d 151, 159 (1951)).  "[I]t is immaterial that the means

12   of knowledge are open to the complaining party, or easily available to him, and that he may

13   ascertain the truth by proper inquiry or investigation."  *Id.*  In particular, Washington has a

14   strong policy of supporting a plaintiff who relies on misrepresentations made by a vendor. *See*

15   *Gordon v. Hillman*, 91 Wn. 490, 495 (1916), *aff'd*, 95 Wash. 699 (1917) ("The fraudulent

16   vendor cannot escape from liability by asking the law to applaud his fraud and condemn his

17   victim.").  For these reasons, the argument that TransAlta should not have trusted Coalview's

18   measurements and representations is meritless as a matter of law.

19        Moreover, as matter of fact, TransAlta's reliance on Coalview's measurements was

20   entirely reasonable.  Throughout the course of the parties' relationship, TransAlta has made

21   efforts to ensure that Coalview was meeting its obligations.  This included direct inquiries as to

22   the methods and practices involved with Coalview's measurement of removed slurry.  During

23   the 2016 dispute, Coalview made numerous assertions about how it would improve its practices

24   going forward, thereby preventing a repeat of the circumstances that led to that dispute.

25   (Johnson Decl. Ex. H.)  Thus, in December of 2016, to ensure accurate measurement and

26   invoicing going forward, Coalview purchased for Coalview a pair of Ronan nuclear density

27   meters.  (*Id.* ¶ 30.)  TransAlta believed that, by assisting Coalview in this manner, it had taken

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 18
No. 3:18-CV-05639-RBL

1   commercially reasonable steps to ensure accurate measurements going forward, and that

2   therefore TransAlta did not need to engage in parallel contemporaneous measurement of WCS.

3   (*Id.* ¶ 30.)

4         Not only that, but TransAlta did in fact measure the amount of WCS removed by

5   Coalview—more than once.  Over the life of the project, TransAlta has carried out several

6   surveys of Pond 3C.  (*Id.* ¶ 6.)  It was one such survey that led to the discovery of Coalview's

7   underperformance in 2016, and a survey in March 2018 led to the investigation which

8   precipitated the present dispute.  (*Id.* ¶¶ 3–7, 33.)  Indeed, had TransAlta not carried out

9   measurements of Coalview's work, TransAlta would have no measurement of its damages in

10  this case.

11        Further, it would not have been reasonable for TransAlta to have installed its own

12  parallel measurement system.  Such an effort would have been duplicative of the efforts

13  TransAlta made in helping Coalview obtain and operate its own measurement system, as once

14  installed and calibrated, Coalview's measuring equipment should have been reliable for several

15  years unless tampered with.  (*Id.* ¶ 32.)  It was not until the outset of this dispute that TransAlta

16  learned that Coalview had been deliberately tampering with the Ronan meter, as well as

17  fabricating Marcy scale measurements—the impetus for TransAlta's fraud claim.  (*Id.* ¶ 33.)

18        At the very least, whether TransAlta reasonably relied on Coalview's false statements

19  raises genuine issues of material fact, including issues regarding what TransAlta actually did do

20  and the feasibility of doing what it did not do.  Taking the above facts as true, and drawing all

21  reasonable inferences in TransAlta's favor, these issues preclude summary judgment in

22  Coalview's favor.  *See Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1100 (W.D.

23  Wash. 2011) (denying summary judgment).

24        Coalview's only authority to the contrary, *Breco Envtl. Contractors, Inc. v. Town of

25  Smithtown*, 762 N.Y.S.2d 822, 823 (2003), is in apposite.  There, the defendant hired the

26  plaintiff to cap its landfill by emplacing soil over the landfill material.  Before beginning work,

27  the plaintiff informed the defendant that the plaintiff's estimates regarding the amount of soil

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 19
No. 3:18-CV-05639-RBL

required were low and submitted an independent higher estimate.  At the end of the project, after the plaintiff submitted invoices for more soil than defendant's estimates had called for, the defendants refused to pay.  Denying defendant's motion for leave to amend its counterclaim to add a count for fraud, the court held that the defendant could not have not reasonably relied upon the plaintiff's statements because (a) the defendant had been informed by the plaintiff that completing the job would require more soil than defendant's estimates called for, and (b) the defendant could have devised a method of monitoring the quantity of soil actually delivered. *Id.*  But in *Breco*, the defendant never took ***any*** measurements—it simply relied upon its initial estimates, alleged that the plaintiff had billed it for emplacing far more soil than those estimates called for, and withheld payment.  That is not the case here.

Breco is inapplicable for a number of reasons.  First, as discussed above, *Breco* is inapposite on its facts.  Second, *Breco* relies upon New York law, whereas Washington law applies to TransAlta's fraud claim and recognizes TransAlta's right to rely on Coalview's statements.  *See Jenness*, 39 Wn.2d at 159 ("It is immaterial that the means of knowledge are open to the complaining party… and that he may ascertain the truth by proper inquiry or investigation.")  Third, *Breco* did not involve a motion for summary judgment but instead concerned the defendant's motion for leave to amend its counterclaim to add a count for fraud.  And finally, the court's denial of leave to amend in *Breco* cannot be reduced to a simple ruling that the defendant had no right to rely on the plaintiff's representations; the court also noted that the defendant's fraud count was duplicative of its breach of contract claim—a claim that was not challenged or addressed by the court's opinion (and would have a different result under applicable Washington law).

Thus, Coalview's argument that TransAlta should not have trusted is contrary to Washington law regarding fraud and, in any event, raises genuine issues of material fact.

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 20
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1

## IV.    CONCLUSION

2      For the foregoing reasons, the Court should deny Coalview's Motion for Summary

3  Judgment and enter summary judgment in TransAlta's favor that MSA Article 7.04 does not

4  bar its claims in this case.

5

6          DATED: July 29, 2019.

7                              SAVITT BRUCE & WILLEY LLP

8

9                     By    s/Miles A. Yanick
                            _____
10                          Miles A. Yanick, WSBA #26603
                            Duncan E. Manville, WSBA #30304
11                          Sarah Gohmann Bigelow, WSBA #43634
                            Jacob P. Freeman, WSBA #54123
12                          1425 Fourth Avenue Suite 800
                            Seattle, Washington  98101-2272
13                          Telephone:  206.749.0500
                            Facsimile:   206.749.0600
14                          Email:    myanick@sbwLLP.com
                                      dmanville@sbwLLP.com
15                                    sgohmannbigelow@sbwLLP.com
                                      jfreeman@sbwLLP.com
16
17                          Attorneys for Defendants TransAlta Centralia Mining LLC
                            and TransAlta Corporation
18

19

20

21

22

23

24

25

26

27

TRANSALTA CENTRALIA MINING LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - 21
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1

## <u>CERTIFICATE OF SERVICE</u>

2    I certify that a copy of the foregoing document was filed electronically with the Court

3  and thus served simultaneously upon all counsel of record, this 29th day of July, 2019.

4

5  _____

6  Nate Garberich

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27