1

2

3

4

5

6

7

8

The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

| | |
|---|---|
| COALVIEW CENTRALIA, LLC, a Delaware limited liability company,<br><br>      Plaintiff,<br><br>      v.<br><br>TRANSALTA CENTRALIA MINING LLC, a Washington limited liability company, and TRANSALTA CORPORATION, a Canadian corporation,<br><br>      Defendants. | NO.    3:18-CV-05639-RBL<br><br>**TRANSALTA CENTRALIA MINING, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING TERMINATION**<br><br>NOTE ON MOTION CALENDAR: FRIDAY, SEPTEMBER 20, 2019<br><br>ORAL ARGUMENT REQUESTED<br><br>**FILED UNDER SEAL** |

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION
No. 3:18-CV-05639-RBL

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     FACTS ....................................................................................................... 2

    A.   The Reclamation Project and its History ....................................... 2

    B.   Coalview's Default ......................................................................... 3

        1.   The Master Services Agreement ............................................ 3

        2.   Notice of default and Coalview's response ........................... 4

        3.   Current financial information shows that, ██████████ ██████████ ....................... 5

    C.   The Dredge Fatality and Resulting Work Stoppage ......................... 8

III.    ARGUMENT ............................................................................................... 9

    A.   Based on the Undisputed Facts, Coalview ██████████ ██████████ ................................. 9

        1.   Coalview ██████████ ............................................ 10

        2.   Coalview ██████████ .......................................... 11

        3.   Coalview ██████ .................................................. 13

    B.   As a Matter of Law, the Dredge-Sinking was not a Force-Majeure Event ...... 14

        1.   Coalview can present no evidence that the dredge-sinking was unforeseeable or beyond its control ........................................ 14

        2.   The plain language of the MSA does not encompass the dredge-sinking as a force-majeure event ........................................ 15

        3.   The words, "without limitation," do not extend the force-majeure clause to include the dredge-sinking ........................................ 17

    C.   MSHA's Actions in Response to the Dredge-Sinking were not a Force-Majeure Event ......................................................................... 19

    D.   Even if a Force-Majeure Event Had Occurred, This would not Excuse Coalview's Default ......................................................................... 22

        1.   Coalview's default was not caused by the alleged force-majeure events ........................................................................... 22

2.  Coalview failed to provide prompt written notice of the alleged force- majeure event ............................................................................. 23

IV.  CONCLUSION ............................................................................................... 24

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - iii
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

# I.     INTRODUCTION

It is now apparent why Coalview fought so hard to conceal its financial information from TransAlta.  The ledger that the Court recently required Coalview to produce shows that █

████████████████████████████████████████████████████████████████████████

███     The reason for Coalview's failure to pay debts also is clear: ███████████████

██████████████████████████████     On any or all of these grounds, Coalview was in default under the Master Services Agreement ("MSA") when TransAlta gave notice of the default on March 29 of this year, and it was in default at end of December, when Coalview's dredge sank.  Based on the undisputed facts as established by Coalview's own financial records, TransAlta is entitled to an order dismissing Coalview's claim for a declaratory judgement that TransAlta may not terminate the MSA based on an event of default under MSA Article 11.20(c). (ECF No. 135, Amended Complaint, Count II.)

In defense of ██████████████████████████, Coalview seeks to capitalize on the fact that its dredge sank, ██████████████████████████, by calling it a force-majeure event.  The Mine Safety and Health Administration ("MSHA") recently completed its investigation and report of the incident.  MSHA has concluded that ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████     And the fact that MSHA shut the site down pending its investigation is not only foreseeable but the direct and inevitable response to an incident ███████

██████████████████████████████████     Coalview can offer no

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 1
No. 3:18-CV-05639-RBL

**Savitt Bruce & Willey llp**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

evidence to the contrary.  Accordingly, TransAlta is entitled to an order dismissing Coalview's force-majeure defense.

Finally, given Coalview's default under MSA Article 11.02(c) and the absence of force-majeure protection, the Court should order that, pursuant to the March 29, 2019 termination notice and MSA Article 11.01, the MSA is terminated effective April 2, 2019.

## II.   FACTS

### A.   The Reclamation Project and its History

During the lifetime of the Centralia coal mine, waste from the mine's coal-processing plant, which prepared mined coal for use in the Centralia Steam Plant, was stored in several impoundments known as Ponds 3B, 3C, and 3D (the "Ponds").  This waste, known as waste-coal slurry ("WCS"), included a significant quantity of small coal particles ("fines").

With the mine now closed, TransAlta is obligated by the terms of its permits with the Office of Surface Mining ("OSM") to reclaim the mine site, including the Ponds.  (Decl. B. Nelson Opp. P.'s Second Mot. For Prelim. Inj. ¶ 3–4.)[1]  The Ponds must be reclaimed in large part because they are artificial, created by several impoundments that the Mine Safety and Health Administration ("MSHA") classifies as High-Hazard Dams.  (*Id.* ¶ 5.)  Reclamation of the Ponds involve dredging them empty, backfilling them to an appropriate level, notching the impoundments so that they can no longer retain water, and landscaping the site to OSM standards. (*Id.* ¶ 6.)

In May of 2010, TransAlta began negotiating an agreement to dredge the Ponds with a company known as Beard Technologies.[2]  Beard Technologies represented that it possessed proprietary technology that would let it recover coal fines from WCS in an economical manner. (*Id.* ¶ 11.)   These negotiations were the brainchild of Roger Fish, then a TransAlta employee, who had been tasked with finding ways to reduce the overall cost to TransAlta of complying with its obligation to reclaim the site of the former Centralia coal mine.  (*Id.* ¶ 9.)   TransAlta

---

[1] This declaration is being filed contemporaneously with the present motion.

[2] In April 2011, Beard Technologies became Coalview Recovery Group, LLC.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 2
No. 3:18-CV-05639-RBL

1  believed it could realize a cost savings by separating the coal fines from WCS during

2  reclamation and burning the recovered coal in the Centralia Steam Plant. (*Id.* ¶ 10.)

3         After several years of negotiation, the parties entered into a series of agreements,

4  including the MSA, in December 2013.  Coalview began operations a year later, in December

5  2014.  From the outset, Coalview had difficulty getting the job done. (*Id.* ¶ 15.)  Coalview was

6  plagued by delays and breakdowns, and never substantiated its claims that it could extract coal

7  fines from the WCS in the Ponds in an economically viable manner. (*Id.* ¶ 12.)    To the

8  contrary, Coalview has been losing money practically since day one of operations.  (Decl.

9  Lorraine Barrick Supp. Mot. Partial Summ. J. ("Barrick Decl.") ¶ 9.)  These problems

10  culminated in March of 2018, when it became clear that Coalview was not going to be able to

11  complete the dredging operation within the deadline contemplated by the parties' agreements.

12  (ECF No. 19, at ¶¶ 13–14.)

13         Moreover, it became apparent that Coalview was billing TransAlta for work not done.

14  A previous dispute had resulted in Coalview admitting that it had overcharged TransAlta by

15  $3.4 million between December 2014 and July 2015 due to improperly programmed meters.

16  (*See* TransAlta's Opposition to Coalview's Motion for Summary Judgment, ECF No. 167, at 5–

17  7.)  Despite TransAlta's efforts to help Coalview resolve these problems, including purchasing

18  new meters for Coalview, TransAlta learned that Coalview was now fabricating measurements

19  and had tampered with the meters, leading to inflated invoices.  (*Id.*)  TransAlta then attempted

20  to exercise its setoff rights under the MSA, and this litigation ensued.

**B.**    **Coalview's Default**

       **1.**    **The Master Services Agreement**

         The parties' Master Services Agreement ("MSA") identifies as an "Event of Default" a

situation where "Either Party… (iii) otherwise becomes bankrupt or insolvent, or (iv) is unable

to pay its debts as they fall due or, if able, fails to do so."  (MSA Art. 11.02(c).)[3]  Thus, any one

---

[3] The MSA is filed with the Affidavit of R. Fish, ECF No. 4, Ex. G.  For the Court's convenience, a copy of the MSA is attached hereto as Appendix A.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 3
No. 3:18-CV-05639-RBL

of the following is an Event of Default: (1) *Failing to pay* debts when due; (2) Being *unable to pay* debts when due; or (3) Being bankrupt or insolvent.

Although the definition of other Events of Default (*e.g.*, a material breach) includes the *failure to cure* within specific time (*see id.* Art. 11.02(a) & (b)), an Event of Default based on insolvency, bankruptcy, inability to pay debts, or failure to pay debts does not include any cure period.

### 2. Notice of default and Coalview's response

By March, TransAlta had obtained enough information from the Washington Economic Development Finance Authority ("WEDFA") to determine that Coalview was insolvent and failing to pay its obligations under the bond, and thus was in default under the MSA.  By notice of default to Coalview dated March 29, 2019, TransAlta explained that Coalview was insolvent because, "[a]mong other things, Coalview's liabilities exceeded its assets, as shown on CVC Balance Sheets" as of December 31, 2019.  (ECF No. 130 Ex. A.)  Coalview also was in default because:

> Coalview has been unable to make all of the payments due to bondholders.  By June 2017, Coalview had defaulted on its obligation to make principal payments on the bonds, maintain reserves, and maintain its debt-service coverage ratio.  These prior defaults resulted in U.S. Bank's forbearance agreement, notice of which was dated June 6, 2017, in which certain requirements of the original debt were waived or restructured.

(*Id.*)  At the time, WEDFA did not have information about Coalview's financials post-2018, but "given the absence of any operating revenue" TransAlta noted that "there [was] no reason to think circumstances [had] improved" by March 29.  (*Id.*)  TransAlta concluded its letter by offering to consider any information Coalview might offer to the contrary.

Coalview denied that it was in default but refused to provide any information to support its position.  (*Id.* at Ex. B.)  Despite repeated requests, Coalview steadfastly declined to provide any basis for its assertions that it was not in default.  (*Id.* at Exs. C–F.)  Instead, Coalview

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 4
No. 3:18-CV-05639-RBL

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1   amended its complaint to seek a declaratory judgment that TransAlta may not terminate the

2   MSA based on an event of default under Article 11.02(c).  (ECF No. 135 ¶¶ 115–130.)[4]

3          Coalview's amendment mooted any objection that its finances were not relevant.  But

4   when TransAlta demanded production of Coalview's financial statements and information

5   about its payment of debts in light of the amended complaint, Coalview continued to object

6   (ECF No. 146 ¶ 2) and opposed TransAlta's motion to compel these documents (ECF No. 153).

7   The Court initially denied but then granted this motion, ordering Coalview to produce current

8   financial statements and information about its payment (or non-payment) of debts.  (ECF No.

9   170.)

10          **3.    Current financial information shows that,** ██████████████████████

11   ████████████████████████

12          Now that Coalview has been forced to reveal its financial situation, ████████████

13   ██████████████    Coalview's financial records show that, as of March 29, 2019, when

14   TransAlta declared default, C██████████████████████████████████████████████

15   ████    This was true not only on March 29 but well before Coalview's dredge sank in late

16   2018.

17          **a.**    ████████████████████████

18   ████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ████████████████████████████████    On June 27, 2019, U.S. Bank National Association,

23   the bond trustee, declared Coalview to be in default under the terms of its loan agreement with

24   its bondholders.  (ECF No. 159 Ex. A.)  "Among other things," the trustee declared that default

25   had occurred because Coalview had failed "to maintain a Debt Service Coverage Ratio of

26   ──────────────────────────

27   [4] The amended complaint alleges that, as of April 16, 2019, "TransAlta was already on notice" of Coalview's position that a force-majeure event had occurred.  (ECF No. 135 ¶ 41.)  But nowhere in any of its court papers or correspondence does Coalview specify the date or form of the alleged notice.  A comprehensive review of the correspondence between the parties reveals no evidence of such notice.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 5
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1.0x." (*Id.*)  Coalview also failed to make its bond payment in February 2017.  (*Id.* ¶ 20.)  This failure led to the execution of a forbearance agreement between Coalview and the bondholders on or about July 20, 2017.[5]

In addition to failing to pay its debts to the bondholders, ███████████████████
████████████████████████████████

    ➢ ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████

    ➢ ███████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
██████████████████████████

    ➢ ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████

    ➢ ███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████[6]

[5] TransAlta relies upon a draft version of the forbearance agreement dated July 20, 2017 that it received from WEDFA. TransAlta requested that Coalview provide an executed copy of the agreement and Coalview refused. The existence of the forbearance agreement is not in doubt; Mr. Fish disclosed its existence in Coalview's audited 2017 financial disclosures.  (Barrick Decl, ¶ 20(c).)

[6] TransAlta also requested that Coalview produce documents showing any obligations that were paid on Coalview's behalf by third parties between January 1, 2018 and the present, as these constitute a failure to pay a debt and thus fall within the scope of the Court's July 30 order. Coalview refused to produce these documents.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 6
No. 3:18-CV-05639-RBL

1    Coalview's failures to pay debts began well before its dredge sank in late December

2   2018.  (*Id.* ¶ 18.)[7]  Nor can Coalview's non-payment be attributed to TransAlta's withholding

3   of $1.5 million payment until February 2019 while the parties resolved a dispute regarding

4   June–October 2018 invoices.  (*Id.* ¶ 11, 23, 26.)

5        **b.**    ████████████████████████████████████

6    According to Coalview's own audited financial statements for 2014 through 2017 and

7   an internally prepared financial statement for 2018[8], Coalview's net income was consistently

8   negative in all five consecutive years.  (Barrick Decl. ¶ 9.)  Since beginning operations,

9   Coalview has repeatedly missed its revenue projects and experienced net losses.  (Id. ¶ 10.)

10  Coalview's audited financial statements from 2014 through 2017 reveal that Coalview's cash

11  flows from operating activities also were negative for every year except 2017.  (Id. ¶ 12.)  Even

12  for 2017, it appears the positive cash flow is due in part, if not completely, to the fact that

13  Coalview stopped replenishing the restricted cash reserve fund as required by its bondholders,

14  as well as its failure to make the February 1, 2017 bond payment. In other words, Coalview

15  showed positive cash flow only because it had defaulted on its obligations to the bondholders.

16  (Id. ¶ 13.)

17       Finally, liquidity analyses reveal that, except for 2014 (which was the year in which

18  Coalview received the bond funds), Coalview's working capital was consistently negative,

19  meaning that its current assets were less than its current liabilities. (Id. ¶ 14.)  By 2015,

20

21

_____

22  [7] Coalview filed its Second Motion for Preliminary Injunction and supporting declaration of its expert, Garrett
    Wilson, while TransAlta's motion for reconsideration on the motion to compel production of this financial
23  information was pending.  (ECF Nos. 163 & 165.)  To avoid contradicting its position that the information
    TransAlta was seeking was irrelevant, Coalview was forced to limit the information provided to Mr. Wilson to
24  information publicly available at the time.  (ECF No. 165 ¶ 15.)  Thus, although his declaration was dated July 29,
    2019, Mr. Wilson was limited to making projections about Coalview's financial condition as of March 29, 2019
25  based on 2018 financial information, and he never reviewed Coalview's general ledger.

26  [8] Coalview has not produced audited financial statements for 2018.  TransAlta pointed out to Coalview that ████
    ████████████████████████████████████████████████████████████████████████████

27  TransAlta asked Coalview for these financial statements because they fall within the scope of the Court's July 30
    Order compelling Coalview to produce documents and Coalview refuses.

MOTION FOR PARTIAL SUMMARY JUDGMENT                    **SAVITT BRUCE & WILLEY LLP**
REGARDING TERMINATION - 7                              1425 Fourth Avenue Suite 800
No. 3:18-CV-05639-RBL                                  Seattle, Washington 98101-2272
                                                       (206) 749-0500

1   Coalview's current ratio, quick ratio, and cash ratio were all below one (1), which are all

2   indications of an inability to pay obligations as they become due.  (*Id.*)

3        All of the above factors (decreasing revenues, continuing losses, negative working

4   capital, and negative cashflow) point toward an inability to pay debt. (*Id.* ¶ 15.)  And in fact,

5   there was a long period of time during which Coalview's liquid assets were less than its current

6   liabilities, meaning that Coalview was unable to pay its debts as they came due from liquid

7   reserves.  (*Id.*)  In particular, negative working capital indicates that current assets are

8   insufficient to cover current obligations—i.e., an inability to pay debts as they become due.

9   (*Id.* ¶ 16.)  By December 31, 2018, Coalview's net working capital was approximately negative

10  $2.6 million, which means that it was unable to pay its debts as they came due.  (*Id.*) ███████

11  █████████████████████████████ (*Id.*)

12  **C.      The Dredge Fatality and Resulting Work Stoppage**

13       On the evening of December 29, Coalview employee Caleb J. Brown was operating

14  Coalview's dredge, removing WCS from Pond 3C.  ████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██████████████████

24       Upon their arrival at the mine site, MSHA investigators issued an order pursuant to 30

25  U.S.C. § 813(k), also known as Section 103(k) of the Mine Act, shutting down Coalview's

26  operation pending MSHA's investigation (the "K Order").  Six months later, Coalview

27  amended its complaint to include a claim seeking declaratory relief to the effect that these

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 8
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

events constituted a force-majeure event—i.e., among other things, something unforeseeable and outside of its control—and that therefore TransAlta may not terminate the MSA.  (ECF No. 135 ¶¶ 115–30.)

MSHA completed its investigation and issued its report[9] on the causes of the sinking and fatality on August 19, 2019.  (Nelson Decl. ¶ 3.) █████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

Reviewing the 13-page MSHA report, ███████████████████████

███████████████████████████████████████████████████

██████████████████████████

## III.   ARGUMENT

### A.   Based on the Undisputed Facts, Coalview had Failed to Pay Its Debts and was Unable to Pay Its Debts as of the Termination Date

Article 11.02(c) of the Master Services Agreement ("MSA") provides three distinct bases for a declaration of default and termination by TransAlta:  Coalview (1) becomes

---

[9] The MSHA Supervisory Inspector who provided the report, Mr. Randy Cardwell, explained that the parties had until Thursday, August 22 to submit proposed corrections regarding the factual details, such as names, spelling, etc.  TransAlta submitted several such corrections to Mr. Cardwell.  However, Mr. Cardwell stated that MSHA will not allow any changes to their findings or conclusions.  The report is expected to be published imminently. (Nelson Decl. ¶ 4.)

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 9
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1  "bankrupt or insolvent" (terms not defined in the MSA); (2) "is unable to pay its debts as they

2  fall due"; *or* (3) "fails" to pay its debts as they fall due, even if able.  By any measure, the

3  undisputed facts establish that Coalview was already in default before its dredge sank at the end

4  of 2018; by March 29, 2019, when TransAlta sent its notice of default, Coalview's inability to

5  pay had only become more pronounced and the number of its unpaid debts had increased.

**1.** ██████████████████████████

7       The MSA provides for default if Coalview "fails" to "pay its debts as they fall due,"

8  regardless of its hypothetical ability to do so.  (MSA Art. 11.02(c).)  Unlike the "insolvency" or

9  "ability to pay" provisions, this basis for default requires no inquiry into Coalview's financial

10 health.  Rather, it is a straightforward inquiry as to whether Coalview has, in fact, timely paid

11 its debts.

12      The agreement between the parties in *Brookfield Asset Mgmt., Inc. v. AIG Fin. Products*

13 *Corp.*, 2010 WL 3910590 (S.D.N.Y. Sept. 29, 2010), contained a similar default provision.

14 Under that agreement, an event of default occurred when either party "'becomes insolvent or

15 *fails or* is *unable* or admits in writing its inability generally to pay its debts as they become

16 due.'"  *Id.* at *1 (emphasis added).  The court noted that "fails to pay" is distinct from being

17 unable to pay, because it "leaves open the possibility that the entity has the resources to pay its

18 debt, but is choosing not to, for whatever reason."  *Id.* at *8.  The court also found that the

19 parties' use of the present tense, "fails" to pay, "speaks to a moment in time, and implies that

20 the failure… must actually happen in order to trigger an Event of Default."  *Id.* at *2.  By the

21 same token, "fails to pay" does not contain a prospective element that would require the court

22 to consider the likelihood of failing to pay at some future date.  *Id.* at *7.

23 ████████████████████████████████

24 ██████████████████████████████████████

25 ██████████████████████████████████████

26 ██████████████████████████████████████

27 ████████████████████████████    Based on these undisputed facts, Coalview

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 10
No. 3:18-CV-05639-RBL

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

was in default under the plain meaning of the MSA, both as of March 29, 2019 and before the

dredge sank.

In addition to letting debt go unpaid, "making arrangements to extend payment"—for

example, through a forbearance agreement, also "is evidence of failure to pay debts as they

become due." *In re Hentges*, 351 B.R. 758, 769 at n.16 (Bankr. N.D. Okla. 2006); *In re Knoth*,

168 B.R. 311, 318 (Bankr. D.S.C. 1994).  Thus, the fact that Coalview has entered into a

forbearance agreement with the bondholders is further evidence of its failure to pay its debts

when due.  (Barrick Decl. ¶ 21.)

Furthermore, for purposes of determining whether a party has failed to pay debts as they

become due, "[p]ayments of a debtor's obligations by a third party are not treated as payment

by the debtor." *In re Hentges*, 351 B.R. 758, 769 n.15 (Bankr. N.D. Okla. 2006).  Rather, third-

party payments are treated as evidence of the debtor's failure to pay.  *Id.*; *see also In re Knoth*,

168 B.R. at 318.  Thus, to the extent others have made payments on Coalview's behalf— ██

████████████████████████████████████████████████████ these would

provide additional instances of Coalview's failure to pay its debts as they come due.  (*Id.* ¶ 24.)

Again, TransAlta has asked Coalview to provide this information, and Coalview has refused,

████████████████████████████████████████████—and it's not

Coalview.

Based on the undisputed facts and the plain, unambiguous meaning of the MSA,

Coalview is in default, and TransAlta rightfully terminated the MSA effective April 2, 2019.

**2.**   ████████████████████████

Under the MSA, an event of default also occurs when either party is "unable to pay its

debts as they fall due."  (MSA Art. 11.02(c).)  As in *Brookfield Asset Mgmt., Inc.*, 2010 WL

3910590 at *7, it is significant that the MSA's "inability to pay" provision uses the present

tense.  Thus, by its plain meaning, the test for inability to pay does not look at projections about

whether a party may be able to pay debts in the future.  *Id.*  Rather, the proper inquiry is

whether an inability to pay ***has*** occurred.  *Id.*  To interpret "inability to pay" otherwise by tying

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 11
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

it "to events that might or might not come to pass lacks specificity and is virtually impossible to apply in practice.  Looking into a future filled with payables that are coming due is a speculative and unworkable exercise…."  *Id.* (quoting *In re Charter Communications,* 419 B.R. 221, 236 (Bankr. S.D.N.Y.2009)); *see also, U.S. v. 58th St. Plaza Theatre, Inc.*, 287 F. Supp. 475, 500 (S.D.N.Y. 1968) (noting that "[t]he equity test of insolvency equates insolvency with a lack of liquid funds, or the inability to pay one's debts in the ordinary course of business as the debts mature").

The fact that Coalview might be able to pay its debts in the future if its rosy, unrealistic, and unsupported projections were to come true is irrelevant.  New York courts will consider a current inability to meet imminent debts as an inability to pay, and thus as insolvency.  *In re Hudson & Manhattan R. Co.*, 138 F. Supp. 195, 200 (S.D.N.Y. 1955) ("If the maturity of the debt is imminent and the inability to meet it certain, the debtor is unable to meet debts as they mature").  But there is no support for the proposition that a hopeful turnaround cures an inability to pay debts currently due.  *Wager v. Hall*, 83 U.S. 584, 599 (1872) "(Insolvency [] does not mean an absolute inability of the debtor to pay his debts at some future time, upon a settlement and winding up of his affairs, but a present inability to pay in the ordinary course of his business.")

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  *See Sec. Inv'r Prot. Corp. v. Glob. Arena Capital Corp.*, 164 F. Supp. 3d 531, 537–38 (S.D.N.Y. 2016) (failure to pay debts to multiple creditors, including customers and government entities, demonstrated insolvency on the basis of inability to pay debts).

██████████████████████████████████████████████████████████████

both before and after the dredge sank, ████████████████████████████████

████████████  This was true both on March 29, 2019 and on December 31, 2018 and thus has nothing to do with the dredge-sinking or the delayed payment of $1.5 million from TransAlta (which had been paid by the end of February).  Furthermore, Coalview entered into a

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 12
No. 3:18-CV-05639-RBL

forbearance agreement with the bondholders, which evidences an "inability to pay debts," as well—had Coalview been able to pay, it would not have needed a forbearance from the bondholders.[10]

Based on the undisputed facts and the plain, unambiguous meaning of the MSA, Coalview is in default for inability to pay debts when due, and TransAlta rightfully terminated the MSA effective April 2, 2019.

**3.** ████████████

The third Event of Default under the MSA is either party becoming "bankrupt or insolvent." The MSA is governed by New York law. (MSA Art. 20.01.) In the absence of any statutory or contractual provision imposing another definition, New York law requires application of the common-law definition of insolvency. *In re Gordon Car & Truck Rental, Inc.*, 59 B.R. 956, 958 (Bankr. N.D.N.Y. 1985); *see Wells Fargo Bank, N.A. v. Palm Beach Mall, LLC*, 177 So. 3d 37, 39 (Fla. Dist. Ct. App. 2015) (applying New York common law definition to interpret meaning of obligation in loan agreement to "remain solvent") The common-law test for insolvency is the inability to meet obligations as they mature in ordinary course of business. *In re Gordon*, 59 B.R. at 961 (citing *American Castype Corp. v. Niles-Bement-Pond Co.*, 42 N.Y.S.2d 638, 639 (1st Dep't 1943), *In re Wil-Low Cafeterias*, 22 F. Supp. 617, 619 (S.D.N.Y 1937)). In this sense, the insolvent/bankrupt standard in the MSA is addressed above in part III.A.2—Coalview was unable to meet its obligations as they matured and was thus "insolvent."[11]

---

[10] Again, this was the case both on March 29, 2019, when TransAlta declared Coalview in default, and before Coalview's dredge sank. (Barrick Decl. ¶ 11.) Thus, the inability cannot be attributed to the dredge-sinking.

[11] The phrase "otherwise becomes bankrupt or insolvent" in MSA Article 11.02(c)(iii) suggests that this event of default may not be merely duplicative of the inability-to-pay-debts standard stated in Article 11.02(c)(iv). Arguably, this standard invites a balance-sheet or bankruptcy law standard. TransAlta believes that Coalview was in default under this standard as well, for the reasons detailed in the Declaration of Lorraine Barrick in Opposition to Coalview's Second Motion to for Preliminary Injunction, filed contemporaneously with this motion. However, because this argument might raise issues of material fact (such as the value of Coalview's assets, on which neither party's expert is qualified to opine), and default either for failure or for inability to pay debts is sufficient to terminate the MSA, TransAlta is not moving for summary judgment on this basis.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 13
No. 3:18-CV-05639-RBL

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

**B.**     **As a Matter of Law, the Dredge-Sinking was not a Force-Majeure Event**

**1.**     **Coalview can present no evidence that the dredge-sinking was unforeseeable or beyond its control**

The basic purpose of a force-majeure clause is to "relieve a party from its contractual duties when its performance has been prevented by a force ***beyond its control***." *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985) (emphasis added). In addition, under New York law, the party claiming force majeure must prove that the event was "produced by an ***unanticipated*** event that ***could not have been foreseen*** or guarded against in the contract." *Kel Kim Corp. v. Cent. Markets, Inc.*, 70 N.Y.2d 900, 902 (1987) (emphasis added). The burden to prove that a force-majeure event has occurred lies on the party seeking to have its performance excused. *Phillips*, 782 F.2d at 319. Finally, the MSA itself requires that a force-majeure event be "not reasonably within the control and not a result of the fault of" Coalview. (MSA Art. 9.01.)

Here, after months of investigation, MSHA found, among other things, ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ The MSHA report is admissible evidence of the cause of the incident—in part due to the agency's expertise. *See Kennedy v. Joy Techs., Inc.*, 269 F. App'x 302 (4th Cir. 2008).[12]

---

[12] In *Kennedy*, the Fourth Circuit considered the admissibility of an MSHA investigation report in the context of proving causation on summary judgment. There, the widow of a coal miner who had been killed by a mining machine filed suit against the machine's manufacturer under negligence and product liability claims. *Id.* at 306. The defendants moved for summary judgment, arguing that the plaintiff had put forth no evidence that the

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 14
No. 3:18-CV-05639-RBL

**Savitt Bruce & Willey llp**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1

2

3

4

5

6  Coalview can present no evidence to the contrary. But ultimately the question is not

7  whether TransAlta can prove, or Coalview can disprove, that MSHA's conclusions are correct

8  in every detail. Rather, the question is whether Coalview can come forth with ***any*** evidence

9  indicating that the dredge-sinking was (a) not within its control, (b) not Coalview's fault, and

10  (c) not foreseeable. Coalview's best effort in this regard has been to label the event as

11  "unexplained" (before the issuance of the MSHA report). (*See* ECF No. 163, at 10, 20.) This

12  is as good as an admission that Coalview cannot meet its burden. Summary judgment

13  dismissing Coalview's force-majeure defense is appropriate for this reason alone, without

14  reference to the actual force-majeure events described in the MSA.

15  **2. The plain language of the MSA does not encompass the dredge-sinking as a force-majeure event**

16

17  Under applicable New York law, courts may construe a contract as a matter of law

18  where the language is plain and unambiguous. *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397

19  F.3d 158, 164 (2d Cir. 2005). As with any other clauses in a contract, construction of a force-

20  majeure clause is a question of law that can be resolved on summary judgment. *See Phibro*

21  *Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 318 (S.D.N.Y. 1989)

22  (summary judgment on force majeure appropriate where contract unambiguous and no material

23  issue of fact presented).

24

25  machine caused the fatal accident. *Id.* The plaintiff opposed the motion, relying upon the MSHA report as proof

26  of causation. *Id.* at 307. The district court granted summary judgment for the defendant, finding that the MSHA report was inadmissible. *Id.* The Fourth Circuit reversed, holding that the district court had abused its discretion by excluding the report and citing Federal Rule of Evidence 803(8)(C), which creates a hearsay exception for

27  "factual findings resulting from an investigation made pursuant to authority granted by law." *Id.* at 310. Moreover, MSHA's expertise "plainly weighed in favor of the admissibility of the Report." *Id.*

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 15
No. 3:18-CV-05639-RBL

New York law generally requires that a force-majeure clause include the specific event that is claimed to have prevented performance. *Kel Kim Corp. v. Central Markets, Inc.*, 524 N.Y.S.2d 384, 385 (1987) (citing Squillante & Congalton, *Force Majeure*, 80 Com. L.J. 4 (1975)). Thus, when the parties have defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure. *Route 6 Outparcels, LLC v. Ruby Tuesday, Inc.*, 931 N.Y.S.2d 436 (3d Dept. 2011). Where a force-majeure clause enumerates specific events coupled with more general language of excuse, courts apply the principle of *ejusdem generis*. *Krulewitch v. National Importing & Trading Co.*, 186 N.Y.S. 838 (1921). Under this principle, words constituting general language of excuse are held to apply only to the same kind or class of conditions or events as those specifically mentioned. *Kel Kim*, 516 N.Y.S.2d at 808–09.

Article 9.01 of the MSA (the "force-majeure clause") provides:

> [T]he term "Force Majeure" as used herein and in all the Project Agreements shall mean an act, condition, or event that is not reasonably within the control and not a result of the fault of the Party claiming Force Majeure, including without limitation, acts of God; acts of the public enemy; insurrections; riots; labor disputes; boycotts; unusual geologic conditions; fires; explosions; floods; embargoes; acts of judicial or military authorities; acts of governmental authorities; inability to obtain, maintain, renew or operate under necessary permits, licenses, and governmental or third-party approvals after applying for same using their reasonable commercial efforts; or other such similar acts, conditions, or events which prevent the dredging… of WCS by [Coalview].

The plain, unambiguous language of the MSA does not include among the force-majeure events equipment failure, equipment loss, or anything of the sort—whether unforeseen ████ ████████████████████████████ By the same token, none of the events that *are* listed in the MSA as force-majeure events would encompass equipment failure, equipment loss, or anything of the sort.

Nor can Coalview present any evidence that the █████████████████████ ████████████████████████████████████████████ More

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 16
No. 3:18-CV-05639-RBL

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

importantly, even Coalview could show that other causes were at work (for instance, operator error), it would still have no evidence that the dredge-sinking was an act of God,[13] fire, explosion, unusual geologic condition, or any of the other events identified in MSA Article 9.01.  Without any evidence that the dredge-sinking was—or was even like—any of the force-majeure events identified in the MSA, Coalview's force-majeure defense must be dismissed as a matter of law.  *Kel Kim*, 516 N.Y.S.2d at 809.

*Tug Blarney, LLC v. Ridge Contracting, Inc.*, 14 F. Supp. 3d 1255, 1258 (D. Alaska 2014), is illustrative.  There, the defendant sought to dismiss a breach of contract claim against it on the theory that its performance was excused due to the sinking of its tug boat, which it characterized as a force majeure.  The force-majeure provision on the contract referenced only the boilerplate events, such as acts of God, civil disturbance, labor disputes, etc.; like the MSA here, the contract in *Tug Blarney* did not expressly cover loss of equipment, accidents, or the sinking of a vessel.  Noting that the movant had "failed to identify any authority which support[ed] the notion that the unexplained sinking of a vessel qualifies as an act of God under a force majeure clause," the court denied its motion to dismiss.  *Id*. at 1276.

### 3. The words, "without limitation," do not extend the force-majeure clause to include the dredge-sinking

Implicitly conceding that none of the events enumerated in the MSA occurred, Coalview argues in its second motion for preliminary injunction (ECF No. 163, at 18–19) that the phrase "without limitation" expands the scope of the force-majeure clause to include any event that might conceivably prevent Coalview from performing.  This argument proves too much.  Under New York law, "without limitation" encompasses only "other such similar acts, conditions, or events" that, while not expressly enumerated, are of a kind with the enumerated

---

[13] A "casualty is said to be caused by the 'act of God' when it happens by the direct, immediate, and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man and without human intervention, and is of such a character that it could not have been prevented or escaped from by any amount of foresight or prudence, or by any reasonable degree of care or diligence, or by the aid of any appliances which the situation of the party might reasonably require him to use."  *Joseph Resnick Co. v. Nippon Yusen Kaisha*, 241 N.Y.S.2d 134, 136 (Civ. Ct. 1963) (citing Black's Law Dictionary, 4th ed.).

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 17
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1   events.  *Team Mktg. USA Corp. v. Power Pact, LLC*, 839 N.Y.S.2d 242, 246 (2007).  Thus, the

2   fact that MSA Article 9.01 says that a force majeure shall "without limitation" constitute the

3   events identified does not make it applicable to an entirely different class of events, such as

4   industrial accidents and equipment failure.

5       Coalview's second motion for preliminary injunction cites *Constellation Energy*

6   *Services of New York, Inc. v. New Water St. Corp.*, 46 N.Y.S.3d 25 (N.Y. App. Div. 2017), for

7   the proposition that the phrase, "without limitation," creates an "expansive" force-majeure

8   clause.  *Constellation* involved a contract for the supply electricity by the plaintiff to the

9   defendant's plant.  The contract provided that, if the plaintiff's revenues fell below a certain

10  level due to a failure by the defendant to use at least the "baseline" amount of electricity, the

11  plaintiff could bill the defendant for the baseline amount—unless the defendant's failure to use

12  the baseline amount was the result of a force-majeure event.  *Id.* at 26–27.  After Hurricane

13  Sandy struck the New York area, flooding the defendant's plant, the defendant used

14  significantly less electricity than planned and less than the baseline amount.  *Id.* at 27.  The

15  plaintiff sued to recover the difference in value between the defendant's actual electricity use

16  and the baseline rate contemplated by the contract.  *Id.* at 26.  The defendant moved to dismiss,

17  arguing that the hurricane constituted a force majeure and excused it from the obligation to pay.

18  *Id.*  The trial court denied the motion to dismiss, and the defendant appealed.  *Id.*

19      The contract in *Constellation* included in the definition of a force majeure any

20  "condition ***resulting in*** the curtailment or disruption of [the defendant's] Energy supply or the

21  transmission on the electric transmission and/or distribution system."  *Id.* at 27.  Thus, unlike

22  the MSA here, the *Constellation* contract expressly included ***any*** event that had the ***effect*** of

23  disrupting the defendant's operations.  It was this "expansive language" that led the court to

24  conclude that the defendant's force-majeure defense was meritorious.  *See id.* at 28 (refusing to

25  grant the motion to dismiss on other grounds).  Moreover and more obviously, *Constellation*

26  involved the occurrence of a traditional force-majeure event—a catastrophic hurricane.  No

27  such event occurred here.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 18
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

In *Osborn v. Wilson & Co., Inc.*, 193 N.Y.S. 241 (Sup. 1922), *aff'd*, 200 N.Y.S. 938 (4th Dep't 1923), also cited by Coalview, the force-majeure clause provided that a force-majeure event would include "floods, drought, ***or other unavoidable cause*** preventing Seller from filing this contract in full." (Emphasis added.)  The party claiming force majeure was unable to meet its quota for delivery of canned fruit following a wind storm, a frost, and a "dry spell." Applying the doctrine of *ejusdem generis*, the court held that "other unavoidable cause[s]" included other weather-related losses.  Here, the MSA does not include "other unavoidable causes," and the dredge fatality is unlike any of the causes enumerated.  Thus, like *Constellation*, *Osborn* illustrates what the MSA would have to say—but does not—and what the circumstances would have to be—but are not—for the MSA's force-majeure clause to apply.

## C.   MSHA's Actions in Response to the Dredge-Sinking were not a Force-Majeure Event

There is no dispute that MSHA issued the K Order because of the dredge-sinking incident.  Coalview argues that the K Order constitutes an "act of governmental authorities" within the meaning of the MSA's force-majeure clause, and thus excuses its performance and prevents TransAlta from terminating the MSA.  As with the dredge-sinking itself, Coalview bears the burden of proving that the issuance of the K Order was both beyond its control and unforeseeable.  *Phillips*, 782 F.2d at 319; *Kel Kim*, 70 N.Y.2d at 902.  But, to the contrary, the K Order was the natural and foreseeable consequence of a serious safety violation at a mine site.  Indeed, the issuance of K Orders is a matter of course in MSHA investigations.[14]  It follows that, for the virtually automatic issuance of the K Order to be a force majeure, the triggering incident must have been "beyond the control" of Coalview and unforeseeable, which it was not.

---

[14] MSHA publicly posts notices and reports of every fatal coal mining accident. These reports can be viewed on MSHA's website, at https://www.msha.gov/data-reports/fatality-reports/search.  A review of every coal mining fatality report on file shows that a work-stoppage order was issued in response to 160 of 165 such incidents. The Court may take judicial notice of these public records.  *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (on consideration of dispositive motion, court may take judicial notice of matters of public record).

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 19
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1    Thus, in *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099 (C.D.

2    Cal. 2001), an FDA consent decree had shut down the defendant's subsidiary drug

3    manufacturer following its failure to meet manufacturing safety requirements.  The defendant

4    invoked the force-majeure clause in the parties' contract, which applied to "regulatory [and]

5    governmental" action that prevented delivery of the drugs that were the subject of the contract.

6    *Id.* at 1109.  Both parties moved for summary judgment on the issue.  *Id.* at 1101.  The court

7    denied the defendant's motion, reasoning that the "boilerplate" language covering "regulatory

8    [and] governmental" actions could not reasonably be construed to reflect an intent cover a

9    government shutdown that was the foreseeable consequence of the defendant's own conduct.

10    *Id.* at 1113.  More than that, the court granted the plaintiff's motion, holding that, as a matter of

11    law, the force-majeure clause provided no defense to the defendant.  *Id.*

12    Likewise, in *Nissho-Iwai Co. v. Occidental Crude Sales*, 729 F.2d 1530 (5th Cir. 1984),

13    the defendant's oil-production facilities were shut down by the Libyan government for failure

14    to failure to pay taxes and royalties and failure to comply with production regulations.  *Id.* at

15    1534, 36.  When the plaintiff sued for the defendant's failure to deliver oil, the defendant

16    argued that the government shutdown was a force-majeure event.  *Id.*  On appeal, the Fifth

17    Circuit held that, as matter of law, the defendant was required to prove that the shutdown was

18    caused by events beyond the defendant's reasonable control.  *Id.* at 1539–40.  Moreover, the

19    court found that the evidence presented showed that the shutdown could have been prevented if

20    the defendant had taken the necessary actions.  *Id.* at 1540–43.

21    Here, the MSHA report states that the sinking occurred because █████████

22    ████████████████████████████████████████████████

23    ██████████████████████████████████

24    ████████████████████████████

25    █████████████    (Nelson Decl. Ex. A, at 3.)  Like the defendant in *Occidental*, had

26    Coalview taken the necessary actions, it would not have been shut down.

27

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 20
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

By contrast, in cases where courts have found that a government intervention qualified as a force-majeure event, the government action was wholly independent of the actions of the parties.  An often-cited example, *Eastern Air Lines Inc. v. McDonnell Douglas Corp*, 532 F.2d 957 (5th Cir. 1976), illustrates this clearly.  In *Eastern Air Lines*, the plaintiff airline sued McDonnell Douglas after it failed to fulfill the airline's order for a large number of DC-9 passenger aircraft.  *Id.* at 962.  The defendant argued that, because the federal government had requested that aircraft manufacturers prioritize the production of military aircraft for use in Vietnam over the production of civilian aircraft, its performance under its contract with Eastern was excused.  *Id*. at 980, 88.[15]  In response, the plaintiff argued that because the directive to focus on military manufacturing was informal, and not a formal government order, it could not excuse the defendant's performance.  *Id*. at 964.  The trial court sided with the plaintiff and issued jury instructions sharply limiting the defendant's force-majeure defense.  *Id*. at 965.  But the Fifth Circuit reversed, holding that, because the government directive was beyond the defendant's control and compliance was not actually optional, the defendant should have had full opportunity to assert the defense.  *Id.* at 994, 98.

Thus, *Eastern Air Lines* is the classic case of government action constituting a force majeure: an outside action taken by the state, without regard for the invoking party's conduct or because of something the party did, that in turn affects the ability of that party honor the obligations imposed by the contract.  In this sense, the government action is like an act of God or other event out of the parties' control.  Here, by contrast, MSHA issued the K Order in direct response to the sinking of a dredge that was under Coalview's control at the time of the accident, under conditions where no traditional force majeure (e.g. a natural disaster) caused the sinking.[16]

---

[15] The contract in *Eastern Air Lines* refers to "excusable delay" rather than "force majeure."  But this distinction is immaterial.  The provision reads as a force-majeure provision; the opinion references treatises regarding force majeure in its analysis; and there are no apparent doctrinal differences between the two phrases.

[16] Coalview's second motion for preliminary injunction cites *In re Whistler Energy II, LLC*, 571 B.R. 199 (Bankr. E.D. La. 2017), as an example of a case where a government shutdown following an accident was considered a force majeure.  But in Whistler, the parties agreed that a force-majeure event had occurred, so the court never

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

**D.      Even if a Force-Majeure Event Had Occurred, This would not Excuse Coalview's Default**

MSA Article 9.02 provides:

> *If, because of* Force Majeure, either Party is unable to perform any of its obligations under this Agreement (other than the obligation of a Party to pay money), and *if such Party shall promptly give to the other Party written notice* of such Force Majeure, then the obligation of the Party giving such notice shall be excused, but only to the extent made necessary by such Force Majeure and during its continuance. . . .

Thus, the inability to perform must be caused by the force-majeure event, and the party claiming force-majeure protection must give prompt notice that a force-majeure event has occurred.  Neither of these conditions is present here.

**1.      Coalview's default was not caused by the alleged force-majeure events**

For a force-majeure event to excuse performance, it must be the cause of the non-performance.  This is true not only under the plain language of the MSA ("If, because of Force Majeure, either Party is unable to perform…") but also under basic legal principles and common sense.  Thus, in *Vitol S.A., Inc. v. Koch Petroleum Grp., LP*, 2005 WL 2105592, at *11 (S.D.N.Y. Aug. 31, 2005), the plaintiff purchased 100,000 barrels of heating oil from the defendant for delivery to the plaintiff's barge on a specified day.  In the days leading up to the delivery, an unaffiliated barge struck a pier at the delivery terminal, causing significant disruptions to the port.  *Id*. at * 3.  Following this, delivery slipped past the agreed-upon date, and the plaintiff sued for breach of contract.  *Id*. at * 4.  The defendant invoked force majeure, claiming that its performance was excused by the disruption at the port.  *Id*. at * 11.  The plaintiff moved for summary judgment on its breach of contract claim and to dismiss the force-majeure defense.  But because the defendant did not even have the cargo available by the delivery date, the court reasoned that the pier collision could not have caused any delay.  *Id*. at *10–11.  Thus, the court granted the plaintiff's motion, dismissing the force-majeure defense.

---

considered the issue.  *Id*. at 203.  Rather, the issues before the court were the adequacy of notice and the duration of the force-majeure event.  *Id*. at 203–05.  Thus, *In re Whistler Energy II* is entirely irrelevant.

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 22
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

*Id.* at 13; *see also Sabine Corp. v. ONG W., Inc.*, 725 F. Supp. 1157, 1168 (W.D. Okla. 1989) (force-majeure defense failed where government action did not and could not render defendant unable to perform under parties' contract).

Coalview's position is that its default (insolvency and failure or inability to pay debts) is "the result of Force Majeure" because "the sinking of the dredge and/or the MSHA investigation and K Order have 'prevent[ed] the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties.'" (ECF No. 163, at 18.) But, based on the undisputed facts, neither of these events ***caused*** the Event of Default. As discussed above, Coalview was ████████████████████████████████████████████ well before the dredge fatality occurred; thus, the alleged force-majeure event (even if one had occurred) could not have caused the default. The force-majeure provision is therefore inapplicable and does not shield Coalview from termination.

### 2. Coalview failed to provide prompt written notice of the alleged force-majeure event

MSA 9.02 provides that, if a force-majeure event occurs, "***and if*** [Coalview] shall promptly give to [TransAlta] written notice of such Force Majeure, ***then*** the obligation [] shall be excused." (Emphasis added.) This if-then language creates a condition precedent. For instance, in *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691 (1995), the parties' sublease required the plaintiff to provide timely written notice of the landlord's consent to the defendant's proposed modifications to the property, or else the contract would be void. The court, finding that contractual language such as "if," "unless," and "until" constituted the "unmistakable language of condition," granted summary judgment against the plaintiff for its failure to tender the required notice.

Thus, where a contract requires one party to give the other notice of the existence of force-majeure conditions, such notice must be given for a party to be excused from its contractual obligations. *Vitol S.A., Inc. v. Koch Petroleum Grp., LP*, 2005 WL 2105592, at *11

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 23
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1  (S.D.N.Y. Aug. 31, 2005).  In *Vitol* (discussed above at p. 22), the defendant claimed that a

2  collision at terminal where it was to deliver oil was a force-majeure event excusing its

3  performance.  *Id*. at *3, 11.  Although the plaintiff was aware of the event itself, and the parties

4  had even discussed it, the court found that the defendant had not given express notice that it

5  considered the collision to be a force-majeure event.  *Id*. at *11.  This failure provided an

6  independent basis for granting the plaintiff's motion for summary judgment.  *Id.*  Numerous

7  other cases have refused to allow a force-majeure defense where the party invoking it failed to

8  give the required notice.[17]

9        Coalview's first invocation of the force-majeure clause was in Coalview's April 16,

10  2019 letter to TransAlta's counsel—part of an exchange of correspondence brought about in

11  response to TransAlta's March 29, 2019 notice of default and termination.  Despite its vague

12  reference to an earlier notice, Coalview had given no notice previously.  Thus, nearly four

13  months passed between the accident and any communication to TransAlta from Coalview

14  indicating that Coalview considered the sinking a force majeure.  This is not prompt notice.

15  *See*, *e.g*., *Three RP Ltd. P'ship v. Dick's Sporting Goods, Inc*., 2019 WL 573413, at *6 (E.D.

16  Okla. Feb. 12, 2019) (four-month delay in notice where force-majeure clause required "prompt

17  written notice" justified summary judgment against plaintiff on force-majeure claim).  Given

18  this, Coalview's force-majeure defense must be dismissed for lack of notice.

19                  **IV.**    **CONCLUSION**

20        For the foregoing reasons, the Court should order summary judgment dismissing

21  Coalview's claim for declaratory relief that TransAlta's termination was improper, dismissing

22  its force-majeure defense, and declaring TransAlta's termination of the MSA valid and

23  effective as of April 2, 2019.

24  _____

25  [17] *See also*, *In re The Containership Co.*, 2016 WL 2341363, at *9 (Bankr. S.D.N.Y. Apr. 29, 2016) (force majeure
defense fails where contract requires notice and invoking party provides none);  *United States v. Alshabkhoun*, 277

26  F.3d 930, 935–36 (7th Cir. 2002) (same);  *Superior Oil Co. v. Transco Energy Co.*, 616 F. Supp. 98, 109 (W.D.
La. 1985) (same);  *Res. Inv. Corp. v. Enron Corp.*, 669 F. Supp. 1038, 1044 (D. Colo. 1987) (failure to give notice

27  "fatal" to force majeure defense).

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 24
No. 3:18-CV-05639-RBL

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

1

2      DATED: August 26, 2019.

3                          **SAVITT BRUCE & WILLEY LLP**

4

5                          By    s/Miles A. Yanick
                                _____
6                                Miles A. Yanick, WSBA #26603
                                 Duncan E. Manville, WSBA #30304
7                                Sarah Gohmann Bigelow, WSBA #43634
                                 Jacob P. Freeman, WSBA #54123
8                                Patrick D. Moore, WSBA #54177
                                 1425 Fourth Avenue Suite 800
9                                Seattle, Washington  98101-2272
                                 Telephone: 206.749.0500
10                               Facsimile:  206.749.0600
                                 Email:   myanick@sbwLLP.com
11                                        dmanville@sbwLLP.com
12                                        sgohmannbigelow@sbwLLP.com
                                          jfreeman@sbwLLP.com
13                                        pmoore@sbwllp.com

14                          Attorneys for Defendants TransAlta Centralia Mining LLC
15                          and TransAlta Corporation

16

17

18

19

20

21

22

23

24

25

26

27

MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING TERMINATION - 25
No. 3:18-CV-05639-RBL

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

# APPENDIX A

EXECUTION COPY

# MASTER SERVICES AGREEMENT

This **MASTER SERVICES AGREEMENT** ("**Agreement**") is entered into as of the 20th day of December, 2013 between Coalview Centralia, LLC, a Delaware limited liability company, (referred to herein as "**Contractor**"), and TransAlta Centralia Mining LLC, a Washington limited liability company (referred to herein as "**Owner**"). Contractor and Owner may be individually referred to herein as a "**Party**" or collectively as "**Parties**". Terms used herein and not otherwise defined shall have the meanings set forth in Section 1.03.

## RECITALS

WHEREAS, Contractor is in the business of Processing WCS into Refined Coal and Non-coal Slurry;

WHEREAS, Owner desires to hire Contractor on an exclusive basis to Process WCS within the Leased Premises, the Easements and other proximate areas at Owner's Centralia, Washington location (the "**Site**"), for the purpose of assisting in the remediation of the Owner's Slurry Impoundments on Site;

WHEREAS, Contractor is going to invest considerable sums to (a) build a Processing Plant and dredging operation, (b) Process Owner's WCS into Refined Coal for use in the Centralia Power Plant, and (c) deliver the Non-coal Slurry to a reclamation pond designated by Owner;

WHEREAS, Owner and Contractor are entering into a certain Exclusive Coal Tendering Agreement (the "**Tendering Agreement**") and a certain Exclusive Waste Coal Slurry Recovery and Processing Agreement (the "**Processing Agreement**"), each dated the date hereof, as a condition and inducement to the Contractor to obtain the Financing and construct the Processing Plant, and to purchase the dredging and other necessary equipment;

WHEREAS, Owner and Contractor are entering into a certain Ground Lease (the "**Ground Lease**") for the lease of certain real property and any improvements thereon as described therein (the "**Leased Premises**") whereby Owner will grant Contractor certain easements in real property owned by Owner (collectively, the "**Easements**") to enable Contractor to carry out its obligations under the Processing Agreement and the Tendering Agreement, dated the date hereof;

WHEREAS, Owner and Contractor are entering into this Agreement to define all requirements of the Parties related to the purpose of Processing WCS pursuant to the Processing Agreement and recovering Refined Coal pursuant to the Tendering Agreement and to provide equipment to the Contractor for the purpose of Processing WCS and recovering Refined Coal;

WHEREAS, Owner and Contractor are entering into a certain Escrow Agreement (the "**Escrow Agreement**"), governing the collection and disbursement of Escrow Funds in accordance with this Agreement;

WHEREAS, Owner believes that the Processing of the WCS pursuant to the Processing Agreement will provide it with a source of Refined Coal for TransAlta Centralia Generation LLC's ("**TA Generation**") Centralia Power Plant and enable it to eliminate or substantially reduce its remediation costs of the Slurry Impoundments on Site;

WHEREAS, the fees relating to the Processing of WCS and delivering Refined Coal are a critical part of the compensation to the Contractor for (a) building and operating the Processing Plant, (b) Processing the Owner's WCS, (c) Tendering the Refined Coal to Owner and (d) delivering the Non-coal Slurry to Pond 3E;

- 1 -

WHEREAS, Contractor will also enter into additional contracts with other entities for the purpose of funding, constructing and operating Contractor's operations at the Site, specifically an Engineering, Procurement and Construction Agreement, Exclusive Dredging Services Agreement (the "**Dredging Agreement**"), Operating and Management Agreement (the "**O&M Agreement**") and documents related to the Financing (collectively, the "**Contractor's Agreements**");

WHEREAS, the Parties believe it will be mutually beneficial to set the terms and conditions under which the Contractor will be compensated for (a) Processing the WCS into Refined Coal and Non-coal Slurry and (b) Tendering the Refined Coal to Owner for use at the Centralia Power Plant; and

WHEREAS, Owner's parent corporation, Guarantor, will enter into that certain Guarantee Agreement, dated the date hereof (the "**Guarantee**"), guaranteeing the obligations of the Owner hereunder and under the Project Agreements.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth hereafter, the Parties to this Agreement, intending to legally bind themselves, agree now as follows:

## ARTICLE 1.  GENERAL TERMS AND DEFINITIONS

**1.01**    The terms of this Agreement shall govern all Processing of WCS at the Site and the sale of the associated Refined Coal during the Term of this Agreement.  All amendments, modifications, revisions and changes to this Agreement must be in writing and signed by both Parties.

**1.02**    The Project Agreements are complementary and are intended to be read in conjunction with one another.  However, should there be any conflict between the Project Agreements, the Parties agree that this Master Services Agreement is intended to take precedence, and conflicts and inconsistencies will be resolved by reliance on the terms and conditions set forth herein.

**1.03**    Each of the following terms when used in this and all other Project Agreements will have the meaning given to it in this Article:

    **a)**    "**Actual Btu**" means the Ton-weighted average as-received calorific value (stated in Btu/lb).

    **b)**    "**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to either (i) elect a majority of the directors of that Person, or (ii) direct or cause the direction of the management or policies of that Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise.

    **c)**    "**Agent**" means an escrow agent mutually acceptable to the Parties.

    **d)**    "**ALCO**" means Alco Holdings, LLC.

    **e)**    "**BLM**" means the U.S. Department of the Interior Bureau of Land Management.

    **f)**    "**Bond**" or "**Bonds**" means the Environmental Facilities Revenue Bonds 2013 (Coalview Centralia, LLC Project) issued by the Washington Economic Development Finance

Authority, a body politic and corporate of the State of Washington, or other issuer acceptable to the Parties.

g) **"Bond Equivalent Payment"** means 50% of the average annual principal and interest payment over the term of the Bonds.

h) **"Bond Principal"** means the outstanding principal amount of the Bonds.

i) **"Bond Redemption"** means the earlier of August 1, 2025 upon final payment of principal and interest on the Bonds, or any date after the issuance of the Bonds when the principal, redemption premium, if any, and all interest accrued on the Bonds have been fully repaid.

j) **"Bond Trustee"** means the Trustee as defined in the Indenture.

k) **"Business Day"** means any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in the State of Washington.

l) **"Centralia Power Plant"** means the Centralia coal-fired power plant located in Centralia, Washington with a net capacity of 1340 megawatts.

m) **"Debt Service Reserve Fund"** means the fund by that name established under the Indenture to secure the payment of principal, redemption premium, if any, and interest on the Bonds.

n) **"Delivery Point"** shall have the meaning set forth in Section 4.03 of the Tendering Agreement.

o) **"Dispute"** shall have the meaning in Section 12.01.

p) **"Easements"** shall have the meaning set forth in Section 2.02 of the Ground Lease. The Easements will be memorialized in a memorandum of ground lease from Owner to Contractor, satisfactory in form and substance to Owner and Contractor and recorded in the public records of the counties in which the Site is located. Moreover, Owner will grant to Contractor such other easements as Contractor reasonably requests in order for Contractor to exercise its rights under the Project Agreements.

q) **"Effective Date"** means the date upon which the terms and conditions of this Agreement take effect, which shall be the date that the Contractor provides written confirmation to Owner of receipt of its Financing.

r) **"Electronic Communication"** means confirmed facsimiles, emails, or any other forms of electronic data transfer.

s) **"Escrow Funds"** means the funds deposited with the Agent and disbursed by the Agent pursuant to Sections 6.07, 6.08, 6.10 and 6.11.

t) **"Financing"** means the Contractor's receipt of approximately $29.5 million from proceeds of the Bonds, a subordinate loan and equity capital.

u) **"Force Majeure"** shall have the meaning set forth in Article 9.

- 3 -

v)    "**Guarantor**" means TransAlta Corporation, a Canadian corporation.

w)    "**Indenture**" means the Indenture of Trust, dated as of December 1, 2013 by and between the Washington Economic Development Finance Authority and U.S. Bank National Association as Bond Trustee, describing the terms of the Bonds and pursuant to which the Bonds are issued, as amended from time to time.

x)    "**Invoices**" means any statement or notice of payment due from one Party to another, including without limitation Period Invoices.

y)    "**Leased Premises**" shall have the meaning set forth in the Ground Lease.

z)    "**Loan Agreement**" means the Loan Agreement between the Contractor and the Washington Economic Development Finance Authority, as amended from time to time.

aa)    "**Loading Bin**" means the loading bin to be constructed by Contractor for delivery of Refined Coal to Owner's Trucks at a mutually agreed site near the Processing Plant.

bb)    "**Mining Plan**" means the Contractor's operational plan at the Site, and its revisions from time to time, to use its equipment and facilities to Process the WCS and Tender the Refined Coal for Owner to Receive into Trucks in accordance with the Project Agreements.

cc)    "**Non-coal Slurry**" means the remaining material following the Processing of WCS and recovery of Refined Coal by the Contractor's Processing Plant, and slurry that bypasses the coal recovery circuits, going directly to the thickeners.

dd)    "**Operating Reserve**" means the reserve account established by the Indenture to provide for the payment of operating expenses of Contractor in the event moneys on hand are insufficient for such purpose.

ee)    "**Period Invoice**" shall have the meaning in Section 6.03.

ff)    "**Pond 3E**" means that certain refuse pond no. 3E located at the Site, or any successor reclamation pond or ponds designated by Owner.

gg)    "**Person**" shall mean any individual, company, corporation, association, partnership, limited liability company, firm, joint venture, trust, governmental authority, or other entity.

hh)    "**Process**" or "**Processing**", means (a) the removal or dredging of the WCS from the Slurry Impoundments, (b) the removal of Refined Coal from the WCS in amounts and utilizing procedures determined by Contractor to be reasonably consistent with industry custom, (c) Tendering the Refined Coal to the Delivery Point, and (d) delivery of the remaining Non-coal Slurry to Pond 3E.

ii)    "**Processing Day**" means the twenty-four (24) hour period from midnight to midnight of the following day or another twenty-four (24) hour period mutually agreed to by both Parties in writing.

jj)    "**Processing Plant**" means the plant to be constructed by the Contractor on the Leased Premises and to be used to Process the WCS into Refined Coal and Non-coal Slurry.

- 4 -

**kk)**     "**Processing Week**" means a calendar week starting on the Processing Day of Sunday or another calendar day mutually agreed to by both Parties in writing.

**ll)**     "**Project Agreements**" means all of the Agreements between the Owner and Contractor related to the development, financing, construction and operation of the Coalview Centralia, LLC Waste Coal Slurry Processing Facility, including but not limited to: this Agreement, Escrow Agreement, Ground Lease, Guarantee, Processing Agreement and Tendering Agreement but specifically excluding the Dredging Agreement and O&M Agreement.

**mm)**     "**Project Reserve**" shall have the meaning in Section 6.05.

**nn)**     "**Receive**" or variations thereof, means (i) with respect to the Refined Coal, to have sufficient Owner-supplied Trucks available to be loaded at the Delivery Point for timely acceptance of Refined Coal deliveries, and (ii) with respect to Non-coal Slurry, to have sufficient allocated space available at or near Pond 3E, or another location acceptable to Contractor and Owner, for receipt of Non-coal Slurry.

**oo)**     "**Refined Coal**" means fine refuse coal recovered from WCS or any other form of refined coal produced pursuant to the Processing Agreement to be Tendered by Contractor to Owner pursuant to the Tendering Agreement.

**pp)**     "**Refined Coal Payment Calculation**" shall have the meaning in Section 6.02.

**qq)**     "**Senior Representatives**" shall have the meaning in Section 12.02.

**rr)**     "**Slurry Impoundments**" means the impoundments located at the Site identified by Owner as Pond 3B, Pond 3C and Pond 3D.

**ss)**     "**Slurry Payment Calculation**" shall have the meaning in Section 6.01.

**tt)**     "**Steering Committee**" shall have the meaning set forth in Section 10.03.

**uu)**     "**Tender**" or variations thereof, means Contractor shall deliver Refined Coal to the Loading Bin or stockpile (as provided in Article 4.03 of the Tendering Agreement) for prompt pick up and receipt by Owner's Trucks.

**vv)**     "**Term**" shall have the meaning in Section 2.01.

**ww)**     "**Termination Notice**" shall have the meaning in Section 11.03.

**xx)**     "**Termination Payment**" shall have the meaning given to it in Appendix A.

**yy)**     "**Ton**" or "**Tonnage**" means 2,000 pounds avoirdupois.

**zz)**     "**Tracking Account**" means a record keeping account documenting the cumulative excess amounts that Owner has paid for Processing WCS in excess of Refined Coal, which will be calculated based on payments for Processing WCS, less the payments for Refined Coal for each Period Invoice. The intent of the Tracking Account is to track the financial transactions under the Project Agreements to allow the Owner, over the Term, the opportunity to recover amounts by which the cost of processing Slurry that produces a Ton of Coal exceeds the Coal Base Price (as defined in the Tendering Agreement) per

Ton (subject to adjustment as provided herein and in the Processing Agreement) for Refined Coal.

**aaa)** **"Truck"** means the Owner's trucks suitable to Receive and transport Refined Coal from the Loading Bin to the Centralia Power Plant.

**bbb)** **"WCS"** means any coal slurry waste materials (and any liquids included therein that are required to dredge and pump the coal slurry waste material) located in the Slurry Impoundments and to be Processed by Contractor.  For payment purposes, WCS is measured on a dry basis.

## ARTICLE 2.  TERM

**2.01** The term of this Agreement (the **"Term"**) shall begin on the Effective Date and shall, subject to the provisions of Article 11, continue in effect until December 31, 2025.  The Parties acknowledge and agree that TA Generation will not be allowed to burn Refined Coal at the Centralia Power Plant after December 31, 2025.

## ARTICLE 3.  RISK OF LOSS

**3.01** Title to the WCS, the Refined Coal and the Non-coal Slurry and all risk of loss to such shall remain with Owner at all times.

**3.02** Contractor shall be responsible for delivering the Refined Coal from the Processing Plant to the Delivery Point.  The Owner shall not be required to pay for any Refined Coal that is not Tendered to the Delivery Point.

## ARTICLE 4.  PROPERTY DAMAGES

**4.01** Contractor shall be responsible for all reasonable direct costs resulting from damage to Owner's equipment, including stationary equipment on the Site, if said equipment is damaged as a result of Contractor's actions or the actions of Contractor's agent(s), Affiliate(s) or contractor(s), except to the extent such damage is caused by the negligence or recklessness of Owner or Owner's agent(s), Affiliate(s), or contractor(s).  Subject to the provisions of Section 7.03, Contractor shall pay Owner for such costs within thirty (30) days of receiving an invoice and supporting documentation from Owner.

**4.02** Owner shall be responsible for all reasonable direct costs resulting from damage to Contractor's equipment, including stationary equipment on the Site, if said equipment is damaged as a result of Owner's actions or the actions of Owner's agent(s), affiliate(s) or contractor(s), except to the extent such damage is caused by the negligence or recklessness of Contractor or Contractor's agent(s), Affiliate(s), or contractor(s).  Subject to the provisions of Article 7.03, Owner shall pay Contractor for such costs within thirty (30) days of receiving an invoice and supporting documentation from Contractor

## ARTICLE 5.  EQUIPMENT

**5.01** The Owner shall provide the equipment identified on Appendix D (the **"Equipment"**) to the Contractor for the purpose of Processing WCS and recovering Refined Coal.

**5.02** The Owner will provide the Equipment free and clear of any and all liens, claims, orders and indebtedness.

- 6 -

5.03   The Equipment will be provided to the Contractor for use on an as-is and where-is basis, without any compensation for any existing wear and tear, defects or other needed repairs.

5.04   At the expiration of the Term, the Contractor will return the Equipment to the Owner on an as-is and where-is basis, without any compensation for any then existing wear and tear, defects or other needed repairs. Neither Party has any obligation to maintain or repair the Equipment during the Term.

5.05   The Contractor may pledge the Equipment to the Contractor's lenders (the "**Lenders**"), and the Lenders shall have a first priority security interest in the Equipment and the right to take title to the Equipment and sell the Equipment without consent or notice to the Owner upon a default by the Contractor.

### ARTICLE 6.   INVOICE ADJUSTMENTS

6.01   In accordance with Article 7 of the Processing Agreement, Contractor shall prepare calculations to support an invoice to Owner as set forth in Article 7 of the Processing Agreement for all WCS dredged or in any way recovered by Contractor for Processing, including any adjustments allowed in the Processing Agreement (the "**Slurry Payment Calculation**").

6.02   In accordance with Article 9 of the Tendering Agreement, Contractor shall prepare calculations to support an invoice to Owner as set forth in Article 9 of the Tendering Agreement for all Refined Coal Tendered to Owner including any price adjustments allowed in the Tendering Agreement (but excluding any set-offs in any Period Invoice) (the "**Refined Coal Payment Calculation**").

6.03   The Contractor shall submit an invoice, similar in form to Exhibit A herein attached, to Owner reflecting the Slurry Payment Calculation and the Refined Coal Payment Calculation prepared in Sections 6.01 and 6.02 and reflecting any adjustments pursuant to Section 6.05 through Section 6.12 (the "**Period Invoice**"). The Period Invoices will require the Owner to pay to the Contractor the greater of the Refined Coal Payment Calculation or the Slurry Payment Calculation that corresponds to each Ton of Refined Coal Tendered for such Period Invoice. Contractor shall make all calculations and adjustments to the Period Invoice and submit such calculations with each invoice to Owner, in the manner of Exhibit A herein attached.

6.04   A Tracking Account will be established by Contractor to record and account for the cumulative difference in value that Owner has paid for WCS when the Slurry Payment Calculation is greater than the Refined Coal Payment Calculation for a Ton of Refined Coal in each Period Invoice. If the Slurry Payment Calculation is greater than the Refined Coal Payment Calculation for a Ton of Refined Coal in a Period Invoice, the adjustment to the Tracking Account will be the positive difference between the Slurry Payment Calculation and the Refined Coal Payment Calculation for such Ton of Refined Coal. Whereas, if the Refined Coal Payment Calculation is greater than the Slurry Payment Calculation, there is no adjustment to the Tracking Account.

6.05   An additional reserve of funds (the "**Project Reserve**") shall be generated should WCS production exceed 1.4 million Tons of WCS per calendar year. The Period Invoice shall indicate the then current year-to-date production. The Project Reserve shall be paid by the Contractor to and be held by the Agent until disbursed in accordance with Section 6.08 of this Agreement unless the Contractor gives the Owner credit to a Period Invoice. The Bond Trustee shall have a first priority security interest in the Escrow Funds. The amount of the Project Reserve payment (or credit to Period Invoice) shall be determined by multiplying a unit cost per WCS Ton by the Processed Tons on an annual basis in excess of one million four hundred thousand (1,400,000)

- 7 -

Tons per year within the associated annual Tonnage ranges.  The annual Tonnage ranges and unit costs are defined in the following table.

| Annualized WCS Production Rate Range (Tons Per Year) | Unit Cost Applied to WCS Tons within Production Range ($ Per Ton) |
|---|---|
| 0 to 1,400,000 | $0.00 |
| 1,400,001 to 1,600,000 | $4.00 per Ton in excess of 1,400,001 (Tons per year), but less than 1,600,000 (Tons per year) |
| 1,600,001 to 1,800,000 | $3.00 per Ton in excess of 1,600,001 (Tons per year), but less than 1,800,000 (Tons per year) |
| 1,800,001 and greater | $1.50 per Ton in excess of 1,800,001 (Tons per year) |

6.06    The Project Reserve unit costs shall not be escalated during the Term or any agreed extension.

6.07    When the remaining balance of the Bond Principal, together with redemption premium, if any, and accrued interest can be paid in full by using the balance of available funds including the balances of Debt Service Reserve Fund, Operating Reserve, Project Reserve and the current bond payment, and when the Bonds will allow for retirement prior to the end of term of the Bonds, the Bonds, subject to approval by the Parties, may be retired. Alternatively, when there are funds in the Project Reserve and subject to approval by the Parties, the Parties may instruct the Agent to disburse up to the balance of the Project Reserve to the Contractor to fund Bond Payments, and once the Bonds are paid in full, in equal shares to Contractor and Owner.

6.08    The Project Reserve may be distributed to Owner as a credit to the Period Invoice, up to the then current balance of the Tracking Account in lieu of depositing the Project Reserve with the Agent. If the Tracking Account has no balance or there is remaining Project Reserve following refunds of the Tracking Account, the Project Reserve will be held by the Agent as Escrow Funds under the Escrow Agreement for (a) the future payment of Bond Principal, (b) the reimbursement to Owner of a subsequent period's Tracking Account balance or, after the Bonds have been paid in full, (c) to be distributed to the Parties.  The Tracking Account balance will be reduced by the amount of funds from any Project Reserve disbursed by the Agent to Owner for refund of a Tracking Account balance.

6.09    Owner shall direct Contractor to reduce the Period Invoice by the amount of royalties to be paid by Owner to BLM and ALCO.  Contractor will also pay an overriding coal royalty in the amount of $1.25 per Refined Coal Ton to Owner (including any unpaid overriding coal royalty), to the extent of funds available therefor under the Indenture.  A failure to pay such overriding coal royalty if funds for such purpose are not available under the Indenture shall not give rise to an Event of Default hereunder.  Contractor shall not consent to any amendment to the Indenture or the Loan Agreement that materially adversely affects the rights of Owner under this Section 6.09.

6.10    Following Bond Redemption, to the extent that there is a balance in the Tracking Account on such date, funds remaining in the Project Reserve shall be disbursed to Owner and applied to the balance of the Tracking Account at that time.

- 8 -

**6.11**   To the extent there is a remaining balance in the Project Reserve following the disbursement of funds in accordance with Section 6.10 above, the remaining balance will be distributed in equal shares to Contractor and Owner.

**6.12**   Following Bond Redemption, the Tracking Account and Project Reserve will not be utilized for the remainder of the Term or any agreed extension and Contractor shall pay (or give credit to) Owner an amount equal to 1/24 of the Bond Equivalent Payment as a credit to the Period Invoice.

**6.13**   The applicable adjustments in this Article 6 shall be applied to the Period Invoice each invoicing period.   An annual true up shall be done at the end of each year and applied to the final Period Invoice of the year.   Subject to approval by the Parties, additional invoice true ups may be done throughout the year prior to the annual true up.

## ARTICLE 7.   INVOICES, PAYMENTS, NETTING, AND SET OFF

**7.01**   Contractor will invoice Owner as prescribed in the Processing Agreement and the Tendering Agreement and make adjustments pursuant to Article 6 of this Agreement.   Period Invoices to Owner shall be transmitted by Electronic Communication, as outlined in Article 13 below.

**7.02**   Contractor will invoice Owner on a semi-monthly basis, with one Period Invoice covering the first fifteen (15) days of a calendar month and another Period Invoice covering the remaining days in the calendar month.   Contractor shall clearly indicate Owner's applicable identification number on all invoices.

**7.03**   Owner shall pay Contractor net thirty (30) days from date of Contractor's Period Invoice. All claims for monies due or to become due from Contractor to Owner shall be subject to deduction or set-off by Owner by reason of any claim or counterclaim arising out of this Agreement or any other Project Agreement or transaction with Contractor. Any credit to Owner under the quality adjustment invoices may be applied to the next Period Invoice. For all Period Invoices, payment will be made via electronic means (i.e., ACH or Federal Reserve wire transfer of funds).   The wire transfer of funds shall be sent to Contractor's bank as indicated in Article 13 hereof.   Simple interest on any past due payment shall accrue from the date the payment was due and until the payment is made and shall be calculated at the greater of (a) two (2) percentage points over the then current U.S. prime rate as listed in the Money Rates section of The Wall Street Journal on the date the payment was due (or the next business day if payment was due on a weekend or holiday) and (b) the interest rate on the Contractor's Financing.

**7.04**   In the event a Party in good faith disputes part or all of an invoice issued under this Agreement, written notice of the disputed portion, with reasons for dispute, must be given to the other Party prior to the due date of the invoice and the undisputed portion shall be paid by the due date.   If the disputed portion is determined to have been properly due and payable, simple interest on that portion in dispute and which has not been paid shall accrue from the date that portion was due and payable and until that portion is paid.   If a disputed portion is paid and is later determined not to have been properly due and payable, simple interest will similarly be refunded from the date payment had been received and until that portion is refunded.   Interest shall be calculated at two (2) percentage points over the then current U.S. prime rate as listed in the Money Rates section of The Wall Street Journal. All invoices will be final and not subject to further adjustments or correction unless objection to the accuracy thereof is made prior to the lapse of one (1) year after the date of the invoice.

**7.05**   Each Party reserves to itself all rights, set-offs, counterclaims, and other remedies and defenses to the extent not expressly disclaimed or waived herein which such Party has or may be entitled to

- 9 -

in law or equity, arising from or out of or in connection with any transactions under this Agreement.

7.06   If a Party fails to pay amounts under this Agreement within ten (10) days of the due dates stated in Section 7.03 above, unless such amount is the subject of a good-faith dispute as provided above, the aggrieved Party shall have the right to pursue all remedies under this Agreement, in law or equity.

## ARTICLE 8.   INSURANCE REQUIREMENTS.

8.01   Contractor shall procure and maintain, at its own expense, appropriate insurance covering its and all of its subcontractors', agents' or employees' obligations under this Agreement, including the following minimum insurance coverage:

    **a)**    Workers' Compensation or equivalent insurance, to the full extent required in the jurisdictions with a limit of no less than Two Million ($2,000,000) U.S. Dollars in which the work is being performed and wherever the contracts of employment for Contractor's employees are made or expressed to be made;

    **b)**    Employers' Liability Insurance (including Occupational Disease) in an amount of not less than One Million ($1,000,000) U.S. Dollars;

    **c)**    Automobile Liability Insurance covering all motor vehicles owned, operated or licensed by Contractor with a bodily injury, death and property damage limit of not less than Two Million ($2,000,000) U.S. Dollars inclusive;

    **d)**    Comprehensive/Commercial General Liability Insurance with a bodily injury, death and property damage limit of not less than Five Million ($5,000,000) U.S. Dollars inclusive and including Owner and its personnel as additional insureds; and, without restricting the generality of the foregoing, including extensions known as:  Cross Liability; Blanket Contractual; Products and Completed Operations; Personal Injury; Non-Owned Automobile Liability; if Contractor/Tenant is a Canadian resident, Contingent Employers' Liability; and if Contractor/Tenant is a United States resident, Company Owners' and Contractors' Protective;

    **e)**    All Risk Property Insurance covering all risks of physical loss or damage to property of every description owned by Contractor or for which Contractor is legally liable or responsible, for an amount not less than the replacement value of such property, and providing a waiver of subrogation against Owner and all Persons with whom Owner may be participating; and,

    **f)**    Environmental and Pollution Control Insurance of not less than Ten Million ($10,000,000) U.S. Dollars.

8.02   Notwithstanding the foregoing, if any of the aforementioned insurance coverage is maintained on a "claims made" basis, such coverage shall be extended to cover claims made during the three (3) years beyond the Term.

8.03   Each insurance policy required to be maintained by a Party in accordance with the terms hereof shall be primary and shall apply to any loss or claim before any contribution of the insurance of the other Party is applicable, and shall require the carrier of such policy to provide at least thirty

(30) days' prior written notice to the other Party of any material change or refusal to renew such policy or termination or cancellation thereof.

8.04    The Parties shall duly and punctually pay all premiums payable by them in connection with complying with their respective insurance obligations hereunder. Upon request, either Party shall provide to the other Party from time to time a certificate of insurance evidencing the insurance coverage required to be in place pursuant to the terms hereof.

8.05    Notwithstanding anything contained herein, each of the Contractor and the Owner shall obtain and keep in force in connection with the Contractor's facilities and the Owner's facilities, respectively, such other insurance as may be required by Applicable Laws from time to time.

8.06    **WASHINGTON WAIVER.   FOR SERVICES PERFORMED IN THE STATE OF WASHINGTON AND, TO THE EXTENT APPLICABLE, EACH PARTY SPECIFICALLY AND EXPRESSLY WAIVES ANY IMMUNITY UNDER INDUSTRIAL INSURANCE, TITLE 51, RCW, AND ACKNOWLEDGES THAT THIS WAIVER WAS MUTUALLY NEGOTIATED BY THE PARTIES.**

8.07    Other Project Agreements may also state insurance requirements, but the Parties intend that all references to insurance requirements are the same and not duplicative of each other.

## ARTICLE 9.  FORCE MAJEURE

9.01    Subject to the other provisions of this Article 9, the term "**Force Majeure**" as used herein and in all the Project Agreements shall mean an act, condition, or event that is not reasonably within the control and not a result of the fault of the Party claiming Force Majeure, including without limitation, acts of God; acts of the public enemy; insurrections; riots; labor disputes; boycotts; unusual geologic conditions; fires; explosions; floods; embargoes; acts of judicial or military authorities; acts of governmental authorities; inability to obtain, maintain, renew or operate under necessary permits, licenses, and governmental or third-party approvals after applying for same using their reasonable commercial efforts; or other such similar acts, conditions, or events which prevent the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties. Force Majeure includes the failure of a Party's contractors to furnish labor, services, materials or equipment in accordance with contractual obligations but solely to the extent such failure is itself due to Force Majeure as herein defined.

9.02    If, because of Force Majeure, either Party is unable to perform any of its obligations under this Agreement (other than the obligation of a Party to pay money), and if such Party shall promptly give to the other Party written notice of such Force Majeure, then the obligation of the Party giving such notice shall be excused, but only to the extent made necessary by such Force Majeure and during its continuance; provided, the Party giving such notice shall use good faith efforts to eliminate such Force Majeure and/or minimize its effects or impacts to the other Party, insofar as reasonably possible, with a minimum of delay. Should a situation of Force Majeure which materially affects Contractor's or Owner's ability to perform its obligations hereunder exceed two hundred seventy (270) consecutive days in duration, the Party not affected by the Force Majeure event may, at its option, terminate the Project Agreements in whole or in part and if terminated by Owner, Owner shall make the Termination Payment to Contractor in Appendix A. Upon such payment in full, neither Party shall have any further obligation to the other Party; however, each Party shall be obligated to make any payments which had become due and payable prior to such termination. The affected Party shall provide suitable proof to the other Party to substantiate any claim made under this Article 9.

- 11 -

**9.03**  Both Parties agree significant capital expenditures and settlement of strikes and lockouts shall be entirely within the discretion of the Party having the difficulty. The above requirement that any Force Majeure shall be remedied with all reasonable dispatch shall not require significant capital expenditure or settlement of strikes and lockouts by acceding to the demands of the opposing party, when such course is inadvisable in the discretion of the Party having difficulty. Further, said requirement shall not obligate Contractor to obtain WCS from a source other than the Site nor shall it obligate Owner to Receive Refined Coal at a destination or facility other than the Delivery Point.

**9.04**  The following shall not constitute events of Force Majeure: Owner's or Contractor's ability to Process WCS or purchase Refined Coal at a more advantageous price, Owner's inability to economically store Refined Coal or Non-coal Slurry Tendered hereunder, the change in the regulatory or other laws, changes in the costs of Processing or other related costs, and scheduled or routine maintenance or repairs.

**9.05**  The Parties recognize that legislative, regulatory, administrative or other governmental bodies or the courts may impose new laws or amend existing laws or change the interpretation or application of existing laws that may:

**a)**  make it necessary for Contractor to make material additional capital or operating expenditures to produce, Process, prepare or load WCS to be Processed hereunder, or

**b)**  prevent or delay Contractor from dredging the WCS, or delivering the Refined Coal or Non-coal Slurry as set forth in this Agreement.

**9.06**  In such cases as stated in Section 9.05 that involve cumulative annual costs of $20,000 or more, Contractor shall give written notice to Owner, and Owner and Contractor shall consider what steps can be taken by the Parties in the dredging, handling, Processing and transportation of WCS in order to accommodate such changes prior to Owner adjusting the WCS Base Price to reflect such increased costs according to Article 6.06 of the Processing Agreement.

## ARTICLE 10.  RECORDS, AUDITS, ACCESS, STEERING COMMITTEE

**10.01**  Contractor shall maintain books and records relating to the Processing of WCS and Tendering of Refined Coal under this Agreement for a period of not less than three (3) years after the end of each calendar year for all invoiced quantities and supporting documentation during such calendar year. The Parties shall maintain books and records relating to the Tracking Account and Project Reserve for the duration of this Agreement.

**10.02**  Upon reasonable notice and during normal business hours, a Party and/or its independent auditors shall have the right at its sole cost to inspect the other Party's books and records relating to all provisions of this Agreement which include, without limitation, Refined Coal quality, quantity shipped, and price or invoice adjustments or as may be necessary to satisfy inquiries from governmental or regulatory agencies, but only to the extent necessary to verify the accuracy of any statement, charges or computations made pursuant to this Agreement. A Party shall make a reasonable effort to facilitate the other Party's inspection of such records in its possession.

**10.03**  Contractor shall form a "**Steering Committee**" including delegates from both Contractor and Owner for the purpose of managing the safe and efficient activities at the Site. Steering Committee meetings will be scheduled no less than once every three (3) months and will cover the detailed actual financial results and future plan for dredge, Processing Plant and Refined Coal production and operations. The Steering Committee will also focus on actions required by the

- 12 -

Contractor and/or Owner to optimize the Processing of WCS, maximize Refined Coal yield and production and minimize operational costs of both Contractor and Owner.

## ARTICLE 11.  DEFAULT, REMEDIES, AND TERMINATION

**11.01**   The provisions set forth in this Section 11.01 shall apply to the non-defaulting Party's remedies for the defaulting Party's failure to perform.

    **a)**   As an alternative to the non-exclusive remedies below, if the Parties mutually agree in writing, the non-performing Party may schedule Tenders or payment of Invoices, as the case may be, pursuant to such terms as the Parties may agree upon in order to discharge some or the entire obligation to pay damages.

    **b)**   Unless otherwise excused by the provisions of this Agreement (e.g., Force Majeure, etc.), the non-breaching Party shall be entitled to recovery of   direct damages and other available remedies from and against the breaching Party, excluding however in all cases any recovery for consequential, exemplary and punitive damages.

    **c)**   Owner and Contractor shall be subject to commercially reasonable obligations to mitigate any damages hereunder.

**11.02**   The occurrence of any of the following shall constitute an "Event of Default" and shall entitle the non-defaulting Party to terminate the Agreement if the Event of Default is not remedied within the prescribed period of time or to exercise and avail itself of any and all other remedies applicable in law or equity, excluding however in all cases any recovery for consequential, exemplary and punitive damages:

    **a)**   Failure by either Party to pay any amounts due and such failure is not cured within thirty (30) days of written notice from the non-defaulting Party to the defaulting Party.

    **b)**   Either Party fails to perform any material contractual obligation under this Agreement, the Tendering Agreement or the Processing Agreement, and such failure is not cured within ten (10) Business Days of receiving written notice thereof from the other Party; provided that if it shall be impracticable or impossible to remedy such failure within such ten (10) Business Day period, the cure period shall be extended for an additional ten (10) Business Day period to remedy such failure subject to the condition that during the additional period, the non-performing Party shall be diligently pursuing a remedy for the failure.

    **c)**   Either Party (i) makes any general assignment or any general arrangement for the benefit of creditors, (ii) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors or has such a petition involuntarily filed against it and such petition is not withdrawn or dismissed within thirty (30) days after such filing, (iii) otherwise becomes bankrupt or insolvent, or (iv) is unable to pay its debts as they fall due or, if able, fails to do so.

    **d)**   The Guarantor (i) makes any general assignment or any general arrangement for the benefit of creditors, (ii) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar

- 13 -

law for the protection of creditors or has such a petition involuntarily filed against it and such petition is not withdrawn or dismissed within thirty (30) days after such filing, (iii) otherwise becomes bankrupt or insolvent, or (iv) is unable to pay its debts as they fall due or, if able, fails to do so.

e)      Any representation or warranty made by either Party under the Project Agreements is false or untrue.

11.03   Owner may, in its sole discretion, terminate the Project Agreements in whole or in part, at any time prior to the end of the Term in the event the Centralia Power Plant actually stops operations upon at least ninety (90) days' written notice to Contractor ("**Termination Notice**"). The Project Agreements shall only terminate upon both payment of (a) a one-time variable amount payment to Contractor as calculated in accordance with Appendix A and referred to therein as the Termination Payment, and (b) the amount calculated in accordance with Appendix B. Upon the effective date of such Termination Notice, Contractor shall accordingly stop Processing of the WCS and Tendering of the Refined Coal and shall cause any of its suppliers or subcontractors to cease such work. If Bonds are outstanding as of the effective date of the Termination Notice, the Contractor shall pay the Termination Payment to the Bond Trustee. Except as contemplated by the Termination Payment and the payments pursuant to Appendix B, Contractor shall not be paid for anticipated profits or any other amounts in respect of services performed or goods delivered after the date of termination set forth in the Termination Notice, nor for any costs incurred by Contractor or Contractor's suppliers or subcontractors after such date.

11.04   At any time prior to the end of the Term, the Project Agreements shall terminate in the event Owner and Contractor mutually agree that there does not exist sufficient WCS to be Processed in an economical manner (cost to Process is greater than the WCS Base Price) at a mutually agreed termination date. If the Contractor has Processed less than 18 million tons of WCS, the Owner shall pay the Termination Payment determined in accordance with Appendix A. If the Contractor has Processed 18 million or more tons of WCS, the Owner shall not be required to make any Termination Payment, but the Project Reserve and other matters shall be addressed in Appendix C. The Project Agreements and the Guarantee shall terminate on such date (provided that all applicable payments are made, if any) and Contractor shall accordingly stop Processing of the WCS and Tendering of the Refined Coal and shall cause any of its suppliers or subcontractors to cease such work on such date. If Bonds are outstanding as of the effective date of termination, the Contractor shall pay the Termination Payment to the Bond Trustee. Except as contemplated hereby, Contractor shall not be paid for anticipated profits or any other amounts in respect of future services performed or goods delivered after the agreed date of termination, nor for any costs incurred by Contractor or Contractor's suppliers or subcontractors after such date. Prior to the Project Agreements terminating in accordance with this Section 11.04, the Contractor shall, at Contractor's own expense, engage an independent third party to verify there is insufficient WCS to be Processed in an economic manner.

11.05   Owner shall have the right to terminate the Project Agreements at any time after December 31, 2020 if the Tracking Account has a balance of $20 million or more  and there is no additional Refined Coal that can be Tendered at a price per ton less than the total delivered cost of PRB coal made up of the addition of (a) the following year's "**PRB 8400**" forecast price of 8400 BTU/15 coal in the Powder River Basin published by ICAP United, Inc. or equivalent index and (b) rail transportation costs to deliver PRB coal to the Site. The Parties shall negotiate in good faith as to the estimated cost to Tender Refined Coal, based on the drilling samples prepared by Contractor and corresponding yield estimates of such samples, but if the Parties cannot agree on the estimated yield, the Parties shall engage a mutually acceptable independent third party to

- 14 -

determine the same. Owner may not terminate the Project Agreements prior to December 31, 2020, pursuant to this Section 11.05, and shall have a continuing obligation to pay the Termination Payment to Contractor if the Owner terminates the Project Agreements in accordance with this Section 11.05. If Bonds are outstanding as of the effective date of such termination Contractor shall pay the Termination Payment to the Bond Trustee. No further payments shall be required to be made by the Owner under the Project Agreements and the Guarantee shall be terminated. Except as contemplated by the Termination Payment, Contractor shall not be paid for anticipated profits or any other amounts in respect of future services performed or goods delivered after the agreed date of termination, nor for any costs incurred by Contractor or Contractor's suppliers or subcontractors after such date.

11.06 If the Leased Premises (or land subject to easement) become subject to expropriation or condemnation under Article 18 of the Ground Lease, Owner shall pay the Termination Payment in accordance with Appendix A and the amount calculated in accordance with Appendix B to Contractor (or portion thereof if a partial expropriation). Except as contemplated by the Termination Payment and the payments pursuant to Appendix B, Contractor shall not be paid for anticipated profits or any other amounts in respect of services performed or goods delivered after the relevant date of termination, nor for any costs incurred by Contractor or Contractor's suppliers or subcontractors after such date.

11.07 If Owner fails to make Period Invoices or payments for Refined Coal when due and in accordance with Article 11.02(a) in such an amount that (i) amounts available under the Guarantee Agreement plus (ii) amounts on deposit in the Debt Service Reserve Fund, plus (iii) amounts on deposit in the Bond Fund become equal to or less than the sum of (x) the then outstanding Bond Principal, plus (y) accrued and unpaid interest due on the Bonds, plus (z) an amount equal to 80 days of interest on the Bonds, then the Owner shall pay the Termination Payment in accordance with Appendix A, unless such non-payment is otherwise excused by the provisions of this Agreement, such as Force Majeure, or the occurrence of an Event of Default under 11.02 by Contractor (as "Defaulting Party").

11.08 If an Event of Default set forth in 11.02(d) has occurred the Owner shall pay the Termination Payment to the Bond Trustee.

11.09 The provisions of Articles 15, 16, 18, 19 and 20 shall continue in full force and effect following any expiration or termination of this Agreement.

## ARTICLE 12. DISPUTE RESOLUTION

12.01 Any dispute, controversy or claim (a **"Dispute"**) arising out of this Agreement or any of the Project Agreements that cannot be resolved by the Steering Committee at the operating level shall be resolved according to this Article 12.

12.02 Upon written request by either Party, each Party shall promptly refer the Dispute to the Contractor's General Manager and Owner's Mine Manager or other representatives from each Party with authority to resolve the Dispute (the **"Senior Representatives"**). The Senior Representatives shall promptly meet and attempt, in good faith and with reasonable diligence, to resolve the Dispute.

12.03 If the Senior Representatives have not resolved the Dispute within ten (10) Business Days, then either Party may, upon notice to the other Party, submit the Dispute to binding arbitration as follows:

- 15 -

**a)**   Any Dispute arising out of or in connection with, or relating to, this Agreement, or the performance, breach, termination or validity thereof, shall be finally settled by arbitration.  Any Party to the Dispute may initiate arbitration within a reasonable time after any such dispute, controversy or claim has arisen, by delivering a written demand for arbitration upon the other Party or Parties to the Dispute. The arbitration shall be administered by the American Arbitration Association.  The arbitration shall take place in Centralia, Washington unless otherwise agreed to by the Parties.

**b)**   The arbitration shall be conducted by a single arbitrator qualified by experience and training and having no financial or personal interest in the outcome of the arbitration. The arbitrator shall be appointed jointly by agreement of the Parties to the Dispute. In the event the Parties to the Dispute are unable to agree on the appointment of the arbitrator within ten (10) days after notice of a demand for arbitration is given by either Party to the Dispute, then any Party to the Dispute shall be free to apply to the Courts of Washington for an order appointing the arbitrator.  Absent agreement or an award in the arbitration to the contrary, the arbitration fees and expenses shall be paid by the parties to the Dispute jointly.

**c)**   Upon the arbitrator's appointment, the arbitrator shall determine the appointed time and date for the hearing of the Dispute; and prescribing a schedule for all necessary pre-hearing steps and procedures, including the exchange of statements of position, documents, expert reports and discoveries, if the arbitrator deems such necessary, together with such additional rules and procedures which the arbitrator in his or her discretion deems to be desirable for the conduct of the arbitration.

**d)**   Prior to the end of the arbitration and before the arbitrator issues any decision on the merits of the Dispute (whether proposed or partial), each Party to the Dispute shall by a date certain established by the arbitrator submit a proposed arbitration award. The arbitrator shall be required to adopt in full the proposed arbitration award of one of the Parties to the Dispute and the arbitration award selected shall be final and binding on the Parties to the Dispute and there shall be no appeal on any question of fact or law or of mixed fact and law by either Party to the Dispute from the decision of the arbitrator.

**e)**   The arbitrator shall only have authority to award monetary damages. The arbitrator shall not have any authority to order specific performance, injunctions and other equitable remedies. Every award of the arbitrator made pursuant hereto shall be final and binding upon the Parties and there shall be no appeal therefrom.

**f)**   The arbitral award shall be in writing, stating the reasons for the award and be final and binding on the Parties to the Dispute with no rights of appeal. The award may include an award of costs, including reasonable legal fees and disbursements and fees and expenses of the arbitrator.   Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant Party or its assets.

**g)**   All notices and all other documents required or permitted by this Article to be given by the Parties to the Dispute or one of them to the arbitrator shall be given in accordance with the arbitrator's instructions.

**h)**   Notwithstanding Section 12.03(a), if the Dispute involves a matter that will have a financial impact of One Million ($1,000,000) U.S. Dollars or more upon a Party, such matter may, at the election of either Party, be brought before a court having jurisdiction thereof or having jurisdiction over the relevant Party. Where a disagreement arises

- 16 -

concerning whether a Dispute satisfies the One Million ($1,000,000) U.S. Dollar threshold, such matter will be referred to such court for resolution. In order to avoid duplicate litigation and arbitration, either Party must bring the Dispute before a court having competent jurisdiction within thirty (30) days of the date of original submission of the Dispute to binding arbitration or lose the right to subsequently bring the Dispute before a court. The Parties have agreed to binding arbitration as an exclusive means of resolving Disputes unless such court filing is made within this thirty (30) day time period. No ruling of the arbitrator hereunder shall be subject to appeal or further judicial review, except for enforcement proceedings.

**12.04**   Notwithstanding any Disputes arising out of this Agreement, or any activities being conducted pursuant to this Article 12, Contractor and Owner shall diligently proceed with performance of this Agreement.

### ARTICLE 13.   NOTICES, CORRESPONDENCE, ADDRESSES

**13.01**   Except as expressly provided otherwise, any notice or other correspondence required or permitted hereunder or any of the Project Agreements shall be in writing and sent, with all necessary charges fully prepaid: (a) by local courier or personal delivery to the Party; (b) by reputable national overnight express mail service (e.g. Fed-Ex, UPS, Airborne Express); or (c) by Electronic Communication promptly followed with a hard copy sent by other means for notices hereunder. All notices shall be deemed effective and properly delivered the earlier of: (a) actual receipt by the Party for whom it is intended; or (b) if by local courier or personal delivery, on the date of delivery to the Party or its offices; (c) if by overnight express mail service, one business day after timely entrustment to the overnight service; or (d) if by Electronic Communication, upon confirmation of completed transmission by Electronic Communication to the correct and current phone number or address; provided however, that foregoing times/days sent or delivered are presumed to be during normal business hours, and, if not, then it shall be deemed properly sent or delivered on the next business day (except for Electronic Communication of quality analysis, which, for the purposes of Sections 6.01 and 7.01 of the Tendering Agreement, is deemed received on the date and time indicated for confirmation of successfully completed transmission). All notices, invoices, payments and other communications to the Parties shall be addressed respectively as follows:

**IF TO CONTRACTOR:**

**Contract Notifications**

Coalview Centralia, LLC
2525 Ponce de Leon Boulevard
Suite 300
Coral Gables, FL  33134
Attn: David Henry
Email: dhenry@coalview.com
Telephone (913) 469-1112
Fax: (913) 469-1119

**Billing and Payment**
Bank:
ABA Number:
Account Number:
Account Name:

- 17 -

For further credit to:

**IF TO OWNER:**

**Contract Notifications**
Manager, Supply Chain Management
TransAlta Centralia Mining LLC
913 Big Hanaford Road
Centralia, WA  98531
Telephone:  360-330-8106
Fax:  360-330-8191

**With Copy To:**
Mine Manager
TransAlta Centralia Mining LLC
913 Big Hanaford Road
Centralia, WA  98531
Telephone:  360-807-8148
Fax:  360-330-8168

Treasurer
TransAlta Corporation
Box 1900, Station M
110-12th Avenue S.W.
Calgary, AB TZP2M1
Telephone:  403-267-7222
Fax:  403-267-7177

**Invoices**
Email to: apinvoice@transalta.com
Accounts Payable
TransAlta Centralia Generation LLC
913 Big Hanaford Road
Centralia, WA  98531
Telephone:  360-807-8030
Fax:  360-330-8199

**Lab Sample**
Coal & By-Products QC Specialist
TransAlta Centralia Generation LLC
913 Big Hanaford Road
Centralia, WA  98531
Telephone:  360-330-8242

**Quality Analysis (by E-mail)**
Dan Thomas at email:  dan_thomas@transalta.com
Lisa Underhill at email:  lisa_underhill@transalta.com
Will Greenough at email:  will_greenough@transalta.com
Jim Taylor at email:  jim_taylor@transalta.com
Cody Duncan at email:  cody_duncan@transalta.com

- 18 -

**For notification of Non-Conforming Refined Coal Delivery to Owner during non-business hours/days, Contractor shall email or call the following:**
Will Greenough at email: will_greenough@transalta.com
Phone: 360-508-0456 (cell)
Dan Thomas at email: dan_thomas@transalta.com
Phone: 360-508-0990 (cell)

The above addresses may be changed upon written notice in the manner provided above, and no amendment of this Agreement shall be required under this Article 13 for a change of address or a Party's name change. All proper notices sent pursuant to this Agreement shall be effective for all other Project Agreements.

## ARTICLE 14.  COOPERATION

14.01   Subject to the other provisions and limitations of this Agreement, each Party agrees to take such further action that may be commercially reasonable to perform hereunder and to effectuate the purposes and intent of this Agreement and the Project Agreements.

## ARTICLE 15.  WARRANTY, LIMITATION ON LIABILITY, DUTY TO MITIGATE, AND INDEMNIFICATION

15.01   IT IS EXPRESSLY AGREED THAT CONTRACTOR MAKES NO WARRANTY EXPRESSED OR IMPLIED AS TO THE QUALITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE REFINED COAL TO BE DELIVERED OR AS TO THE RESULTS TO BE OBTAINED FROM THE USE OF SUCH REFINED COAL. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, HOWEVER AND WHEREVER ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT. NOTHING IN THIS ARTICLE SHALL BE CONSTRUED AS LIMITING A PARTY'S RIGHT, SUBJECT TO THE TERMS OF THIS AGREEMENT, TO SEEK DIRECT, NON-CONSEQUENTIAL DAMAGES FOR THE OTHER PARTY'S BREACH OF ANY OF ITS OBLIGATIONS HEREUNDER.

15.02   Each Party agrees it has a duty to act in a commercially reasonable fashion and to mitigate damages and covenants that it will use commercially reasonable efforts to minimize any damages it may incur as a result of the other Party's performance or non-performance of this Agreement and to minimize any damages it may cause as a result of its performance or non-performance of this Agreement.

15.03   Each Party shall indemnify, defend, and hold the other Party harmless from and against any and all claims arising out of or resulting from the willful acts or negligence of such Party, its agent(s), contractor(s), and employees. Notwithstanding the foregoing, if any claim shall arise from the joint or concurrent negligence of both Parties, then with respect to such claim each Party shall be liable for its own litigation costs and attorney fees and shall pay that portion of any judgment in accordance with the percentage of liability attributable to its willful or negligent actions or inactions as adjudicated by a court or tribunal of competent jurisdiction.

15.04   Owner shall retain any liability for environmental or other legal issues relating to the WCS, the Refined Coal and the Non-coal Slurry and shall indemnify and hold harmless Contractor from the same, provided that in no event shall the Owner have liability for or indemnify Contractor for environmental or other issues relating to the WCS if such liability arises out of or in connection

- 19 -

with any negligence, willful misconduct or non-compliance with applicable laws on the part of Contractor or for those whom at law it is legally responsible for.

## ARTICLE 16.  LIMITATION ON WAIVER

**16.01**  The failure of either Party hereto on any one or more occasions to exercise any right or remedy shall not be construed as a waiver by such Party of said right, and no waiver by either Party of any one or more defaults of the other Party in the performance of this Agreement shall operate or be construed as a waiver of any future default, or defaults, whether of a like or different character.

## ARTICLE 17.  INTENTIONALLY DELETED

## ARTICLE 18.  ENTIRETY, AMENDMENTS

**18.01**  This Agreement and the Project Agreements constitute the entire agreement of the Parties relating to the subject matter hereof and supersedes and cancels all previous negotiations, commitments, representations, agreements, understandings and dealings between the Parties with respect to the subject matter hereof.  This Agreement may not be amended except in a written instrument making reference hereto signed by both of the Parties.  As a further covenant, Contractor agrees that none of the Contractor's Agreements may be amended without the written consent of the Owner, such consent not to be unreasonably withheld.

## ARTICLE 19.  SUCCESSORS AND PERMITTED ASSIGNS

**19.01**  This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns; provided, however, this Agreement may not be assigned by either Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.  Owner consents to the assignment of this Agreement and the Project Agreements to the Bond Trustee in accordance with the terms and conditions of the Consent to Collateral Assignment of Project Agreements between Owner and the Bond Trustee. The Parties acknowledge and agree that Contractor may subcontract dredging, and other activities to a third party and provide notice of same to Owner.  Contractor shall only request consent to any assignment to a third party entity if it is demonstrable that such proposed assignee has proven creditworthiness and demonstrated operational competency.  No assignment of this Agreement is permissible without the contemporaneous assignment to the same entity of all Project Agreements.

## ARTICLE 20.  GOVERNING LAWS

**20.01**  This Agreement shall be governed by and construed in accordance with the laws in the State of New York.

## ARTICLE 21.  INTERPRETATION

**21.01**  The Parties acknowledge that each Party and its counsel have reviewed this Agreement and that the rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.

*[signatures appear on the following page]*

- 20 -

IN WITNESS WHEREOF, the Parties have executed this Agreement by their respective, duly authorized representatives effective as of the date first written above.

**COALVIEW CENTRALIA, LLC**          **TRANSALTA CENTRALIA MINING LLC**
                                     **by:  TECWA Fuel, Inc., its sole member**

By: _____            By:_____

Title: _Presiden~ 4 Ceo__            Title: _____

Date:__12/14/13_____              Date:_____

                                     By:_____

                                     Title: _____

                                     Date:_____

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their respective, duly authorized representatives effective as of the date first written above.

**COALVIEW CENTRALIA, LLC**

By:_____

Title:_____

Date:_____

**TRANSALTA CENTRALIA MINING LLC
by:  TECWA Fuel, Inc., its sole member**

By:_____
        MICKEY G. DREHER

Title:____TREASURER_____

Date:____DEC 15/2013_____

By:_____
        LORI SCHMITT

Title:____CORPORATE SECRETARY____

Date:____DEC 15/2013_____

- 21 -

MIAMI 955516 v24 (2K)

EXHIBIT A

INVOICE EXAMPLE

## CoalView Centralia, LLC
## Semi-Monthly Invoice (15th and Last Day of Month)

| | For the Period | | | | 6/1/2014 | to | 6/15/2014 |
|---|---|---|---|---|---|---|---|
| | YTD | Current Period | | | YTD | | Current Period |
| Total Slurry Tons Removed | 769,201 | 69,205 | | Tons of Recovered Coal | 162,040 | | 14,299 |
| Elapsed Number of Days | 166 | | | Recovery Rate | 21.07% | | 20.66% |
| Estimated Annual Tons | 1,691,315 | | | | | | |
| | | | | | | | |
| Current Slurry Price per Ton | | 9.16 | | Current Recovered Coal Price | | | $    42.75 |
| | | | | | | | |
| Basis for Slurry Surcharge | $ 633,917.80 | | | Current Coal Charge @ 8,400 Btu / LB | | | $ 611,282.25 |
| | | | | | | | |
| Total Equivalent Tons at 8,400 BTU/lb | 15,691 | | | Current Btu Content | 9,218 | | |
| | | | | Minumum Btu Rate | 8,400 | | |
| Effective Rate per ton at 8,400 BTU/lb | $    40.40 | | | Heat Content Factor | 109.74% | | |
| | | | | Heat Content Bonus Value | | | $   59,538.89 |
| | | | | | | | |
| | | | | Total Recovered Coal Value | | | $ 670,821.14 |
| | | | | | | | |
| | | | | Slurry Charge Excess & Tracking Account Adder: | | | |
| | | | | Add excess of Slurry Payment Calculation over | | | |
| | | | | Refined Coal Payment Calculation if any; and if no | | | |
| | | | | excess, ignore Slurry Payment Calculation | | | $           - |
| | | | | | | | |
| | | | | Total Period Gross Amount Due | | | $ 670,821.14 |

| Less: | Royalties Due | | Rate: | | Amount | |
|---|---|---|---|---|---|---|
| | BLM | | 0.3874% | $ | 2,598.76 | |
| | ALCO* | | 1.2165% | $ | - | |
| | TCM | $ | 1.25 | $ | 17,873.75 | |
| | | | | $ | 20,472.51 | $   (20,472.51) |
| | | | | | | |
| | * ALCO Royalty payments due starting 1/1/2018 | | | | | |
| | | | | | | |
| | Portion of Annual Rent | | | | | $        (50.00) |
| | | | | | | |
| | Net Period Invoice Amount Due Coalview Centralia, LLC | | | | | $ 650,298.63 |

Supporting Daily Weight Records and Required Lab Test Reports are Attached

| Tracking Account Estimate Based on Projected Annual Tons: | | | Current YTD Estimate | | |
|---|---|---|---|---|---|
| | | | YTD Estimate | | Prior |
| Less than @ $0.00 | 0 | 1,400,000 | $          - | | - |
| Between @ $4.00 | 1,400,001 | 1,600,000 | 800,000.00 | | 800,000.00 |
| Between @ $3.00 | 1,600,001 | 1,800,000 | 273,946.36 | | 231,049.36 |
| Greater than @ $1.50 | 1,800,001 | | | | |
| Total Current Estimated Deposit to Reserve | | | $   1,073,946.36 | | $ 1,031,049.36 |

## APPENDIX A

### TERMINATION PAYMENT

In the event Owner terminates this Agreement in accordance with Sections 9.02, 11.03, 11.04, 11.05 and 11.06, the following settlement activities shall occur:

(a)   Owner shall pay all outstanding Period Invoices due Contractor from Owner according to Project Agreement provisions.

(b)   If Bonds have not been paid in full, then Owner shall pay an amount in accordance with the following:

    i.   The lesser of the appropriate "Principal Component" amount set forth in Appendix A-II or the actual amount of the outstanding Bonds at the date of termination to Contractor, if any (provided, however, that if Owner fails to make Period Invoices or payments for Refined Coal when due and such failure leads to a non-payment of principal on the Bonds when due, the "Principal Component" set forth in Appendix A-II shall not be reduced from the amount corresponding to the date of the missed Period Invoice until such invoice has been furnished by Owner or Guarantor);

    ii.   *plus* the pro rata portion of the Maximum Accrued Interest Component set forth in Appendix A-II corresponding to the period from the February 1 or August 1 immediately preceding the date of termination of this Agreement through the date on which the Termination Payment is made (assuming a 360-day year comprised of twelve 30-day months), unless the Agreement is terminated due to an Event of Force Majeure declared by the Contractor;

    iii.   *minus*  any amount in the Bond Fund established under the Indenture;

    iv.   *minus* the amount on deposit in the Debt Service Reserve Fund;

    v.   *minus* the amount on deposit in the Operating Reserve Fund;

    vi.   *minus* the amount on deposit in the Repair and Replacement Fund; and

    vii.   *minus* the amount of the Project Reserve held by Agent (which amount of the Project Reserve shall be paid to the Contractor who shall pay such Project Reserve amount to the Bond Trustee to the extent necessary to redeem all then outstanding Bonds);

and if the resulting amount, after making the calculation in i through vii above, is a: (A) positive number, then Owner will pay such amount to Contractor in full within thirty (30) days of the effective date (the "**Termination Payment**"), or (B) a negative number, then no further payment shall be due from Owner to Contractor.  If Owner pays Contractor the amount to Contractor set out in (A), then Contractor shall pay such amount to the Bond Trustee.

(c)   After the payment of the amounts, if any, in (a) and (b) above, then all remaining funds in the Project Reserve shall be applied first to Owner's Tracking Account if balance exists (and paid to Owner) and secondly, shall be split evenly (50%/50%) between Contractor and Owner.

(d)   Owner's Tracking Account shall be closed without payment by Contractor if balance exists following (c) above.

MIAMI 955516 v24 (2K)

(e)  Upon the payment in full of all amounts contemplated in this Appendix A, all of the Project Agreements shall terminate without further liability to either Party, except for the payment of the amounts described in this Appendix A.

(f)  Owner takes possession and ownership of all project equipment and facilities, the title to which shall be delivered to Owner free and clear of all liens, charges and encumbrances.  Owner shall be responsible for any decommissioning of the Processing Plant.

(g)  For a period of two (2) years, Contractor has the first right of refusal on any equipment or facilities associated with the Project that Owner desires to sell and can be removed without rendering Owner's equipment or facilities unusable.

(h)  A full accounting and documentation of all above obligations will be supplied to Owner to substantiate all of the settlement activities described in this Appendix A.

MIAMI 955516 v24 (2K)

## APPENDIX A-II

### TERMINATION PAYMENT SCHEDULE

| Date of Termination | Termination Payment | |
|---|---|---|
| | Principal Component | Maximum Accrued Interest Component |
| Prior to February 1, 2014 | $26,500,000.00 | $   273,304.86 |
| February 1, 2014 through July 31, 2014 | 26,500,000.00 | 1,199,875.00 |
| August 1, 2014 through January 31, 2015 | 26,500,000.00 | 1,199,875.00 |
| February 1, 2015 through July 31, 2015 | 26,500,000.00 | 1,199,875.00 |
| August 1, 2015 through January 31, 2016 | 25,260,000.00 | 1,143,933.75 |
| February 1, 2016 through July 31, 2016 | 24,380,000.00 | 1,104,403.75 |
| August 1, 2016 through January 31, 2017 | 23,090,000.00 | 1,046,001.25 |
| February 1, 2017 through July 31, 2017 | 22,220,000.00 | 1,006,930.00 |
| August 1, 2017 through January 31, 2018 | 21,200,000.00 | 960,395.00 |
| February 1, 2018 through July 31, 2018 | 20,500,000.00 | 928,340.00 |
| August 1, 2018 through January 31, 2019 | 19,590,000.00 | 887,150.00 |
| February 1, 2019 through July 31, 2019 | 19,005,000.00 | 861,550.00 |
| August 1, 2019 through January 31, 2020 | 17,895,000.00 | 811,075.00 |
| February 1, 2020 through July 31, 2020 | 16,945,000.00 | 768,575.00 |
| August 1, 2020 through January 31, 2021 | 15,615,000.00 | 708,118.75 |
| February 1, 2021 through July 31, 2021 | 14,450,000.00 | 655,656.25 |
| August 1, 2021 through January 31, 2022 | 12,990,000.00 | 589,275.00 |
| February 1, 2022 through July 31, 2022 | 11,690,000.00 | 530,618.75 |
| August 1, 2022 through January 31, 2023 | 10,115,000.00 | 459,025.00 |
| February 1, 2023 through July 31, 2023 | 8,695,000.00 | 394,981.25 |
| August 1, 2023 through January 31, 2024 | 6,965,000.00 | 316,337.50 |
| February 1, 2024 through July 31, 2024 | 5,385,000.00 | 244,943.75 |
| August 1, 2024 through January 31, 2025 | 3,510,000.00 | 159,693.75 |
| February 1, 2025 through July 31, 2025 | 1,780,000.00 | 80,956.25 |
| August 1, 2025 and After | 0.00 | 0.00 |

MIAMI 955516 v24 (2K)

## APPENDIX B

### ADDITIONAL OWNER TERMINATION SETTLEMENT

In the event Owner terminates this Agreement in accordance with Sections 11.03 and 11.06, the following settlement activities shall occur:

(a) Owner shall pay to Contractor the lesser of (i) $7,500,000.00 or (ii) the amount if any, which, when added to prior distributions to Contractor's equity holders, yields an internal rate of return of twelve percent (12%) based on the initial investment amount of $7,500,000, in full within thirty (30) days of the notice of termination.

(b) Contractor shall return for reimbursement all spare parts or inventoried items subject to mutual agreement of the Parties.

(c) Owner pays Contractor a demobilization fee of $200,000.00 less any accrued tear down costs which shall be utilized by Contractor to fund decommissioning of equipment and facilities and satisfaction of Contractor's Agreements.

(d) Full accounting and documentation of all above obligations will be supplied to Owner to substantiate all of the settlement activities.

- 26 -

**APPENDIX C**

PAYMENTS UPON PROJECT COMPLETION

(a)   Owner shall pay all outstanding Period Invoices due Contractor from Owner according to Project Agreement provisions.

(b)   The current balance of the Project Reserve held by Agent is applied first to Owner's Tracking Account, if balance exists in Tracking Account (and paid to Owner), and then split evenly (50%/50%) between Contractor and Owner.

(c)   Owner's Tracking Account shall be closed without payment by Contractor if balance exists following (b) above.

(d)   Upon such termination and payment in full, all of the Project Agreements would terminate without further liability to either Party.

(e)   Contractor retains possession and ownership of all project equipment.

(f)   Contractor is responsible for the decommissioning of the Processing Plant.

(g)   A full accounting and documentation of all above obligations will be supplied to Owner to substantiate all of the settlement activities.

- 27 -

## APPENDIX D

### FCR Equipment and Buildings Contribution by TCM

**Physical Asset Description:**

Existing processing plant building including two 15-ton cranes, office building, electrical room and restrooms, but not including Owner's interest in any underlying land
Conveyor and Storage Bin
Static Thickener, 220 foot diameter with pumps at Center Well, but not including Owner's interest in any underlying land
Chemical Flocculent mixing and storage building, but not including Owner's interest in any underlying land
Crisafulli 250 HP diesel powered Dredge - Rotomite 6000 model
Approximately 48,000 Feet - 12" OD Poly Pipe SDR 11
6 Electric Powered Pumps - 250 HP to 350 HP

MIAMI 955516 v24 (2K)

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing document was filed electronically with the Court and thus served simultaneously upon all counsel of record, this 26th day of August, 2019.

Rondi A. Greer

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500