UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COALVIEW CENTRALIA, LLC, a Delaware limited liability company, Plaintiff, v. TRANSALTA CENTRALIA MINING LLC, a Washington limited liability company, and TRANSALTA CORPORATION, a Canadian corporation, Defendants. | NO. 3:18-cv-05639 PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT[1] NOTE ON MOTION CALENDAR: SEPTEMBER 20, 2019 ORAL ARGUMENT REQUESTED |

---

[1] TransAlta Centralia Mining, LLC ("**TCM**")'s Motion for Partial Summary Judgment Regarding Termination (D.E. 179, the "**MSJ**") was filed under seal.

[PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT] - 1

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

# I.  INTRODUCTION

TCM's MSJ is not brought in good faith. **TCM has repeatedly represented to MSHA that Coalview is and will remain <u>the project's contractor</u> going forward when operations soon resume**. This alone sounds the death knell to TCM's current efforts to have this Court approve TCM's wrongful termination of its contract with Coalview. In any event, TCM's latest claim is of a technical breach under the Master Services Agreement (the "**MSA**"), arguing not that Coalview failed to perform the work it was hired to do, but that Coalview is insolvent. TCM has *again* wrongfully claimed to have terminated the parties' relationship in its continued attempt to force Coalview out of business. But TCM is wrong. *First*, Coalview is solvent. Moreover, any purported technical breach claimed by TCM was caused <u>*by TCM's non-payment of monies owed to Coalview*</u>, or is otherwise excused by force majeure. The uncontroverted facts are that TCM has suffered no damages, and that Coalview remains ready, willing, and able to continue operations to complete the important environmental cleanup for which it contracted. *Second*, TCM agreed that Coalview must be permitted to continue its performance pending this dispute. And perhaps most importantly on the issue of continued performance, and showing TCM's instant motion is duplicitous, **TCM repeatedly represented to MSHA that Coalview will be the project's contractor on a going forward basis**. *Third,* and alternatively, in the event TCM can terminate the MSA for convenience or force majeure, it is contractually bound to pay Coalview **<u>in excess of $25 million</u>**.[2] TCM wrongfully seeks to avoid its contractual obligations, including paying the termination payments, all based on its fabricated solvency claim. But above all, even if, *arguendo*, TCM's insolvency claim did have merit,

---

[2] Appendices A and B to the MSA set forth calculations for the termination payment(s) owed by TCM to Coalview in the event TCM terminates the MSA for convenience or a result of force majeure.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

TCM has waived or is estopped from asserting that Coalview has been terminated due to its representations to MSHA that Coalview will be the project's contractor going forward. Thus, for any number of reasons, the MSJ must be denied (and Coalview's Second Motion for Preliminary Injunction (D.E. 163) should be granted).

## II. STATEMENT OF MATERIAL FACTS

### A. The Agreements Unambiguously Prohibit TCM's Claimed Termination

It is undisputed on this record that TCM and Coalview expressly agreed, and this Court has found, that any dispute arising out of the MSA, including regarding Coalview's solvency, would *not stop* Coalview's work or TCM's payments to Coalview.[3] TCM also expressly agreed years ago *with Coalview **and** the project's Trustee* that TCM is prohibited from terminating the MSA and is required to continue to perform with Coalview under the current circumstances.[4] In that regard, in its June 27, 2019 letter, U.S. Bank ("Secured Party" referred to in the Consent Agreement) timely asserted its rights under the Consent Agreement, demanding TCM continue to perform under the MSA.[5] Thus, the parties' agreements unambiguously provide Coalview and Trustee with economic certainty for Coalview to proceed with its operations without fear that TCM can claim a dispute, such as solvency, and seek to prematurely or wrongfully terminate the agreements. *See* Declaration of Roger Fish filed contemporaneously hereto ("**Fish Supp. Dec.**"), ¶10.

---

[3] MSA, Article 12.04 ("**Notwithstanding any Disputes** arising out of this Agreement, or any activities being conducted pursuant to this Article 12 [pertaining to Dispute Resolutions], **[Coalview] and [TCM] shall diligently proceed with the performance of this Agreement**.") (emphasis added); D.E. 34 at 4, 8.

[4] *See* Consent to Collateral Assignment of Project Agreements and Guarantee Agreement (the "**Consent Agreement**") between TCM, Coalview, and U.S. Bank National Association ("**U.S. Bank**"), as Trustee at 4, (filed at D.E. 4-6) (requiring that TCM "**shall continue performance of their respective obligations under the Project Agreements**") (emphasis added); *see also* Fish Supp. Dec., ¶¶7-8.

[5] *See* Fish Supp. Dec.,¶9; (Letter filed at D.E. 166 (Silverman Dec. in Support of Second Injunction), Ex. G).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

**B. Force Majeure**

Article 9.01 of the MSA provides in material part:

> . . . the term **"Force Majeure"** . . . **shall mean an act, condition, or event** that is not reasonably within the control and not a result of the fault of the Party claiming Force Majeure, **including without limitation, acts of God**; acts of the public enemy; insurrections; riots; labor disputes; boycotts; unusual geologic conditions; fires; explosions; **floods**; embargoes; acts of judicial or military authorities; **acts of governmental authorities**; **inability to obtain, maintain, renew or operate under necessary permits, licenses, and governmental or third-party approvals after applying for same using their reasonable commercial efforts**; **or other such similar acts, conditions, or events which prevent the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties**.

MSA, ¶9.01 (emphasis added).[6] Weather conditions and governmental approvals or permits, both of which are implicated here, are both included in the plain language of MSA, ¶9.01. *Id.*

Article 9.02 of the MSA provides in material part:

> **Should a situation of Force Majeure** which materially affects Contractor's or Owner's ability to perform its obligations hereunder **exceed two hundred seventy (270) consecutive days** in duration, **the Party not affected** by the Force Majeure event **may, at its option, terminate the Project Agreements** in whole or in part **and if terminated by Owner, Owner shall make the Termination Payment to Contractor** in Appendix A.

MSA, ¶9.02 (emphasis added).[7]

On December 29, 2018, there was a catastrophic event at the Centralia operation resulting in Coalview's dredge being submerged. The weather conditions on the night of the incident were rainy and windy, with a temperature in the mid 40's. Further, there were large waves in the pond due to the stormy weather. As discussed below, MSHA's report states that ".

---

[6] Article 9.04 lists events that do not constitute Force Majeure, including "scheduled or routine maintenance or repair." MSA, ¶9.04.

[7] Two hundred seventy days from December 29, 2018 is September 25, 2019. Article 13.01 of the Processing Agreement and Article 15.01 of the Tendering Agreement incorporate the MSA's force majeure provision.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

. . the stormy weather [also] caused the dredge to sink." The facility lost electrical power, and Coalview lost communication with the dredge operator. Coalview's other operators immediately went to the dredge and found it submerged. Significant search and rescue efforts ensued. Tragically, the event resulted in the death of the dredge operator. Fish Supp. Dec., ¶12.

On December 29, 2019, MSHA issued a control order (Section 103(k) of the Mine Safety and Health Act of 1977) (the "**K Order**"), prohibiting all mining and related activity at Pond 3C until further order from MSHA. *Id.*, ¶13. Coalview and MSHA promptly notified TCM of the incident and the K Order on the day of the incident. *Id.* As a result of the K Order, Coalview was unable to operate for months, and Coalview was prohibited from access to the site in order to perform its own investigation of the incident. *Id.*[8]

But for the K Order and need to obtain MSHA approval in order to continue operations -- which was withheld by MSHA for many months -- Coalview could have re-commenced operations promptly after the incident. *Id.,* ¶15. Coalview has spent tremendous time and effort cooperating with MSHA's investigation, including gathering and providing information and documentation, answering questions, and sitting for interviews. *Id.*, ¶16. The sinking of the dredge, the length of the MSHA investigation and MSHA's decisions regarding implementing and lifting the K Order are not, and never were, reasonably within the control of Coalview nor a result of the fault of Coalview. *Id.*, ¶17. Coalview has used good faith efforts to eliminate the force majeure and minimize its effects or impacts to TCM, insofar as reasonably possible, with

---

[8] The dredge sinking, MSHA investigation and K Order, independently or together, have implicated the MSA's force majeure provision, as, among other things, "not reasonably within the control and not a result of the fault of" Coalview, and include one or more of "an act of God, an act of a governmental authority, the inability to obtain, maintain, renew or operate under necessary permits, licenses, and governmental or third-party approvals after applying for same using Coalview's reasonable commercial efforts," and include "other such similar acts, conditions, or events which prevent the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties." *See* MSA, § 9.01; Fish Supp. Dec., ¶14. Even MSHA acknowledges "stormy weather" was a "root cause" of the incident. *Id.*, ¶22.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

a minimum of delay, including cooperating with MSHA and seeking to expedite MSHA's investigation and obtain the lifting of the K Order. *Id.*, ¶18.

On or about August 19, 2019, MSHA lifted the K Order. *Id.*, ¶19. Accordingly, Coalview is now permitted to re-enter the area that was formerly inaccessible pursuant to the K Order. Moreover, MSHA will permit Coalview to resume operations upon submission to, and approval by, MSHA of an operating plan.[9] *Id.* Now that the K Order has been lifted, Coalview is able to thoroughly investigate the underlying incident. Coalview disagrees vehemently with MSHA's findings, and anticipates that its investigation will provide further evidence to rebut MSHA's findings and further demonstrate that the force majeure was not reasonably within Coalview's control and not the fault of Coalview. *Id.*, ¶20.[10] Indeed, MSHA concluded that ". . . the stormy weather [also] caused the dredge to sink." *Id.*, ¶22.[11] Coalview has never had an

_____

[9] As TCM is the operator, and Coalview the contractor, MSHA requires that TCM submit the operating plan. Coalview has worked expeditiously to prepare, and assist TCM with the preparation of, the operating plan. Fish Supp. Dec. ¶19, n.4. *See infra.*

[10] While Coalview does not believe the MSHA report should be even considered, *see infra*, in the event the Court does consider it, Coalview notes some of the many flaws in the investigation and inaccuracies in the report that raise questions regarding its trustworthiness and correctness. For example, MSHA's investigation and report was one-sided and its conclusions self-serving as MSHA is established for the protection of miners. When the record is viewed in its entirety, it is obvious MSHA had an agenda to blame the company and not the miner, or some other cause. Mining and dredging are inherently hazardous. Maintenance issues routinely arise under the stress from the difficult conditions of the Centralia climate and from the slurry materials encountered at the operation. MSHA's report failed to note that the purported maintenance issues and hazardous conditions it noted were corrected by Coalview. In fact, MSHA inspected the dredge roughly one month prior to the accident with no citations. In the history of the numerous inspections of the dredge, only one citation was issued – for lighting, and then terminated when additional lights were immediately ordered and installed. MSHA's report is full of inaccurate statements of fact, slanted opinions and wrong conclusions. When Coalview attempted to point out to MSHA inaccurate facts in the report, MSHA summarily dismissed Coalview's efforts. MSHA was not interested in any details that did not support that the company was at fault. Purported safety issues raised regarding the dredge were addressed and corrected, another fact that MSHA did not include in its report. MSHA's report concludes that leaking pontoons filled with water, a condition that could not have sunk the dredge. MSHA's report lacks sufficient facts to support its conclusions. The dredge sank catastrophically and even if small leaks were present, the dredge could not have taken on enough water to sink that quickly. There had to be an external force that inundated the hull, such as weather. Fish Supp. Dec., ¶21.

[11] Coalview has other critiques of MSHA's findings, including, without limitation, its finding that certain changes added weight to the dredge, when in fact changes reduced the weight; that MSHA itself may have caused the

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

active dredge sink or a work-related death of an employee in its operations, and Coalview could not have reasonably anticipated or foreseen the dredge sinking or the tragic death that followed. *Id.*, ¶¶24-25. Nor could Coalview anticipate the subsequent months-long government investigation that would prevent Coalview from operating. *Id.* The Coalview employee had over 47 hours of dredge operation training and over 71 hours of additional safety and operational related training. *Id.,* ¶26. It is through no fault of Coalview that its performance was first hampered by TCM's month's long withholding of payments that were in fact due, *see infra*, and more recently by the sinking of Coalview's dredge, the operator's loss of life, and the ensuing MSHA's K Order. *Id.,* ¶27. Coalview remains ready, willing, and able to re-commence operations as soon as MSHA permits. *Id.,* ¶28.

   C. **TCM's Purported Default Notice**

   On or about March 29, 2019, TCM claimed that "based on information available to TransAlta," Coalview was in default under the parties' MSA and that termination of the MSA was "effective immediately." D.E. 135 (Amended Complaint), Ex. B. TCM's claim of default was based upon Section 11.02(c) of the MSA, stating that "[a]ccording to Coalview's quarterly report . . . for the fiscal quarter <u>ending December 31, 2018</u>, Coalview is insolvent." *Id.* (emphasis added). Additional correspondence followed, D.E. 135, Exs. E and F. On April 16, 2019, Coalview's counsel again responded, again denying that an Event of Default has occurred and reiterating (a) Coalview's Force Majeure defense (about which TCM was already on notice); (b) that Article 12.04 of the MSA and the Court's Injunction Order both require that TCM and Coalview to proceed under the Agreements; and (c) requesting a meeting between

---

leaking conditions with its improper testing, that a hatch was missing when it was not, and that the cabin door frequently jammed. Nor did MSHA account for the potential that the dredge could have been seriously damaged when it sunk, or when it was pulled out of the water. Fish Supp. Dec., ¶23.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

the Senior Representatives pursuant to Section 12.02 of the MSA, which request TCM was required to but failed to make before purporting to declare the Agreements terminated. D.E. 135, ¶41 & Ex. G. On April 18, 2019, TCM responded, denying the applicability of force majeure, and acknowledging it did not request the Senior Representatives' meeting (claiming it was not required to), but agreeing to attend the meeting. D.E. 135, Ex. H. At no time (in the foregoing described letter or otherwise) did TCM state it was unaware of Coalview's force majeure defense or the underlying incident and K Order, or that Coalview had failed to timely provide notice of force majeure (nor could it, discussed below). Fish Supp. Dec., ¶¶ 29-32. On June 7, 2019, Coalview filed its Amended Complaint, which included additional claims for declaratory relief regarding TCM's improper termination of the MSA and asserted facts surrounding the force majeure. D.E. 135.

**D. TCM Agrees that Coalview will be the Contractor and Operate Going Forward: TCM's Conduct Inconsistent with Its Claimed Termination of the MSA**

On **April 23, 2019** – *after* TCM's claimed April 2, 2019 effective date of terminating the MSA, D.E. 179 at 2 – TCM, *in cooperation with Coalview*, submitted to MSHA the required modified operating plan for the project. Fish Supp. Dec., ¶33 & Ex. B thereto. In its letter to MSHA accompanying the operating plan, TCM requested that MSHA approve the modified plan, with Coalview as the operator, and unqualifiedly represented to MSHA that it was submitting the modified plan "in conjunction with *its contract miner, Coalview* Centralia LLC (CVC)" and that "TCM *is* **contracted with Coalview** Centralia LLC (CVC) **as the contract miner and operator** of the Fine Coal Recovery (FCR) system." *Id.* (emphasis added). This operating plan submitted to MSHA, which was a final plan required at the time (not a preliminary plan or draft) provided that Coalview was to be the operator through 2025. *Id.* The

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

operating plan further sets forth TCM's detailed representations to MSHA that Coalview is the current operator, and will continue to be the operator going forward:

> The fine coal recovery (FCR) system will be . . . ***operated by Coalview*** Centralia, LLC (CVC) . . . It is the goal of management for ***Coalview and TransAlta to provide*** and foster a safe work environment for all employees and contractors while working on the Centralia mine property") . . . ***the operator shall position the dredge*** perpendicular to the advancing slurry face exposed above the water surface where a beach area of adequate width (***determined by Coalview***) . . . ***Coalview shall be responsible for evaluating the impoundment conditions*** on a daily basis . . . ***Coalview shall also*** be responsible for determining any unsafe conditions that prohibit the dredge from being operated in various areas of the impoundment structures . . . The following ***policies and procedures shall be enforced by Coalview*** to prevent injury while operating the dredge . . . .

*Id.* at 2, 6-7 (emphasis added).

After MSHA lifted the K Order, it required that TCM submit additional modifications to the April 2019 operating plan in order for Coalview and TCM to re-commence operations. Fish Supp. Dec., ¶35. TCM and Coalview, through as recently as September 12, 2019 have been working together to submit the required revised operating plan, which, consistent with ***the April 2019 operating plan that TCM submitted to MSHA, again provides that Coalview is the current operator, and will continue to be the operator going forward***. The current draft of the revised operating plan again sets forth in great detail the same representations to MSHA that were contained in the April operating plan regarding Coalview continuing as the operator. *See* Fish Supp. Dec., ¶36 & Ex. C thereto. To Coalview's knowledge, TCM has never informed MSHA that it purports to have terminated Coalview and the MSA, nor of its purported intention to bring in another operator, as TCM claims in this litigation. Fish Supp. Dec., ¶37.

Indeed, TCM recently represented to MSHA that TCM and Coalview met on Friday, September 6, and "continued to work on getting a final draft prepared and that we are targeting

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

the end of this week [September 13] for completion." *Id.* ¶ 36 & Ex. D thereto. Coalview anticipates that the final plan will be submitted to MSHA the week of September 16, and that there will not be any substantial changes regarding the matters set forth therein. *Id.* TCM also has assisted Coalview in re-commencing its operations, including, without limitation, by supplying several pieces of equipment after its claimed date of termination of the MSA, including, a Cat D10 Dozer, trash pump, and water pump. *Id.*, ¶38. TCM has also requested payment for, and accepted payment of, certain amounts it claims are due under the parties' ground lease. *Id.*, ¶39.

It is clear that TCM's conduct and representations to MSHA and Coalview during the plan process are entirely *inconsistent* with its claim made before this Court that the MSA has been terminated. *Id.*, ¶40.

**E. Coalview's Finances**

**a. Coalview's Financial Condition**

Coalview is solvent. Fish Supp. Dec., ¶44; Wilson Decl. (D.E. 165), ¶¶ 6-9; *see also* Declaration of Garrett Wilson in Opposition to MSJ (filed contemporaneously hereto, "**Wilson Supp. Dec.**"), ¶¶6-9 and 13-22. Coalview has not made any general assignment or any general arrangement for the benefit of creditors, and has not filed, nor has any intention of filing or commencing, any petition or cause of action under any bankruptcy or similar law for the protection of creditors, nor has such a petition been involuntarily filed against Coalview. Fish Supp. Dec., ¶¶45-46.[12] Beginning in May 2018, TCM refused to pay Coalview for its invoices, including Invoice "Revision" 2018-06-001 for $311,661.85; (b) Invoice Revision 2018-06-003

---

[12] Further, Coalview is current on payment of its workforce. However, if TCM terminates the agreements, Coalview will be forced out of business and to lay off its entire workforce. *Fish Supp. Dec.*,„ ¶53.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

for $124,256.03; and (c) Invoice 2018-07-001 for $402,688.19. *Id.*, ¶47. Even after Coalview obtained an Injunction Order in October 2018 requiring TCM to pay Coalview for these invoices (D.E. 34), TCM refused to pay the monies it owed. *Id.*, ¶48. It was not until February 2019 that TCM finally paid Coalview $1,522,789.49, about 90% of the outstanding amount. *Id.*, ¶49. TCM's failure to pay Coalview monies owed has contributed to Coalview's financial condition. *Id.*, ¶50; Wilson. Dec. , ¶ 7, 22-23; Wilson Supp. Dec., ¶¶16, 22-23.

### b. Coalview's Debts

**Bond Payments**: On June 27, 2019, the bondholders, in coordination with exercising remedies to require TCM to continue to perform under the MSA, *see supra*, sent a letter to Coalview declaring a default for "Failure to maintain a Debt Service Coverage Ratio of 1.0x." *See* June 27 Letter, Fish Supp. Dec., ¶54. The Bondholders did not declare a default for non-payment of bond amounts, about which *TCM* – who has no right or entitlement to those payments – complains in its MSJ. *Id.*, ¶55. Indeed, the bondholders understand Coalview's circumstances and have been working along with Coalview in order to get Coalview back into operation. *Id.*, ¶56. The bondholders' position is unequivocally that "[i]n the event TA Mining is enjoined from terminating [the MSA], the holders would agree to permit Coalview to continue to operate pursuant to the terms of the bond documents and Project Agreements." D.E. 163 at 12; Fish Supp. Dec., ¶57. Moreover, the bondholders have indicated their willingness to work with Coalview, including, without limitation, entering into a cooperation agreement with Coalview under which the bondholders would forebear on debt service payments, other than from excess revenues, and the bondholders otherwise are willing to negotiate a restructuring of any past due amounts. Fish Supp. Dec., ¶58 & Ex. E thereto. In short, Coalview anticipates an

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

agreement with the bondholders under which any amounts about which TCM complains in its MSJ will not be due, as claimed by TCM. *Id.*

**Related Parties:**  Coalview Recovery Group LLC and Gables Energy Partners I, LLC are entities related to Coalview, principally owned by the executive director of Coalview.  Fish Supp. Dec., ¶59. TCM argues in its MSJ that Coalview has failed to pay Coalview Recovery Group's invoices in the amount of $1,290,246.74 and Gables Energy Partners in the amount of $347,737.70. D.E. 179 at 6. Timely payment of these monies to Coalview Recovery Group and Gables Energy Partners has been excused by these related parties. Fish Supp. Dec., ¶60. Accordingly, these debts are not due. *Id.*

**Payments to TCM:**  TCM argues in its MSJ that Coalview has failed to pay TCM $119,453.50. D.E. 179 at 6. TCM has never declared any default relating to the payment of such sums, which represent royalty payments. Fish Supp. Dec., ¶63. For any purported failure to pay amounts due under the MSA, the MSA requires written notice and 30 days to cure. MSA, ¶11.02(a); Fish Supp. Dec., ¶64. To date, TCM has not provided Coalview with written notice of any purported default for amounts due under the MSA (nor an opportunity to cure). Fish Supp. Dec., ¶65. Instead, when Coalview informed TCM in or about December 2018 that the Indenture of Trust Agreement, to which TCM consented, required payment be made first to the bondholders before Coalview was permitted to pay any royalties to TCM, TCM consented. *Id.*, ¶66. TCM did not bring the issue up again until it filed its MSJ. *Id.*

**Third Party Payments:**  TCM argues in its MSJ that Coalview is not paying the undersigned firm, Kluger Kaplan. *Id.* at 11. Coalview, and not any third party, has timely paid all of Kluger Kaplan's invoices to date. Fish Supp. Dec. ¶67.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

# III. ARGUMENT AND AUTHORITIES

### A. TCM Not Entitled to Judgment As a Matter of Law: The Parties' Agreements Prohibit TCM's Claimed Termination of the MSA

TCM's MSJ requests the Court to find that TCM properly terminated the MSA. D.E. 179 at 24. However, it is already determined on this record that Article 12.04 of the MSA requires TCM to continue to "diligently proceed with the performance of [the] Agreement," "[n]otwithstanding any Disputes arising out of this Agreement." D.E. 34 at 4.[13] As the parties' dispute TCM's termination of the MSA, and there remain several genuine issues of material fact regarding TCM's termination, Article 12.04 of the MSA and the Injunction Order both require TCM's MSJ be denied and that TCM be ordered to continue to perform.

Moreover, TCM cannot dispute that the Consent Agreement unambiguously provides the bondholders with an opportunity to cure and to exercise rights and remedies of their own in the event of a purported breach by Coalview, and expressly prohibits TCM from terminating the MSA in the meantime.[14] Thus, the clear and unambiguous language of the MSA and the Consent Agreement both independently require that TCM's MSJ be denied, or that summary judgment be entered *in Coalview's favor*, as TCM is required to continue to perform.

### B. TCM is Not Entitled to Judgment As a Matter of Law/Genuine Issue of Material Fact: TCM has Waived, or is Estopped from Asserting, Termination of the MSA, or Termination Otherwise Fails By Election of Remedies

---

[13] Moreover, the Court _already rejected TCM's insolvency default argument_ in granting its Injunction Order and requiring TCM to continue to perform. D.E. 34 at 4 ("[TCM] also argues that to the extent Coalview is unable to pay its debts (is insolvent), that too is a default under the MSA").

[14] *See* D.E. 4-6, (Consent Agreement), Article I(c) ("If requested by Secured Party [bondholders] in writing within such ninety (90) day period following receipt of such notice [of default by TCM] . . . , then irrespective of _any_ default by Borrower under such Project Agreement _TA Mining and Guarantor shall continue performance_ of their respective obligations under the Project Agreements and the Guarantee Agreement") (emphasis added).

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

In addition to TCM's claimed termination being prohibited by the parties' contracts, TCM's own contradictory conduct requires denial of the MSJ. Indeed, TCM has taken action wholly inconsistent with its position that the MSA has been terminated. Most significantly, as discussed *supra* in Section II(D), TCM has expressly represented to MSHA that **Coalview is currently the operator, and will continue to be the operator**, on a going forward basis. Further inconsistent with its claimed termination, TCM has assisted Coalview in getting back into operation, including supplying various equipment to Coalview. *See* Fish Supp. Dec., ¶38. Thus, TCM's true position, *as represented to the federal government,* is entirely inconsistent with its litigation posture that the MSA has been terminated. For whatever its reasons, TCM is either mispresenting to this Court or to MSHA. TCM's inconsistent positions cannot be reconciled.

Thus, TCM has waived its right or is estopped from terminating the MSA. TCM cannot represent to the government that Coalview is the operator, while arguing the opposite before this Court. Indeed, Coalview has reasonably relied to its detriment on TCM's representations to Coalview and to MHSA and TCM's conduct, including spending time and money preparing operating plans in cooperation with TCM and MSHA, and planning and preparing to re-commence operations based on those representations. Fish Supp. Dec., ¶43. It is well-settled that a party may, through its course of performance, waive a term of a contract, either retrospectively, *i.e.,* in connection with a past obligation or condition, or prospectively.[15] TCM's inconsistent positions and representations to MSHA are a clear bar to its claim here that

---

[15] *See Kamco Supply Corp. v. On the Right Track, LLC,* 49 N.Y.S.3d 721 (N.Y. App. Div. 2017) (sellers, by electing to continue agreements despite purchasers' breach, waived right to terminate agreements based on initial breach); *Didco Urban Renewal Co. v. Mann Mgmt., Inc.*, 637 N.Y.S.2d 131, 132 (1996) (material issues of fact as to whether plaintiff either waived or was estopped from terminating parties' agreement precluded summary judgment); *Zemel v. Horowitz*, 815 N.Y.S.2d 496 (N.Y. Sup. 2006) (doctrine of judicial estoppel or quasi-estoppel prevents a party from taking inconsistent positions, such as in a court proceeding versus with the government, in this instance in a tax return).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

the MSA has been terminated. Accordingly, summary judgment should be granted *in Coalview's favor* on this issue, but, at the very least, TCM's contradictory conduct presents genuine issues of material fact that preclude summary judgment in TCM's favor.[16] [17]

Moreover, with respect to purported but undeclared breaches dating back to 2017 that TCM now complains about in its MSJ, *see* D.E. 179 at 4[18], TCM undoubtedly has waived, is estopped from now complaining about, or otherwise has elected to continue to perform despite, these years old purported breaches. *Bigda v. Fischbach Corp.,* 849 F. Supp. 895, 901 (S.D.N.Y. 1994) (continued performance after alleged breaches precludes termination, finding material issues of fact existed as to whether actions were pretext used to justify otherwise calculated termination of agreement); *see also In re Gordon Car & Truck Rental, Inc.,* 59 B.R. 956, 959 (Bankr. N.D.N.Y. 1985) (party waived any right to terminate agreement based on insolvency clause where party knew or should have known other party's financial condition and continued with contracts). At a minimum, the record is replete with genuine issues of material fact regarding TCM's contradictory conduct, election of remedies and waiver.

---

[16] Alternatively, or additionally, TCM has lost its right to terminate the MSA based on its election of remedies. Under New York's election of remedies doctrine, a non-breaching party that continues to perform loses its right to otherwise terminate the contract based upon that breach at some later point. *See, e.g., Calvin Klein Trademark Trust v. Wachner,* 129 F.Supp.2d 254, 258–59 (S.D.N.Y.2001) (plaintiffs could not seek termination of contract where they continued to perform under contract despite being aware of various breaches). Here, TCM has performed under the MSA, by supplying Coalview with equipment, cooperating with Coalview to obtain approval from MSHA in order to continue operations and, and expressly representing to MSHA that Coalview is, and will continue to be, the operator. Thus, TCM has lost its right to terminate the MSA based on a purported insolvency default by electing to voluntarily continuing to perform under the MSA.

[17] Despite declarations of termination or form reservations of rights included in certain correspondence from TCM's *counsel, TCM's actions* unequivocally demonstrate that TCM has continued to perform. Likely, this is in part because the MSA, Consent Agreement, and Injunction Order require TCM to continue to perform. *See supra.* It is further worth noting that a contractual "no-waiver" provision does not immunize TCM from the consequences of its election of remedies. *See ESPN,* 76 F. Supp. 2d at 390.

[18] For example, a June 2017 bond payment and forbearance agreement, a March 2017 (or prior) payments to Coalview Recovery Group and Gables Energy Partners, *see supra,* and June 2017 royalty payments. D.E. 179 at 6.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

**C. TCM Not Entitled to Judgment As a Matter of Law: TCM Has Not Shown Nor Can it Show any Damages by the Purported Breach**

TCM alleges that Coalview breached Article 11.02(c) of the MSA. D.E. 140 (Answer and Amended Counterclaim), ¶120. However, to state a claim for breach of contract under New York law, a party must allege damages as a result of the breach.[19] TCM has not demonstrated, and cannot demonstrate, any damages as the result of its claimed technical breach of the MSA. To the contrary, TCM has agreed with and represented to the federal government that Coalview is ready, willing, and able to continue work as soon as possible and to complete the project. Thus, Coalview's continued performance (and TCM paying Coalview for said work) is in TCM's best interest.[20] Fish. Supp. Dec., ¶41. Indeed, once TCM pays Coalview for work performed, Coalview's financial situation will become a non-issue. *Id.*, ¶42.

**D. Genuine Issue of Material Fact: TCM's Insolvency Claim is Belied by Record**

TCM argues it is permitted to terminate the MSA because Coalview is "bankrupt or insolvent." D.E. 179 at 13. TCM's notice of default was sent on March 29, 2019, claiming that "[a]ccording to Coalview's quarterly report filed with the Washington Economic Development Finance Authority for the fiscal quarter ending December 31, 2018, Coalview is insolvent." D.E. 135 (Amended Complaint), Ex. A. The terms of the MSA constrain TCM to argue only this noticed basis of default. MSA, Article 11. But as set forth in greater detail in Garrett Wilson's Declaration and Supplemental Declaration, "TransAlta is incorrect in its allegation that Coalview was insolvent on and around December 31, 2018 (or more recently)." D.E. 165

---

[19] *See First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (affirming summary judgment against plaintiff who could not prove damages).

[20] It is also well-settled that equity does not favor forfeitures. *151 W. Associates v. Printsiples Fabric Corp.*, 92 A.D.2d 76, 80 (1983), such as what TCM is seeking here, despite suffering no damages.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

(Wilson Dec.) at 3. Indeed, both balance sheet and cash flow tests show Coalview was solvent on and around December 31, 2018. *Id.* Indeed, TCM's MSJ and supporting Declaration are devoid of any true solvency analysis. *See* Wilson Supp. Dec., ¶¶ 6-9 and 13-23 (setting forth in detail flaws in TCM's analysis, including focusing on irrelevant *unadjusted historical* accounting information, failure to project future cash flows, and failing to acknowledge realities regarding how businesses operate). Thus, Coalview has demonstrated that it was solvent, and that TCM's claimed default was improper, under various recognized metrics.

Indeed, TCM acknowledges in its MSJ that analysis under a balance-sheet or bankruptcy law standard the issue of solvency "*might raise issues of material fact*" D.E. 179 at 13, n.11.[21] Thus, the MSJ should be denied on this basis alone. Indeed, because TCM admits that Garrett Wilson's analysis raises issues of fact, TCM sidesteps the issue, instead arguing that insolvency, which is not defined under the MSA, should be defined in the exact same manner as the subsequent language in Article 11.02(c) regarding an inability to pay debts as they fall due. D.E. 179 at 13. However, even if the Court were to accept TCM's self-serving interpretation, TCM's argument still fails, as addressed *infra*.

**E.  Genuine Issue of Material Fact: Coalview's Ability to Pay Debts**

Contrary to TCM's *argument*, Coalview does not rely on "a hopeful turnaround" D.E. 179 at 12, to demonstrate its ability to pay debts. Instead, Coalview has presented competent *evidence* demonstrating that Coalview was solvent as of December 2018 (TCM's declared time of insolvency) and was projected to continue to be solvent (under both a balance sheet and cash

---

[21] While TCM states it is not seeking summary judgment on this basis, it does not get to choose how it wishes the MSA should be interpreted in order to seek summary judgment only under its interpretation. At the very least by its admission, TCM acknowledges that there may be internal ambiguity regarding the meaning of Article 11.02(c) of the MSA, which TCM has not demonstrated should be resolved in its favor on summary judgment.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

flow analysis) but for TCM's failure to pay monies owed to Coalview and force majeure. D.E. 165 at 3. As much as TCM wishes to deny it, TCM's wrongful "withholding of amounts due to Coalview was a significant contributor to Coalview's financial status." D.E. 165 at 3. It is well-settled that a party's breach (assuming Coalview was in breach) is excused by the other party's prevention of performance or prior breach.[22] Moreover, failure to pay a single debt, even over a long period, will usually not justify a finding that a debtor is generally not paying its debts as they become due for purposes of determining a debtor's insolvency. *In re Iridium*, 373 B.R. 283. Thus, there are clear genuine issues of fact regarding Coalview' ability to pay debts.

### F. Genuine Issue of Material Fact: Coalview's Payment of Debts

TCM's argument that Coalview failed to pay its debts fares no better. D.E. 179 at 5-6 and 9-11. With respect to payments to the bondholders, in addition to the Consent Agreement precluding TCM's claimed termination, *see supra*, the bondholders have confirmed that they will continue with Coalview if Coalview succeeds on its injunction motion. D.E. 163 at 12. Moreover, as set forth *supra*, the bondholders have indicated their willingness to work with Coalview and forebear on the amounts about which TCM complains in its MSJ. Fish Supp. Dec., ¶58 & Ex, E.[23] Thus, TCM has no basis or standing to complain regarding the bond payments. Nor can TCM complain about payments to Coalview Recovery or Gables Energy, as timely payment of these amounts have been excused by these related parties. Fish Supp. Dec., ¶¶59-61. With respect to royalty payments, TCM cannot now, for the first time and without

---

[22] *See, e.g., Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach"); *In re Food Mgmt. Group, LLC*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007) (anticipatory breach relieved other party of obligation to demonstrate that they could have performed, pursuant to New York doctrine of prevention of performance).

[23] Loan extensions, modifications, restructurings and forbearance are common occurrences for going concerns. *See Wilson Supp. Dec.*, ¶23.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

giving the required notice under the MSA, complain about an alleged default dating back to "early 2017." D.E. 179 at 10; Fish Supp., ¶¶62-66. With respect to TCM's argument regarding payments to Kluger Kaplan, D.E. 179 at 11, this claim similarly has no merit. *See* Fish Supp., ¶¶67-68. The authority cited by TCM in inapposite.[24] Here, TCM's analysis of Coalview's debts is misplaced and Coalview's opposition evidence presents genuine issues of material fact precluding summary judgment.

### G. TCM Not Entitled To Judgment as a Matter of Law and Genuine Issues of Material Fact Exist: TCM's Claimed Default is Barred by the Prevention Doctrine and Any Purported Breach is Excused by Force Majeure

TCM's claimed termination is barred by the "prevention" or "hindrance" doctrine, as TCM's failure to pay amounts owed to Coalview frustrated or prevented Coalview from complying with Article 11.02(c) of the MSA. [25] *See Wilson Dec.* (D.E. 165), ¶¶8, 23; Wilson Supp. Dec., ¶¶16, 22, 23 (TCM's nonpayment of $1.5 million in invoices due to Coalview was a significant contributing factor to the company's arrearages).

Additionally, any purported breach is excused by force majeure. Article 9.01 of the MSA provides a broad, *non-exhaustive list* of events, which clearly includes weather conditions and governmental approvals. The unambiguous intent of the MSA's force majeure provisions

---

[24] TCM cites to *Brookfield Asset Mgmt., Inc. v. AIG Fin. Products Corp.*, 2010 WL 3910590 (S.D.N.Y. Sept. 29, 2010), an inapplicable case where the court granted a motion to dismiss plaintiff's claim for failing to state a claim based on an "inability to pay" event of default but found that plaintiff stated a claim based on insolvency. Here, Coalview has demonstrated both its solvency and ability to pay debts, and that any purported inability was waived by TCM or excused for force majeure, none of which facts were at issue in *Brookfield*. TCM also relies on an inapplicable Oklahoma bankruptcy case, which involved the denial of counsel's application for compensation and reimbursement of attorneys' fees.

[25] *See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1007 (2d Cir.1991) (under New York law, each party to contract impliedly agrees not to hinder or obstruct other party's performance); *Westerbreke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 212 (2d Cir.2002) (party cannot act in such way to "frustrate[ ] or prevent[ ] the occurrence of [a] condition"); *Gray v. Met Contracting Corp.*, 167 N.Y.S.2d 498, 501 (1957) (plaintiffs estopped from urging default situation for which they were responsible).

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

is that the parties agreed various specifically delineated *and* non-delineated events could occur that would excuse performance. MSA, ¶9.01. The catastrophic sinking of the dredge, involving an electrical outage, and which MSHA concluded was caused at least in part by "stormy weather", are both often considered acts of god or force majeure events[26], thus fitting squarely within the MSA's broad definition of force majeure. TCM *argues* that the dredge sinking was foreseeable and within Coalview's control. D.E. 188 at 7. That is unpersuasive. Unforeseeability is not a requirement under the MSA to constitute force majeure. *See* MSA, Article 9.[27] In any event, the record belies TCM's *argument*. *See* Fish Supp. Dec.,¶¶ 11-28 (setting forth numerous reasons the force majeure was unforeseeable and not within Coalview's reasonable control, including "stormy weather", power outage, Coalview's safety record, and critiques of MSHA's findings, as well as critiques of MSHA's conclusions). Moreover, TCM *arguing* something is foreseeable does not make it so. Indeed, "foreseeability is generally a question of fact for the jury."[28]

However, even if, *arguendo*, the sinking of the dredge did not constitute force majeure under the MSA (and further assuming that the Court were permitted to weigh, on a motion for summary judgment, the competing evidence regarding whether the sinking of the dredge was reasonably within Coalview's control or foreseeable), MSHA's investigation and K Order are

---

[26] *See, e.g.*, *Facto v. Pantagis*, 915 A.2d 59, 63 (App. Div. 2007) (power outage, even though "not absolutely unforeseeable", was "act of god" or otherwise was "unforeseen event or circumstance" that relieved party of obligation to perform under force majeure provision of contract).

[27] The Court in *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 318 (S.D.N.Y. 1989) noted that the law is "not settled" regarding whether a court must construe force majeure as to unforeseeable events. In any event, the record is clear that the events here were unforeseeable, or at the very least, that there are issues of fact regarding same regarding this issue, to be determined by a jury.

[28] *Karamarios v. Bernstein Mgmt. Corp.*, 612 N.Y.S.2d 12, 13 (1994); *see also Flacke v. NL Indus., Inc.*, 644 N.Y.S.2d 404, 407 (1996) (issues of fact regarding application of force majeure provision precluded summary judgment); *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978, 983 (S.D.N.Y. 1985) (whether force majeure clause applied to situation, thus excusing performance, presented factual question).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
206 464 3939

expressly contemplated by the MSA's definition of force majeure.[29] Thus, the over eight-month unforeseeable delay caused by MSHA's K Order is clearly encompassed within force majeure.

TCM relies exclusively on a report recently issued by MSHA (the "**MSHA Report**") to argue against force majeure. But the MSHA Report contains "hearsay within hearsay" pursuant to Fed. R. Evid. 805 and should not be permitted under the public record hearsay exception of Fed. R. Evid. 803(8). [30] In short, the MSHA Report contains an inadequate foundation for the conclusions asserted, is speculative and conclusory, lacks supporting evidence, and if accepted as conclusive, improperly invades on the province of the fact finder, particularly regarding the disputed force majeure issue.[31] [32]

At the very least, these matters raise genuine issues of fact regarding force majeure and the weight to be afforded to the MSHA Report that preclude summary judgment. Indeed, even

---

[29] *See* MSA, ¶9.01 ("**acts of governmental authorities**; inability to obtain, maintain, renew or operate under necessary permits, licenses, and governmental or third-party approvals after applying for same using their reasonable commercial efforts; or other such similar acts, conditions, or events . . . .") (emphasis added).

[30] *See supra*, n.10 & 11 (setting forth various issues regarding trustworthiness and correctness of report, including that it relies on interviews with several *TCM employees*, without any mention of pending litigation or potential biases, and pointing out various inaccuracies and where report ignores undisputed facts).

[31] When the trustworthiness of such a report has been challenged, courts may look to several factors to determine if the report is admissible: the timeliness of investigation; special skill or experience of investigators; any possible motivation problems, as well as unreliability, inadequate investigation, inadequate foundation for conclusions, and invasion of the jury's province. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264 (4th Cir. 2005) (affirming exclusion of government agency assessment report); *Denny v. Hutchinson Sales Corp.,* 649 F.2d 816, 821 (10th Cir. 1981) (lack of formal procedures and opportunity to cross-examine witnesses are proper factors in determining trustworthiness of findings in government agency report, finding court did not abuse discretion in refusing to admit report); *Franklin v. Skelly Oil Co.*, 141 F.2d 568, 572 (10th Cir. 1944) (cited by Advisory Committee to provide guidance on trustworthiness issue) (report of gas inspector relating to cause of fire was properly excluded because findings contained were "merely the opinion of one whose official office and duty does not rise to the dignity of an adjudicator of causes and effects" noting trustworthiness particularly questionable where conclusion not admissible by direct testimony or no opportunity to cross-examine).

[32] Even if, *arguendo*, the MSHA Report is otherwise admissible it should be excluded as unfairly prejudicial under Fed. R. Evid. 403. The unfair prejudice of the conclusions in the MSHA Report - issued just this month - without opportunity for cross examination - substantially outweigh any probative value.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

if the Court considers the MSHA Report, it need only look to MSHA's conclusion that "stormy weather" was a "root cause" to find a genuine issue of fact.[33]

That the MSJ should be denied on force majeure is evident from *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl,* 720 F. Supp. 312, 319 (S.D.N.Y. 1989), a case cited by TCM. In *Phibro*, the plaintiff claimed that an electrical breakdown was not an "accident" within the meaning of the contract and that the event was foreseeable. The court disagreed, <u>denying</u> summary judgment and stating that "[w]hether or not the shutdown was an accident, or in fact controllable, is a question for the finder of fact to resolve." *Id.* at 319 (emphasis added).[34] Similarly here, genuine issues of material fact exist regarding whether the force majeure was controllable or foreseeable. The other cases cited by TCM are wholly inapplicable or further support Coalview's force majeure argument.[35] For example, *Tug Blarney, LLC v. Ridge Contracting, Inc.,* 14 F. Supp. 3d 1255 (D. Alaska 2014) involved a maritime contract,

---

[33] At a minimum, if the Court's decision rests at all on the Report, then pursuant to Rule 56(d), the MSJ should be denied or deferred until Coalview is permitted sufficient time to present facts essential to justify its opposition. *See ERMI, LLC v. Int'l Rehab. Services, Inc.*, 2019 WL 3285933, at *2 (W.D. Wash. July 22, 2019) (Leighton, J.) (deferring ruling on summary judgment under Rule 56(d)). At the very least, Coalview should be provided an opportunity to present its position through direct evidence and cross examination of the relevant witnesses, and to otherwise challenge MSHA's conclusions. To rely on the MSHA Report as conclusive on summary judgment, without providing Coalview with an opportunity to rebut same and present its own version of the facts, would be unduly prejudicial and deny Coalview due process. Indeed, the MSHA Report was only published on or about September 4, 2019. Moreover, the Report lists 46 people involved in the investigation, 7 of which were TCM employees (and therefore biased given TCM's posture in the case), and 11 of which were MSHA employees. Coalview has not had an opportunity to notice for deposition or subpoena any of the non-Coalview employees identified in the MSHA Report. Additionally, now that the K Order has been lifted, Coalview can begin to perform its own independent investigation. Fish. Supp. Dec.¶20. Moreover, Coalview served discovery on TCM regarding TCM's allegations that the Force Majeure was within Coalview's control, but TCM improperly objected and refused to produce relevant documents, requiring Coalview to file its pending motion to compel (D.E. 197).

[34] The *Phibro* court further held that "[m]echanical problems may constitute *force majeure* under certain circumstances" and that "reasonable inference could be drawn from the evidence that the event was not foreseeable." *Id.* at 320 ("The dispute over whether the February 23 shutdown was foreseeable raises genuine issues of material fact and summary judgment is therefore inappropriate").

[35] *See Route 6 Outparcels, LLC v. Ruby Tuesday, Inc.,* 931 N.Y.S.2d 436, 438 (2011) (applying Pennsylvania law, finding that global economic crisis did not constitute force majeure under lease); *Kel Kim Corp. v. Cent. Markets, Inc.,* 519 N.E.2d 295, 297 (1987) (inability to procure and maintain public liability insurance did not fall within force majeure).

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

governed by admiralty law, where the parties specifically contracted regarding the seaworthiness of the vessel at issue and where the force majeure clause was "limited to specific events" and not a broad or non-exhaustive like the MSA.[36] TCM further argues that "equipment failure, equipment loss, or anything of the sort" are not included in Force Majeure under the MSA. D.E. 179 at 16. However, TCM's argument is contradicted by Article 9.04, which merely excludes "scheduled or routine maintenance or repair" from Force Majeure. MSA, ¶9.04 (emphasis added). Naturally, unscheduled and unexpected equipment failure is therefore within the force majeure provision.[37]

TCM next argues that MSHA's investigation and K Order were foreseeable. D.E. 179 at 19.[38] It strains credulity to claim that a storm, power outage, dredge sinking, tragic death of a Coalview employee, followed by an eight month long MSHA investigation during which Coalview was prohibited from performing any work were foreseeable. However, even if TCM could prove that it was foreseeable, it would have to do so to a jury, to whom such questions of fact are reserved. *See supra.* TCM further relies on two wholly and easily distinguishable cases, *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.,* 178 F. Supp. 2d 1099 (C.D. Cal. 2001) and *Nissho-Iwai Co. v. Occidental Crude Sales*, 729 F.2d 1530 (5th Cir. 1984) to argue that the K

---

[36] In an attempt to expand the significance of the Alaskan maritime court holding which analyzed a limited force majeure clause, TCM misquotes *Tug Blarney* in its MSJ. *Compare* D.E. 179 at 17 ("movant had "failed to identify any authority which support[ed] the notion that the unexplained sinking of a vessel qualifies as an act of God under **a** force majeure clause" *with Tug Blarney,* 14 F. Supp. 3d 1255, 1276 (movant "provided no **compelling** authority that the unexplained sinking of a ship qualifies as an act of God under **the** *force majeure* clause.").

[37] TCM further argues that *Osborn v. Wilson & Co., Inc.,* 193 N.Y.S. 241 (Sup. 1922), cited by Coalview is distinguishable because there "the force-majeure clause provided that a force-majeure event would include 'floods, drought, **or other unavoidable cause** preventing Seller from filing this contract in full.'" D.E. 179 at 19 (TCM's emphasis). TCM argues that "[h]ere, the MSA does not include 'other unavoidable causes.'" *Id.* However, Article 9.01 contains almost identical language: "**or other such similar acts, conditions, or events** which prevent the dredging, producing, processing, and/or loading of WCS by Contractor, or the receiving, transporting, and/or unloading of Refined Coal or Non-coal Slurry by the Parties."

[38] Again, the plain language of the MSA does not require the event be unforeseeable to constitute force majeure.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

Order does not constitute force majeure (despite the MSA's clearly providing otherwise). D.E. 179 at 20. Both cases support denial of TCM's MSJ because they stand for the proposition that genuine issues of material fact exist precluding summary judgment.[39]

### H. Genuine Issue of Material Fact: TCM's Claimed Lack of Notice of Force Majeure is Specious

TCM's argument that Coalview failed to give proper notice of force majeure, D.E. 179 at 23-24, is precluded by genuine issues of material fact. Preliminarily, however, TCM improperly raises this argument for the first time in its MSJ. Indeed, nowhere in any of TCM's pleadings or even in the various correspondence exchanged between the parties regarding Force Majeure did TCM claim that it was not provided timely or proper notice of the Force Majeure. *See, e.g.* D.E. 140 (TCM's Answer and Counterclaim), at ¶ 96. The Ninth Circuit has explained that where a parties' pleading "does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to

---

[39] *Watson* involved a dispute between pharmaceutical companies regarding a contract to supply hypertension drugs. *At the time the parties signed the agreement*, there was an FDA Consent Decree in place (for prior violations) providing "the FDA could immediately order [the party] to stop all manufacturing of pharmaceutical products." *Id.* at 1104. After the party violated the Consent Decree, the FDA ordered the party to cease manufacturing drugs, as warned. *Id.* at 1105. Even still, the court found whether the FDA shutdown was "beyond the reasonable control" of Defendant was "a factual question that the Court cannot resolve on a motion for summary judgment." *Id.* at 1111 (emphasis added). While the *Watson* court further found that the shutdown was foreseeable, it relied on several important factors, which are not present here, including that the parties were "fully apprised of the terms of the [] 'Consent Decree' allowing for immediate FDA shutdown in the event of future [] violations)" *Id.* at 1113-14. Thus, TCM's attempt to compare the situation in *Watson*, where the parties were specifically aware of the possibility of the shutdown at the time they signed the contract, with the facts at hand is wholly disingenuous. TCM's reliance on *Nissho* is more of a reach, wherein Occidental, an American oil company, who contracted to supply oil to Nissho, separately contracted with the Libyan government to export oil in exchange for royalty payments and taxes. The Libyan Government and Occidental got into a dispute because Occidental "withheld $117 million that it owed the Government", after which Occidental refused to pay, the government prevented Occidental from exporting oil. The force majeure (governed by California law) issue went to the jury. *Id.* at 1540. Indeed, with respect to whether the issue was within the party's control, *Nissho* expressly held that "[n]or was the trial court required to decide the issue of reasonable control as a matter of law. **The issue is a classic jury question.**" *Id.* at 1543 (emphasis added). Similarly here, there are many issues reserved for a jury.

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

the district court."[40]  TCM raises no such denial or affirmative defense.  TCM's attempt to raise

this new unpled claim for the first time in its MSJ is should be rejected.  *Id.* Moreover, and in

any event, Coalview did provide notice to TCM of the Force Majeure, Fish Supp. Dec., ¶13,

and the authorities cited by TCM are easily distinguishable. TCM nowhere argues that it was

unaware of the Force Majeure and in fact TCM acknowledges that it did receive written notice

of the Force Majeure. D.E. 179 at 24. Faced with that fact, TCM is left to argue that the written

notice was not "prompt." D.E. 179 at 23. However, Coalview provided prompt notice of the

Force Majeure, Fish Supp. Dec., ¶13, and the cases cited by TCM are wholly inapplicable.[41]

## **CONCLUSION**

TCM is not entitled to judgment as a matter of law, and additionally genuine issues of

material fact permeate the record.  Coalview respectfully requests the Court deny the MSJ,

enter summary judgment in Coalview' favor that TCM waived or is estopped from asserting its

claim of terminating the MSA and is required under the MSA and/or Consent Agreement to

continue to perform, and grant such further relief for Coalview as the Court deems just and

proper.

---

[40] *Forest Serv. Employees for Envtl. Ethics v. United States Forest Serv.*, 341 F. Supp. 3d 1217, 1224–25 (W.D. Wash. 2018) (Leighton, J.) (citing *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079–80 (9th Cir. 2008)).
[41] *See Vitol S.A., Inc. v. Koch Petroleum Group, LP*, 2005 WL 2105592 (S.D.N.Y. Aug. 31, 2005) (applying <u>Kansas law</u>) (defendant failed to timely deliver product under contract that provided time was of essence, defendant claimed force majeure despite otherwise not having necessary cargo, and defendant never gave <u>any</u> notice to the other party); *In re The Containership Co.*, 2016 WL 2341363 (Bankr. S.D.N.Y. Apr. 29, 2016) (contract required notice of force majeure be provided within seven business days, and Defendants failed to give <u>any</u> notice of alleged force majeure condition); *United States v. Alshabkhoun*, 277 F.3d 930 (7th Cir. 2002) (contract required party to notice other party in writing of force majeure event, which party completely failed to do); *Superior Oil Co. v. Transco Energy Co.*, 616 F. Supp. 98 (W.D. La. 1985) (party <u>never</u> gave written notice of force majeure despite requirement to do so <u>as soon as possible</u> after occurrence); *Res. Inv. Corp. v. Enron Corp.*, 669 F. Supp. 1038, 1043–44 (D. Colo. 1987) (defendants failed to comply with notice requirements). Further, TCM mischaracterizes *In Three RP Ltd. P'ship v. Dick's Sporting Goods, Inc.*, 2019 WL 573413, at *5 (Feb. 12, 2019) as holding that a four month delay where contract required "prompt written notice" justified summary judgment. However, in actuality, the contract required "prompt written notice <u>no later than five business days after the occurrence</u>, including an estimation of its expected duration and probable impact on the performance of obligations" *id.* (emphasis added), which TCM conveniently omits to point out to the Court.

GARVEY SCHUBERT BARER, P.C.
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

DATED this 16th day of September, 2019.

                                    KLUGER, KAPLAN, SILVERMAN,
                                    KATZEN & LEVINE, P.L.

                                    By  s/Steve I. Silverman
                                        Steve I. Silverman, Fla. Bar No. 516831
                                        Philippe Lieberman, Fla. Bar No. 27146
                                        Miami Center, 27th Floor
                                        201 South Biscayne Boulevard
                                        Miami, FL  33131
                                        Telephone:  (305) 379-9000
                                        Fax:  (305) 379-3428
                                        Email:  ssilverman@klugerkaplan.com
                                        Email:  plieberman@klugerkaplan.com
                                        *Attorneys for Plaintiff*
                                        *(Admitted Pro Hac Vice)*

                                    GARVEY SCHUBERT BARER, P.C.

                                        David R. West, WSBA #13680
                                        Daniel J. Vecchio, WSBA #44632
                                        1191 Second Avenue, 18th Floor
                                        Seattle, WA  98101
                                        Telephone: (206) 464-3939
                                        Fax: (206) 464-0125
                                        Email:  drwest@gsblaw.com
                                        Email:  dvecchio@gsblaw.com
                                        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

        I hereby certify that on September 16, 2019, I electronically filed the foregoing motion

with the Clerk of the Court using the CM/ECF system which will send notification of this filing

to all parties registered to receive such notice.

                                        *s/ Steve I. Silverman*
                                            Steve I. Silverman

[PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT] - 26

GARVEY SCHUBERT BARER, P.C.
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*