HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COALVIEW CENTRALIA, LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>TRANSALTA CENTRALIA MINING LLC,<br><br>  Defendant. | CASE NO. C18-5639RBL<br><br>ORDER |

THIS MATTER is before the Court on the following Motions:

• Defendant TransAlta Centralia Mining's Motion for Summary Judgment [Dkt. # 179]. TCM seeks summary dismissal of Plaintiff Coalview's claim for a Declaratory Judgment that TCM cannot terminate the MSA for insolvency, and an Order Declaring that its March 29, 2019 letter effectively terminated the MSA. TCM's letter (and a portion of its Motion for Summary Judgment) focused on its claim that Coalview was insolvent because its liabilities exceeded its assets. This claim was based in part on the Declaration of TCM's forensic accountant, Lorraine Barrick [Dkt. # 181].

ORDER - 1

1     •     Coalview's *Daubert* Motion to Exclude Barrick's testimony [Dkt. # 270]. Coalview argues that Barrick's analysis uses the wrong date and the wrong measure (Coalview's liquidation value), rather than properly valuing Coalview as a going concern.

    •     Coalview's Renewed Motion for Summary Judgment based on newly discovered evidence [Dkt. # 306]. Coalview again seeks a determination that the MSA required TCM to object to any invoices within 30 days, making TCM's June 25, 2018 attempt to re-visit invoices dating to 2014 untimely, and its Counterclaims based on those invoices defective as a matter of law. The Motion is based on what it claims is new evidence in the form of an admission from TCM's Rule 30(b)(6) deponent that the MSA did impose a 30-day invoice dispute window.

TCM's initial Motion relied in part on Barrick's opinions, but it also conceded that the "battle of the experts" on the proper measure of solvency might raises issue of fact. It therefore did not move for summary judgment on Coalview's claimed "insolvency," but moved instead on its claim that Coalview was "not able to, or failed to, pay its debts as they became due." [Dkt. # 179 at 13, note 11].

The Court agrees that the competing expert opinions on this topic create a question of fact that would preclude summary judgment on "insolvency" in the valuation context. Coalview has persuasive arguments about how its value should be measured, but its disagreement with Barrick is for cross-examination, and she is qualified to opine about its value. Coalview's Daubert Motion to Exclude Barrick's opinion testimony [Dkt. # 270] is **DENIED**.

Coalview's Renewed Motion is, as TCM argues and Coalview concedes, like the one the Court previously denied. It claims that TCM has now conceded that the MSA required it to dispute any invoice within 30 days, making its attempt to recover some $16 million in alleged

fraudulent overpayments dating to 2014 fatally defective. It also argues there is no evidence supporting TCM's fraud claim, and (for purposes of TCM's motion, at least) demonstrates that TCM's June 2018 letter demanding immediate repayment of that amount was actually its first, awkward attempt to drive Coalview from a project and contract that it did not like, without paying the steep contractual termination fee. It claims that there is no evidence of inflated invoices, much less of fraud. Nevertheless, the new evidence supports Coalview's position, but it does not amount to summary judgment evidence on the issue of TCM's challenges to Coalview's past billings. Coalview's Renewed Motion for Summary Judgment [Dkt. # 306] is **DENIED**.

*\*\*\**

The parties have conducted extensive discovery both before and after on TCM's "termination" Motion was filed. They have filed seven thorough briefs and countless supporting declarations, transcripts and exhibits. The Court has held two oral arguments on the motion and has reviewed all the competing evidence.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears

the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. 242, 248 (1986).

The goal of contract interpretation is to "ascertain the intention of the parties." *Berg v. Hudesman*, 115 Wash.2d 657, 663 (1990) (quoting Corbin, *The Interpretation of Words and the Parol Evidence Rule*, 50 Cornell L. Quar. 161, 162 (1965), 4. S. Williston, Contracts 601, at 306 (3d ed. 1961)). In Washington, courts determine the parties' intent by examining the contract's objective manifestations. *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503 (2005). Words should be given their ordinary, usual and popular meaning "unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst Communications, Inc.*, 154 Wash.2d at 504. Subjective intent is generally irrelevant if the intent can be determined from the actual words used. *Hearst Communications, Inc.*, 154 Wash.2d at 504.

In determining the objective intent, courts may refer to extrinsic evidence for the "meaning of specific words and terms used." *Hearst Communications, Inc.*, 154 Wash.2d at 503 (quoting *Hollis v. Garwall, Inc.*, 137 Wash.2d 683, 695-96 (1999)). Extrinsic evidence may be relied on even in the absence of ambiguity. *See Berg* at 669 (1990). Extrinsic evidence may

1   include: "(1) the subject matter and objective of the contract, (2) all the circumstances
2   surrounding the making of a contract, (3) the subsequent acts and conduct of the parties, and (4)
3   the reasonableness of respective interpretations urged by the parties." *Hearst Communications,*
4   *Inc.*, 154 Wash.2d at 502 (citing *Berg*). Extrinsic evidence may not be used to "show an intention
5   independent of the instrument" or to "vary, contradict, or modify the written word." *Id.*

6    The MSA and related contracts (including the Consent Agreement, which included the
7   Bondholders) are largely stacked against TCM, and in favor of Coalview and its Bondholders.
8   The parties are required to continue paying and performing even in the event of a dispute, and
9   TCM cannot terminate Coalview without the Bondholders' consent or an opportunity to cure.
10  Indeed, the Consent Agreement expressly contemplates the Bondholders' having a continued say
11  in the project, even in the event Coalview is (actually) in bankruptcy or receivership.

12   TCM emphasizes that the MSA's "ability to pay debts" test is written, and should be
13  applied, in the *present tense*. Citing *Brookfield Asset Mgmt., Inc. v. AIG Fin. Prod. Corp.*, 2010
14  WL 3910590, at *1 (S.D.N.Y. Sept. 29, 2010) (The parties' use of the present tense ("fails" to
15  pay) "speaks to a moment in time, and implies that the failure… must actually happen in order to
16  trigger an Event of Default.").

17   TCM argues persuasively that this means Coalview's claimed future ability to pay its
18  debts once it starts working again is not relevant. But it also means that the date of the declared
19  default matters. As the Court has previously noted, TCM has advanced three separate "default"
20  dates in this case, based on different claimed debts and different analyses of the insolvency issue.
21  In June 2018, it accused Coalview of defrauding it of $16 million, and claimed that if Coalview
22  did not pay within 30 days, the MSA would be terminated for Coalview's "failure to pay its
23  debts." On March 29, 2019, TCM notified Coalview that it was in default for insolvency "**as of**
24

1 **December 31, 2018**" [Dkt. # 130 Ex. A]. The letter itself was dated March 29, but that is the only reference to that date in the Notice. The phrase "as of December 31, 2018" appears *five times* in the body of the Notice. TCM now asks the Court to read the Notice as describing a default as of March 29, 2019, and to determine that it effectively terminated the contract on that date.

Coalview argues that its "ability to pay debts" as of the *specific* date referenced in the MSA-required Notice of Default—December 31, 2018[1]—is the only issue before the Court on TCM's "termination" Summary Judgment Motion, which is itself necessarily based on that Notice of Default. The Court agrees. It is certainly true that Coalview's financial position was unlikely to have improved in the ensuing three months (or the months since), but that is not the issue.

The Court can readily see at least two significant differences between the situation at end of 2018, and that at the end of the first quarter of 2019: (1) as of the former date, TCM was still withholding payment for invoices totaling almost $2 million remaining from the June invoice dispute (which TCM ultimately paid in February 2019), and (2) the Bondholders' 2018 Forbearance Agreement (which agreed that Coalview's obligations to them were *not then due*) was in effect. TCM's demonstrative exhibit for the second oral argument implicitly concedes the former point; its response to the "duty of good faith and fair dealing" question emphasizes that "as of March 29, 2019," it had paid all Coalview invoices "in full." It cannot make the same claim about December 31, 2018.

---

[1] TCM's Rule 30(b)6 deponent, Nelson, concedes that the basis for the termination was Coalview's "insolvency" as of "December 31, 2018." [*See* Dkt. # 295 at 16].

Properly viewed in the present tense, there is ample evidence from which a jury could find that as of December 31, 2018, Coalview was paying its debts as they became due. There is evidence which would allow the fact-finder to determine that TCM's first claimed default was orchestrated, perhaps fabricated, to carry out the exit strategy described in its "deep dive" documents—TCM had determined continuing to perform under the MSA was not economical, and neither was paying the required termination fee. The Court reaches this conclusion without accepting Coalview's claim that its inability to perform was the result of *force majeure* (it concludes that such a defense does not apply), or its far more plausible contention that TCM breached the MSA or the duty of good faith and fair dealing prior to December 2018.

This is certainly not the best result for the parties, or for the clean-up project. Perhaps both parties and the community would be better off if TCM terminated the MSA without cause, and the clean-up proceeded without the laudable but apparently uneconomical goal of offsetting the cost through the recovery of usable coal fines. But the Court's role is to evaluate the parties' contract, the evidence, and the law, and apply to law to the facts. The efficacy of TCM's termination attempt is not susceptible to summary adjudication. Its Motion for Summary Judgment [Dkt. # 179] is **DENIED**.

As the parties know, the undersigned Judge is retiring very shortly. This case will be **TRANSFERRED** to another Judge for all further proceedings.

IT IS SO ORDERED.

Dated this 31st day of August, 2020.

Ronald B. Leighton
United States District Judge